**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **WILFREDO CAMACHO** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) **CIVIL ACTION NO.** |
| **PEMCO WORLD AIR SERVICES, INC.** | ) **1: 05CV503-T** |
| | ) |
| **Defendant.** | ) |

**BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant Pemco World Air Services, Inc. ("Pemco") hereby submits the following brief in support of its Motion for Summary Judgment and moves this Honorable Court to enter summary judgment in its favor as to all of Plaintiff Wilfredo Camacho's ("Plaintiff") claims against Pemco. Based on the undisputed material evidence and for the reasons stated below, no genuine issue of material fact exists and Pemco is entitled to summary judgment as a matter of law.

## INTRODUCTION

Plaintiff brings this action against Pemco under Title VII of the Civil Rights Act of 1964 ("Title VII"), the Civil Rights Act of 1991 ("§ 1981"), and the American's with Disabilities Act of 1990 ("ADA"). Specifically, Plaintiff alleges that he was discriminated against because he is an Asian-American of Filipino descent and has a disability, despite not having any evidence whatsoever to support his race/national origin claim and failing to establish he is "disabled" as defined by the ADA. The terms and conditions of Plaintiff's employment and the subsequent termination of his employment were completely unrelated to his race, national origin, or alleged disability. Because Plaintiff offers no evidence of discrimination and cannot rebut Pemco's legitimate, nondiscriminatory reasons for its actions related to Plaintiff, he cannot prevail on his claims as a matter of law.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### Plaintiff's Employment at Pemco

Plaintiff began working for Pemco on October 1, 2003 as a contract airframe and power plant ("A & P") mechanic through Airplanes Incorporated, a temporary manpower company. (Deposition of Plaintiff (hereinafter "Pl. Depo.") at 50:2-5). Plaintiff became a permanent Pemco employee on or about November 3, 2003. (Pl. Depo. at 51:3-52:4). Plaintiff worked as an A & P mechanic on second shift, 3:30 p.m. until 12:00 midnight, throughout his employment at Pemco. (Pl. Depo. at 51:5). As an A & P mechanic, Plaintiff worked in different hangars and worked on varying areas of the aircraft for various supervisors. (Pl. Depo. at 55:11-13, 81:6-82:4).

Throughout his employment, Plaintiff was a dues paying member of the International Association of Machinists and Aerospace Workers, AFL-CIO, Local No. 1632. (Pl. Depo. at 199:7-10). The collective bargaining agreement ("CBA") between the Company and the Union governs many of the terms and conditions of Plaintiff's employment. (Exhibit C to Declaration of Francis X. Henry (hereinafter "Henry Decl.")). Article IV, Section 4(C) provides that an employee's failure to report to work or call in for three (3) consecutive working days constitutes a voluntary resignation. *Id.*

When Plaintiff was hired, he underwent orientation and received booklets and policies covering numerous employment-related topics, including attendance, safety, and equal employment opportunity. (Pl. Depo. at 67:1-23). Pemco's Company Rules were also reviewed during Plaintiff's orientation, including rules governing harassment and discrimination. (Pl. Depo. at 67:15-68:7; Defendant's Exhibit (hereinafter "DX") 2 to Pl. Depo.).

During his employment, Plaintiff received two disciplinary actions related to his job performance, including: a verbal warning on December 12, 2003 for poor work ethics and poor

time management and a verbal warning on October 29, 2004 for failing to properly document maintenance on an aircraft in violation of a Pemco regulation.  (Exhibit B to Henry Decl.).  Although not required to do so, Pemco granted Plaintiff two extended leaves of absence between late June 2004 and mid-August 2004 to go to the Philippines and make funeral arrangements for two family members.  (Pl. Depo. at 126:1-129:8).  Plaintiff returned to work both times without any problems from management.  (Pl. Depo. at 127:17-20, 129:17-23).

Plaintiff's last date of employment was December 22, 2004.  (Exhibit B to Henry Decl.; DX 18 to Pl. Depo.).

### Pemco's Company Rules

Pemco's operation is guided by the policies and procedures set forth in its Division Standard Practice ("DSP").  (Henry Decl. at ¶ 3).  The DSP includes company rules and guidelines for employees at the facility, including, but not limited to, policies governing attendance, employee fair treatment, harassment, equal employment opportunity—affirmative action and nondiscrimination programs, and safety.  (Henry Decl. at ¶ 3).  In addition to being provided in new hire orientation, these policies and procedures are further explained on large posters displayed permanently in conspicuous places throughout the facility.  (Henry Decl. at ¶ 3; Pl. Depo. at 196:11-19; 198:1-6).

The Company Rules detail specific violations and the corresponding discipline for each.  (Exhibit A to Henry Decl.; DX 2 to Pl. Depo.).  Company Rule 10 expressly provides if an employee is "absent three (3) consecutive working days or number of working days specified in labor agreement, if applicable, without reporting to Personnel Records Section (voluntary quit) or reporting a reason not acceptable to Human Resources Department" the violation will result in an automatic discharge.  (DX 2 to Pl. Depo.).

Pemco's harassment and nondiscrimination policy provides that "it shall be the responsibility of every employee, and particularly every management and supervisory employee, to bring to the Company's attention any evidence of discrimination or sexual harassment so that the matter can be investigated and appropriate action taken." (Exhibit A to Henry Decl.). Employees are instructed to report any issues concerning harassment, alleged disability or alleged race discrimination directly to the Director of Human Resources. (Exhibit A to Henry Decl.; DX 15 to Pl. Depo.). Throughout Plaintiff's employment, Jim Battcher was the Director of Human Resources. (Exhibit B to Henry Decl.).

### Plaintiff's Medical Condition

Prior to coming to work for Pemco, Plaintiff sustained an injury to his back during his service in the military, although his back healed and Plaintiff was never precluded from performing work as a mechanic at Pemco because of his back. (Pl. Depo. at 267:8-268:18).

As a condition to begin working for Pemco, Plaintiff took and passed, with no restrictions, a pre-employment physical examination. (Pl. Depo. at 77:6-12, 269:11-13). Before October 1, 2003, Plaintiff had never worked with fiberglass and was not aware he had any skin sensitivity to fiberglass. (Pl. Depo. at 77:19-78:2). During his first week of employment in October 2003, Plaintiff was assigned a job installing fiberglass liners into various parts of the aircraft. (Pl. Depo. at 54:10-14). At that time, Plaintiff began experiencing itching and irritation to his skin. (Pl. Depo. at 55:13-56:4). Plaintiff did not alert Pemco management or his supervisors of his discomfort. (Pl. Depo. at 58:19-59:12). In October 2003, Plaintiff never stopped working because of his discomfort. (Pl. Depo. at 62:2-5). Plaintiff was physically able to do his job that month as well as throughout his employment at Pemco. (Pl. Depo. at 202:7-10).

Approximately two weeks after being hired, Plaintiff eventually complained to various coworkers about his skin condition.  (Pl. Depo. at 57:2-7).  Plaintiff sought and received protective equipment.  (Pl. Depo. at 57:2-13).  This equipment included coveralls, earplugs, goggles/safety glasses, masks, and latex gloves.  (Pl. Depo. at 58:2-4).  Pemco provided the same safety equipment and protective gear to Plaintiff and all employees, even when Plaintiff was employed by Airplanes Incorporated.  (Pl. Depo. at 58:13-18).

Despite experiencing itching and irritation of his skin as a result of exposure to fiberglass as a contract employee, Plaintiff accepted a permanent mechanic job position with Pemco.  (Pl. Depo. at 55:20-21).  Plaintiff testified as follows:

> Q:     Despite the issues you were having with the fiberglass, you accepted the job to work for Pemco when Mr. Briody offered it to you that night?
>
> A:     Correct.
>
> Q:     And you knew that continuing working for Pemco in that job would involve working with fiberglass?
>
> A.     Yes.

(Pl. Depo. at 65:10-18).  At no time during October 2003, did Plaintiff have to stop working because of exposure to fiberglass.  (Pl. Depo. at 62:2-5).  Plaintiff further testified:

> Q:     Were you physically able to do your job throughout your employment at Pemco?
>
> A:     Yes, in spite of the pain.
>
> Q:     Were there any days where if pain was so bad, or for whatever reason, the skin condition was so bad that you couldn't work?
>
> A:     I'd like not to work, so that I would be relieved, but I have no choice but to work.
>
> Q:     You physically could work?
>
> A:     Yes.

(Pl. Depo. at 202:7-19).

Plaintiff did not notify a supervisor or manager of the itching and irritation to his skin for at least one year, until October 29, 2004, when he discussed his skin condition with a supervisor and asked to see a doctor.  (Pl. Depo. at 150:15-22; 152:21-153:7).  Plaintiff completed an "Employee's First Incident Report."  (Pl. Depo. at 154:4-5; DX 10 to Pl. Depo.).  Plaintiff was immediately sent to PrimeCare to see Dr. Joseph Sewell for initial treatment.  (Pl. Depo. at 157:8-9, 164:3-5).  Dr. Sewell diagnosed Plaintiff with contact dermatitis and instructed Plaintiff to limit his exposure to fiberglass and to take Zyrtec, Elidel and Triamcinolone cream to control the condition.  (DX 11 to Pl. Depo.).  Dr. Sewell scheduled a follow-up appointment for November 17, 2004. (Pl. Depo. at 165:11-13; DX 11 to Pl. Depo.).

In the next two weeks, instead of following Dr. Sewell's instructions, Plaintiff self-medicated by spending the entire time rolling masking tape all over his skin and taking cold showers.  (Pl. Depo. at 174:13-17).  Plaintiff had improved enough, however, to convince himself that fiberglass was the problem.  (Pl. Depo. at 179:11-21).

**<u>Plaintiff's Work Restrictions</u>**

 After the initial visit with Dr. Sewell, Plaintiff submitted to Pemco a "work status report" from Dr. Sewell.  (DX 11 to Pl. Depo.).  After reviewing Dr. Sewell's instructions to limit exposure to fiberglass if possible (DX 11 to Pl. Depo.), Mr. Battcher put Plaintiff on medical leave for two weeks, pending the outcome of Plaintiff's follow-up visit with Dr. Sewell.  (Pl. Depo. at 173:1-22).  Plaintiff received workers' compensation benefits for the time he was on medical leave from work.  (Pl. Depo. at 174:4-8; DX 20 to Pl. Depo.).

Two weeks later, when Plaintiff returned to Dr. Sewell's office on November 17, 2004, Plaintiff reported that his symptoms had improved; however, he had not used the prescribed medications as instructed.  (Pl. Depo. at 175:3-10).  Dr. Sewell instructed Plaintiff to continue to limit his exposure to fiberglass and use emollients to keep the particles off his skin.  (DX 12 to

Pl. Depo.). Dr. Sewell further stated that if Plaintiff continued to have problems, he may choose to find other employment, a suggestion with which Plaintiff agreed. (Pl. Depo. at 180:16-22; DX 12 to Pl. Depo.).

Plaintiff's November 17, 2004 work status report stated that Plaintiff was to have **no exposure to fiberglass**. (Pl. Depo. at 246:3-10, 215:21-216:2; DX 13 to Pl. Depo.)(emphasis added). However, all the jobs available to Plaintiff for which he was qualified involved either working directly with or exposed to being around fiberglass and Pemco had no work available for Plaintiff with these restrictions. (Pl. Depo. at 218:21-219:4). Because Pemco had no work available for Plaintiff and Pemco could not expose Plaintiff to an environment where fiberglass is "ever-present" and would cause further skin irritation, Pemco informed Plaintiff there was no work and initiated the separation process on November 18, 2004. (DX 18 to Pl. Depo.).

Later that same day, Plaintiff saw Dr. Sewell and told him that Pemco fired him because of his restriction from working with fiberglass. (Pl. Depo. at 215:10-20). On November 19, 2004, Pemco received a fax from Dr. Sewell's office amending Plaintiff's work restrictions. (Pl. Depo. at 216:11-12, 217:1-2; DX 14 to Pl. Depo.). The amendment stated that Plaintiff was to have **limited exposure to fiberglass** and advised that Plaintiff was able to work but should wear protective gear to limit his contact with fiberglass. (DX 14 to Pl. Depo.)(emphasis added). As a result, Pemco placed Plaintiff's termination on hold and placed him on medical leave pending further evaluation of Plaintiff's condition and work restrictions by a specialist.[1] (DXs 14, 18 to

---

[1] At points in his deposition, Plaintiff contends Pemco never told him he was never placed on medical leave and was still terminated. (Pl. Depo. at 252:17-19). However, on November 20, 2004, he agreed with Mr. Battcher to go see a specialist and it was his understanding that Pemco was trying to figure out a way for him to come back to work. (Pl. Depo. at 227:5-9). Plaintiff received work clearance from the specialist. (Pl. Depo. at 230:9-11-232:7-10). After Plaintiff's appointment, Pemco was very clear that Plaintiff was to return to work. (Pl. Depo. at 233:9-11). Moreover, Plaintiff's personnel file clearly demonstrates that Plaintiff's November 18, 2004 termination was reversed. (Exhibit B to Henry Decl.). While there may be some dispute between the parties, it is immaterial for the purposes of this motion.

Pl. Depo.; Pl. Depo. at 221:3-224:1).  Plaintiff was told he would need to see a specialist as a requirement for reinstatement, and Plaintiff agreed.  (Pl. Depo. at 227:1-9).

Pemco immediately scheduled Plaintiff to see Dr. Tonia Ruddock on November 23, 2004, but Plaintiff failed to go to the appointment.  (Pl. Depo. at 223:1-224:18; DX 14 to Pl. Depo.).  Despite Plaintiff's failure to go to his first appointment, Pemco scheduled another appointment for Plaintiff to see a different specialist, Dr. Laura Tamburin. (Pl. Depo. at 226:12-23; DX 16 to Pl. Depo.).  Dr. Tamburin examined Plaintiff on December 7, 2004 diagnosed Plaintiff with occasional puritus, and recommended symptomatic treatment of Trimcinolone cream and Benadryl.  (DX 16 to Pl. Depo.).  Dr. Tamburin said Plaintiff could return to work assuming that he wear protective gear and take all necessary medications.  (Pl. Depo. at 232:7-10).

From his own perspective, Plaintiff testified that his skin condition required him to take cold showers and caused him to lose some sleep.  (Pl. Depo. at 269:14-270:2, 270:18-271:4).  Otherwise, Plaintiff could work, eat, breathe, sleep, walk, and drive a car without any problems.  (Pl. Depo. at 272:3-22).  Other than some discomfort or pain, Plaintiff was and is able to do everything he could do before developing a skin condition.  (Pl. Depo. at 260:4-8).  Plaintiff admits that he is not disabled, and, to the extent his skin needs treatment, he is able to treat it with medication.  (Pl. Depo. at 256:18-23).[2]  In fact, Plaintiff was physically able to return to work and is not restricted in any way from working because of his skin condition.  (Pl. Depo. at 260:9-20).  Plaintiff was always able to physically do his job at Pemco.  (Pl. Depo. at 202:7-10, 202:18-203:5).

No one at Pemco has ever told Plaintiff that he was disabled or that they thought he was disabled.  (Pl. Depo. at 257:9-14).

---

[2] Plaintiff has not sought medical treatment since December 2004, despite having medical insurance during his interim employment.  (Pl. Depo. at 259:9-23).

**Termination of Plaintiff's Employment**

Following Dr. Tamburin's clearance for Plaintiff to return to work with limited restrictions, Pemco determined Plaintiff could return to work and work was available within his restrictions.  (DX 18 to Pl. Depo.).  Mr. Battcher instructed Plaintiff to return to Pemco with his tool box and ready to work on December 20, 2004.  (Pl. Depo. at 233:9-11).  However, Plaintiff did not report to work on December 20, 21, or 22.  (Pl. Depo. at 233:12-20).

Because Plaintiff did not return to work or call Human Resources for three days, he was terminated for violating the Company Rule 10 and the Collective Bargaining Agreement.  (DX 18 to Pl. Depo.).  Plaintiff never filed a grievance.  (Pl. Depo. at 241:2-11).  Additionally, Plaintiff never complained about or filed a grievance over any alleged harassment or discrimination.  (Pl. Depo. at 198:23-202:3).

**Current Case**

Plaintiff filed a claim for unemployment with the State of Alabama; however, the Department of Industrial Relations denied Plaintiff's request for unemployment benefits.  (Pl. Depo. at 47:21-48:6).  Plaintiff then filed a charge with the Equal Employment Opportunity Commission ("EEOC") on December 1, 2004.  (Cl. ¶ 6).  EEOC never told Plaintiff Pemco did anything wrong.  (Pl. Depo. at 282:3-8).  On February 25, 2005, EEOC dismissed the charge and issued Plaintiff a "Notice of Right to Sue."  (Cl. ¶ 7; DX 22 to Pl. Depo.).  Plaintiff filed this lawsuit on May 27, 2005.  (Cl.).  Plaintiff has not filed and does not intend to file a claim for workers' compensation benefits.  (Pl. Depo. at 265:15-17).

Although his Complaint is unclear, Plaintiff essentially alleges he is "technically disabled" and Pemco failed to accommodate him, although he was never treated differently because of his skin condition.  (Cl. ¶ 10; Pl. Depo. at 261:15-262:2).  Plaintiff also alleges he was

subject to disparate treatment in job assignments, supervision, and working conditions because he is Filipino.  (Cl. ¶ 11).

## SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides for summary judgment when the pleadings and supporting materials demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law.  *See Anderson v. Libbey Lobby, Inc.,* 477 U.S. 242, 248 (1986).  Summary judgment is appropriate when the plaintiff fails to adequately establish the existence of an element essential to his case, and on which the plaintiff bears the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).  A plaintiff cannot defeat a properly supported motion for summary judgment without an affirmative presentation of specific facts showing a genuine issue, and may not merely rely on the general allegations in the pleadings.  *Anderson,* 477 U.S. at 248.  A mere "scintilla" of evidence supporting the plaintiff's position is not enough to survive summary judgment; the plaintiff must produce evidence so a jury could reasonably find in his favor. *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990)(citing *Anderson*, 477 U.S. at 242).

## ARGUMENT

## I.    PEMCO IS ENTITLED TO SUMMARY JUDGMENT WITH REGARD TO PLAINTIFF'S ADA CLAIM.

The ADA provides that no covered employer shall discriminate against "a qualified individual with a disability because of the disability of such individual in regard to . . . terms, conditions, [or] privileges of employment."  42 U.S.C. § 12112(a).  The ADA requires employers to provide reasonable accommodation for known disabilities unless doing so would result in undue hardship.  42 U.S.C. § 12112(b)(5)(A); *Morisky v. Broward County*, 80 F.3d 445, 447 (11th Cir. 1996).  In order to establish a *prima facie* case under the ADA, a plaintiff must show that he or she (1) has a disability; (2) is a qualified individual; and (3) was subjected to

unlawful discrimination as a result of the disability. *Gordon v. E.L. Hamm & Assoc.,* 100 F. 3d 907, 910 (11th Cir. 1996). If a plaintiff fails to establish a *prima facie* case of disability discrimination, the employer is entitled to a judgment as a matter of law. *Id.* at 915.

Plaintiff's ADA claim fails for several reasons. First and foremost, Plaintiff was not and is not "disabled" as defined by the ADA. By his own admission, Plaintiff testified that he is not disabled and only considers himself to be "technically disabled," presumably as part of this lawsuit. Secondly, Plaintiff completely fails to establish a *prima facie* case of disability discrimination. Finally, Plaintiff fails to establish a failure to accommodate claim.

### A.    As a Matter of Law, Plaintiff Is Not Disabled.

Under the ADA, a "qualified individual with a disability" is any individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires to hold. 42 U.S.C. §§ 12111-12117; *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278 (11th Cir. 1997). Importantly, Plaintiff has the burden of demonstrating he was an "individual with a disability" under the ADA. If Plaintiff cannot do so (and here Plaintiff readily admits he cannot), Pemco is entitled to summary judgment as a matter of law. *See Cleveland v. Policy Management Systems Corp.*, 526 U.S. at 805-06 ("Summary judgment for a defendant is appropriate when the plaintiff "fails to make a showing sufficient to establish the existence of an element essential to [his] case, and on which [he] will bear the burden of proof at trial." . . . **An ADA plaintiff bears the burden of proving that [he] is a 'qualified individual with a disability'"**)(emphasis added).

The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more of the major life activities." 42 U.S.C. § 12102 (2)(a). In order to meet this definition of disabled, Plaintiff must show that he is substantially limited in a major life activity

as a result of a physical or mental impairment. *Durley v. APAC, Inc.*, 236 F.3d 651, 657 (11th Cir. 2000).

Here, even if Plaintiff's skin condition is somehow a physical impairment, which is not clear, the ADA is not "a general protection of medically afflicted persons."[3] *Christian v. Saint Anthony Med. Ctr., Inc.*, 117 F.3d 1051, 1053 (7th Cir. 1997). Having a physical impairment, standing alone, is not necessarily a disability as contemplated by the ADA. *See Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 726 (5th Cir. 1995)(holding that although it was undisputed that the injury was indeed an impairment, because it did not prevent plaintiff performing normal daily functions such as driving, grooming herself, carrying groceries and vacuuming or performing her job entirely, the impairment did not constitute a substantial limitation); *Penny v. United Parcel Serv.*, 128 F.3d 408, 414 (6th Cir. 1997)(stating that "[i]n deciding whether an individual is substantially limited in a major life activity, courts should consider the nature and severity of the impairment; the duration or expected duration of the impairment; and the permanent or long term impact, or the expected permanent or long term impact of the impairment.").

Although the ADA does not define "major life activity," this term is defined in EEOC regulations to include functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working. 29 C.F.R. § 1630.2(i); *Stewart*, 117 F.3d at 1285. To be "substantially limited" in the major life activity of working, a plaintiff must have a disability that "significantly restricts his ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities." *Prichard v. Southern Co. Servs.*, 92 F.3d 1130, 1132 (11th Cir. 1996).

---

[3] *See also Boren v. Wolverine Tube, Inc.*, 966 F. Supp. 457, 463 (N.D. Miss. 1997)(employee's chemical allergy preventing her from such activities as painting and food preparation did not constitute exclusion from a class of jobs or broad range of jobs in various classes); and *Shah v. Upjohn, Co.*, 922 F. Supp. 15, 25 (W.D. Mich. 1995)(even if

More recently, the United States Supreme Court addressed the question of what a plaintiff must demonstrate in order to establish a "substantial limitation" of a "major life activity" in *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 194-203 (2002). Curtailing previous case law defining "major life activities," the Court held that "to be substantially limiting in performing manual tasks, an individual must have an impairment that **prevents** or **severely restricts** the individual from doing activities that are of central importance to most people's daily lives." *Id*. at 198 (emphasis added).[4]

Plaintiff completely fails to demonstrate that he suffers from an impairment that substantially limits a major life activity. Plaintiff clearly testified that he is not disabled, has not been told by anyone at Pemco that he was disabled, or been told that anyone at Pemco regarded his as disabled. (Pl. Depo. at 256:18-257:14). Just as the employee in *Dutcher*, Plaintiff still has the ability to perform work and daily life activities at home. Plaintiff testified that he has been able to work since his employment at Pemco and that he is not "technically" disabled at work. (Pl. Depo. at 257:5-8, 269:11-13). His skin condition in no way limited his ability to work, much less his daily life activities away from work. Plaintiff was and is able to eat, breathe, cook, drive, walk, and do household chores with minimal, if any, difficulty. (Pl. Depo. at 272:3-22). Perhaps most telling, Plaintiff testified that apart from some discomfort, he had no physical restrictions whatsoever. (Pl. Depo. at 260:4-20).

---

chemist's allergens prevented her from working in all laboratories, such a limitation did not substantially limit her employment as a whole and render her disabled under the ADA).

[4] Further, many courts have concluded that, in order to establish a "substantial limitation" of a "major life activity," a plaintiff must demonstrate that he is significantly restricted in the performance of a major life activity "as compared to . . . the average person." 29 C.F.R. § 1630.2(j)(1)(ii)(emphasis added); *see e.g.*, *Moore v. J.B. Hunt Transport, Inc.*, 221 F.3d 944 (7th Cir. 2000)(quotation marks omitted)(citation omitted)("We do not believe that these limitations constitute significant restrictions on [the plaintiff's] ability to walk when compared with the ability of the average person. . . ."); *Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180, 186 (3d Cir. 1999)("[T]here was no testimony that [the plaintiff] stands or walks, during the fifty minutes per hour that he can, with any less ability than the average person.").

In fact, although Plaintiff alleges he is "technically disabled," the only impact Plaintiff's skin condition has on him, apart from some minimal degree of discomfort, is his sleep. (Pl. Depo. at 257:5-8, 269:11-19). His only side effects for lack of sleep was that he felt a little sluggish at work. (Pl. Depo. at 272:1). However, Plaintiff was able to get at least three to four hours of sleep each night. (Pl. Depo. at 272:5-7). The Eleventh Circuit has stated that someone who has a "tough night's sleep" or sleep that is "moderately below average" is not disabled under the ADA. *Rossbach v. City of Miami*, 371 F.3d 1354, 1358-59 (11th Cir. 2004)(holding there was no evidence that the employees inability to "sleep normally" was any worse than what is suffered by many adults). *See also Kelly v. Drexel Univ.*, 94 F.3d 102, 107 (3rd Cir. 1996) (holding that difficulty sleeping was extremely widespread and where the plaintiff could not show that his affliction was any worse than what is suffered by a large portion of the nation's adult population it was not a substantial limitation). Because Plaintiff has failed to prove that any of this major life activites are limited, much less substantially limited by his skin condition (or his back), Plaintiff is not disabled. Therefore, Plaintiff's ADA claim fails completely.

Incidentally, several courts have addressed the ADA as it applies to skin conditions. For example, in *Lindloff v. Schenectady Int'l.*, 972 F. Supp. 393 (S.D. Tex. 1997), the employee suffered from a skin condition called leukoderma which caused loss of pigmentation on areas of his skin. *Id.* at 393. His leukoderma was apparently caused by exposure to phenolic compounds, which were found in the major products handled by the former employer's plant. *Id.* The employee's doctor recommend that he avoid exposure and protect his skin when he was in the sun. *Id.* The employee returned to full duty at the plant and wore protective gear. *Id.* at 394. Employee's condition worsened ever though he was moved to an area of low-exposure. *Id.* The employee was discharged by his former employer based on the doctor's recommendation that the employee avoid phenolic compounds. *Id.* at 394. The employee filed

suit alleging he was terminated on the basis of his leukoderma. *Id.* The court granted summary judgment in favor of the company because although the employee's leukoderma qualified as a physical impairment, there was no evidence in the record that the skin condition substantially limited any of the employee's major life activities, therefore it was not a disability for ADA purposes. *Id.*

Likewise, in *White v. Boeringer Mannheim Corp.*, 28 F. Supp. 2d 527 (S.D. Ind. 1998), the employee alleged his former employer discriminated against him in violation of the ADA by failing to accommodate his alleged disabilities, which included contact dermatitis (allergic skin rash). There, the employee worked in a position that required him to occasionally wear a combination of safety gear. *Id.* at 529. The employee contended that the safety gear, primarily made of plastic and rubber-based materials, caused contact dermatitis to his face and upper extremities. *Id.* at 530. The employee visited the doctor several times, but did not miss any days of work as a result of his contact dermatitis. *Id.* at 531. Further, no job restrictions were placed on the employee as a result of contact dermatitis. *Id.* The court granted summary judgment in favor of the company because the employee had not carried out his burden of proving that his skin rash substantially limited his ability to perform either his specific job, or a broad range of jobs. *Id.* at 537.

Plaintiff's facts in the instant case are almost identical to *Lindloff* and *White*. Here, Plaintiff claims he developed a skin rash as a result of exposure to fiberglass, which caused itchiness and sores on Plaintiff's skin. Plaintiff was told to limit his exposure to fiberglass and take certain medicines in order to prevent the rashes. Similarly, Plaintiff has no evidence that the skin condition "prevented him from ably completing his job duties." *White,* 28 F. Supp. 2d at 538. *Lindloff*, 972 F. Supp. at 395. Again, summary judgment is due in the instant case

because Plaintiff, like *Lindloff and White*, cannot demonstrate that his skin condition substantially limits a major life activity.

**B.    Plaintiff Fails to Demonstrate that He was Discriminated Against Because of a Physical Impairment or Disability.**

The integral part of establishing a *prima facie* discrimination claim under the ADA is a showing that the plaintiff was discriminated against because of a physical impairment or disability. *Gordon*, 100 F.3d at 410. Plaintiff has offered no evidence that he was actually discriminated against or treated disparately because of his skin condition. (Pl. Depo. at 261:15-22). As demonstrated above, Plaintiff's condition is not a disability for the purposes of the ADA. However, assuming Plaintiff had a disability (which he clearly does not), Plaintiff testified that he was not treated any differently than any other employee because of his skin condition:

> Q:    Are you alleging as part of this lawsuit that you were treated differently from other employees because of your skin condition?
>
> A:    Yes.
>
> Q:    How so?
>
> A:    Oh, skin condition, no, not—skin color.  That's what I was.
>
> Q:    Just so we are clear, you're not alleging that you were treated differently than any other employee because of your skin condition?
>
> A:    No.
>
> Q:    That's correct? What I said, that's correct?
>
> A:    Yes.

(Pl. Depo. at 261:15-262:7).  Consequently, any disparate treatment claim is strictly limited to his national origin.

Assuming *arguendo*, that Plaintiff has established a *prima facie* case of discrimination (which he has not), Pemco had a legitimate, nondiscriminatory reason for Plaintiff's ultimate termination: Plaintiff's violation of the Company Rule 10 and the CBA. Following Dr. Sewell's modification of Plaintiff's work restrictions, Pemco made several efforts to return Plaintiff to work, including providing specialized medical care with which Plaintiff refused to comply. Ultimately, Plaintiff was called back to work and told to report on December 20, 2004. Plaintiff was well aware that Dr. Tamburin had cleared him return to work with limited restrictions and that Pemco was expecting Plaintiff to return to work on December 20, 2004. Plaintiff did not report to work or call any member of management or his supervisor at Pemco to say he was not coming to work. This behavior occurred on December 20, 21, and 22, 2004. After not reporting to work or calling for three consecutive days, in violation of the Company Rule 10, Plaintiff was deemed to have voluntarily quit his employment and his termination was processed. (Pl. Depo. at 234:23-235:4).

Plaintiff's only attempt to show pretext is to state that he had already been terminated. (Pl. Depo. at 235:10-16). In his deposition, Plaintiff claimed he could not be terminated a second time (the December 22, 2004 date) because he was terminated the first time on November 18, 2004. (Pl. Depo. at 252:17-19). However, Plaintiff readily understood that he was on workers' compensation leave for which he was paid workers' compensation benefits from October 20, 2004 through December 24, 2004. (DX 20 to Pl. Depo.). It is clear that Plaintiff was still and employee in December 2004 when he was receiving medical treatment, and communicating with Pemco about returning to work. (Ex. B to Henry Decl.). It is also clear that Plaintiff knew he was to return to work on December 20, 2004, and was subject to the Company Rules at that time. It is simply not credible that Plaintiff was no longer employed in December in the face of all of Pemco's efforts to get Plaintiff back to work. Plaintiff was an employee until he voluntarily

chose to quit his job. That said, even if Plaintiff's tortured version of the facts were true, and he was terminated on November 18, 2004 and never reinstated as a Pemco employee (which is obviously not true), Plaintiff was not disabled and Pemco had no work available within his restrictions for which Plaintiff was qualified, with or without accommodation. Therefore, Plaintiff has wholly failed to establish by substantial evidence that Pemco discriminated against him because of his skin condition.

### C.    Plaintiff Also Fails to Establish a Failure to Accommodate.

Plaintiff's failure to establish he is disabled as defined by the ADA is also fatal to a failure to accommodate claim. The Eleventh Circuit has held that an employer has no duty to accommodate an employee on the basis of a disability if the employee is not disabled under the ADA. *Swain v. Hillsborough Co. Sch. Bd.,* 146 F.3d 855, 858 (11th Cir. 1998).[5]

Likewise, there is no need for this court to consider whether Plaintiff in the instant case made a sufficient demand for accommodation and reasonable accommodation denied. Plaintiff is unable to present any evidence that he is substantially limited in his ability to work or function in any other major life activity as a result of his allergic reaction to fiberglass. Therefore, summary judgment is due as a matter of law because a court need not consider reasonable accommodations for a person who is not disabled under the ADA.

Assuming *arguendo* that Plaintiff has established he was disabled (which he has not), to prevail on a failure to accommodate claim under the ADA, an employee must also show that he is qualified for the job with or without reasonable accommodation, and that he was denied

---

[5] In *Swain*, the employee, a teacher, suffered from incontinence, resulting from a combination of ailments, which required her to have frequent access to a restroom throughout the day. *Id.* at 856. The employee complained that a new school rule preventing her students from leaving the classroom when other student changed classes demeaned her and her students and restricted her access to the restrooms. *Id.* The court found that the employee did not present sufficient evidence that her physical impairment substantially limited her ability to work. *Id.* at 857. Therefore, there was no need to consider whether a sufficient demand was made for accommodation and reasonable accommodation denied. *Id.* at 858.

reasonable accommodation. *Swain,* 146 F.3d at 855. Under the ADA, the term "reasonable accommodation" may include—

    (A)    making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

    (B)    job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustments or modification of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9). Again, an employer must provide reasonable accommodations for employees with known disabilities unless such accommodations would result in undue hardship to the employer. 42 U.S.C. § 12112(a)(5)(A).

An accommodation is reasonable, and thus required under the ADA, **only if** it allows the employee to perform the essential functions of the job. *Earl v. Mervyns, Inc.,* 207 F.3d 1361 (11th Cir. 2000)(emphasis added). Essential functions are the fundamental job duties of a position that an individual with a disability is actually required to perform. 29 C.F.R. § 1630.2(n)(2)(1). In determining what functions are deemed essential, the ADA states consideration shall be given to the employer's judgment and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job. 42 U.S.C. § 12111(b).

The burden of identifying an accommodation that would allow a qualified employee to perform the essential functions of her job rests with that employee, as does the ultimate burden of persuasion with respect to showing that such accommodation is reasonable. *Earl,* 207 F.3d at 1366. Furthermore, where a plaintiff cannot demonstrate reasonable accommodation, the employer's lack of investigation into reasonable accommodation is unimportant. *Id.* Finally, before an employer has a duty to show undue hardship, the plaintiff first must show that a reasonable accommodation exists. *Earl,* 207 F.3d at 1367.

Despite allegedly suffering discomfort due to his exposure to fiberglass for over one year, Plaintiff alleges his first request for an accommodation was made to Mr. Battcher after Plaintiff's initial doctor visit to Dr. Sewell on November 3, 2004. Although Pemco already provided to Plaintiff safety and protective gear including, coveralls, safety glasses, earplugs, masks and latex gloves, and Plaintiff admitted that he went to the tool crib to get protective gear approximately three times a week and that he "religiously put on" his protective gear that was provided by Pemco, Plaintiff said he asked for "extra protective gears." (Pl. Depo. at 167:16-168:7). However, Plaintiff never articulated how such unidentified gear would help him perform the essential functions of his job after developing a skin condition when he already religiously wore his protective gear provided by Pemco. To date, Plaintiff has failed to identify additional protective gear that would have allowed him to return to work and protect him from fiberglass exposure in a facility where all employees are exposed to fiberglass. (Pl. Depo. at 170:4-12). He was already able to perform the essential functions of the job and was released to return to work by Dr. Tamburin before Plaintiff quit. By definition, Plaintiff's request for unspecified gear is unreasonable.

During this same time period, Plaintiff also requested Mr. Battcher assign him to a job that would remove him from contact with fiberglass:

> Q:    Did you ask for any other kind of accommodation?
>
> A:    Yes, I asked, "If you cannot do that, then is there any way that you could, say, for example, assign me to office job or whether even as a messenger, where I can be at least away, if not total, from fiberglass."

(Pl. Depo. at 170:20-173:4). However, there were no vacant jobs at that time and Pemco was not obligated to create a position for Plaintiff when there were no vacant non-mechanic jobs available. *Terrell v. US Air*, 132 F.3d 621, 626 (11th Cir. 1998). Moreover, such a request would undoubtedly impose an undue burden on Pemco. Again, it would have been impossible to

insulate Plaintiff from fiberglass that is everywhere. Accordingly, Plaintiff has failed to meet his burden of establishing his requests were "reasonable."

Ultimately though, any discussion of a reasonable accommodation is completely moot because Plaintiff's own treating physicians released him to return to work in December 2004, and Pemco had work available within his restrictions that did not require accommodation. Pemco stood ready to comply with the doctor's restrictions, but Plaintiff voluntarily chose not to return to work and quit. Therefore, Pemco is entitled to complete summary judgment as a matter of law with regard to Plaintiff's failure to accommodate claim.

## II.     PEMCO IS ENTITLED TO SUMMARY JUDGMENT WITH REGARD TO PLAINTIFF'S NATIONAL ORIGIN DISCRIMINATION CLAIM.[6]

Plaintiff's national origin discrimination claim is entirely without legal or factual support and is clearly due to be dismissed as a matter of law. Because Plaintiff has no direct evidence of discrimination, Plaintiff must establish a *prima facie* case of intentional national origin discrimination by showing that (1) he is a member of a protected class; (2) he was subjected to an adverse employment action; (3) his employer treated similarly situated employees outside his classification more favorably; and (4) he was qualified for the job. *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973). Moreover, "if a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present." *Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir. 1997)(citing *Mack v. Greatl. and Pac. Tea Co.,* 871 F.2d 179, 182 (1st Cir. 1989)).

In addressing a national origin claim in *Green v. Sch. Bd. of Hillsborough Co. Fla.*, 25 F. 3d 974, 978 (11th Cir. 1994), the Eleventh Circuit stated that the "ultimate issue in any Title VII

---

[6] Although it is not clearly set forth in his Complaint, Plaintiff alleges disparate treatment racial discrimination, citing both Title VII and 42 U.S.C. § 1981. However, since Title VII claims and § 1981 claims have the same requirements of proof and analytical framework, Pemco will address the claims concurrently throughout the brief. *See Standard v. A.B.E.L. Serv. Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998). In his deposition, Plaintiff relied almost

disparate treatment suit is the factual question of whether the defendant intentionally discriminated against the plaintiff on several impermissible bases." In that case, the plaintiff, a substitute food service worker of East Indian descent, brought suit against the school board for not hiring her as a full-time food service assistant. *Id.* at 976. The Court found the "only shed of direct evidence of intentional discrimination is [plaintiff's] own uncorroborated testimony that [a Food Service Manager] referred to her as a "Cuban refugee" during the confrontation that occurred after [plaintiff] learned she had been passed over for the position." *Id.* at 979. The Court ultimately determined that the record contained no direct or indirect evidence that the school board intentionally discriminated against the plaintiff on the basis of her color or national origin. *Id.* at 980.[7]

In this case, it is undisputed that Plaintiff is a member of a protected class and was qualified to performed the duties of an aircraft mechanic. Yet, like the plaintiff in *Green*, Plaintiff offers no direct or indirect evidence that Pemco intentionally discriminated against him because of his race and/or national origin.

### A.    Plaintiff Fails to Present Any Direct or Indirect Evidence of Intentional Discrimination.

Plaintiff offers no substantial evidence to support his claim. Instead, Plaintiff's national origin claim is based entirely on his allegations that: (1) his supervisor verbally reprimanded him for working too slowly; (2) he was watched more closely by his supervisors than other employees while he worked; (3) he was given the dirtiest jobs; (4) in the period of over one year,

---

exclusively on his national origin as the basis of discrimination claim. To the extent Plaintiff is alleging a claim of race discrimination, it is indistinguishable from his complaints related to his national origin.

[7] The Supreme Court also addressed Title VII's prohibition of national origin discrimination in *Espinoza v. Farah Mfg. Co., Inc.,* 414 U.S. 86 (1973). In that case, the employer refused to hire a Mexican national, who was a lawfully admitted resident alien, because she was not a citizen of the United States. *Id.* The Court determined that the term "national origin" in Title VII, on its face, refers to the country where a person was born, or more broadly, the country from which his or her ancestors came. *Espinoza,* 414 U.S. at 89. Similarly, the EEOC defines national origin broadly as including, but not limited to, the denial of equal employment opportunity because of an

two supervisors made statements on two isolated occasions that made Plaintiff feel harassed; (5) two other foreign nationals allegedly concur with Plaintiff's feelings of mistreatment (along with numerous white coworkers); and (6) Plaintiff's employment was involuntarily terminated.

Pemco is entitled to summary judgment on Plaintiff's laundry list of alleged disparate treatment as he does not have any evidence that race played any role in these employment issues. In fact, Plaintiff's primary disparate treatment allegations are based entirely on Plaintiff's unwarranted perception that he was being treated differently because of his national origin. To the extent Plaintiff was treated differently from his coworkers, it was based entirely on his well-documented poor work performance. Importantly, most of Plaintiff's comparators and/or witnesses on whom Plaintiff relies concerning his complaints about his supervisors' actions are white. (Pl. Depo. at 274:2-280:8). Moreover, these alleged actions, save for Plaintiff's termination, do not even constitute adverse employment actions. The evidence, or lack thereof, clearly demonstrates that Plaintiff was not discriminated against in any way on the basis of his race.

Plaintiff's work assignments, conditions, and feelings of being supervised too closely simply are not adverse employment actions. The impact on the plaintiff's job must be "real and demonstrable." *Davis v. Town of Lake Park, Fl.*, 245 F.3d 1232, 1239 (11th Cir. 2001). The Court in *Davis* went on to say that not all conduct taken by an employer that causes a negative affect on an employee constitutes adverse employment action. *Id.* at 1239. While proof of economic consequences is not required in all cases, "the asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment." *Id.* To determine whether a serious and material change has been established, the plaintiff's subjective view of the significance and the adversity of the employer's actions is to be disregarded, as "the

---

individual's, or his ancestor's, place of origin; or because an individual has the physical, cultural or linguistic characteristics of a national origin group. *See* 29 C.F.R. § 1606.1.

employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Id.*[8] In this case, Plaintiff's job assignments and transfers were part of the A & P mechanic job description and cannot be the basis of a disparate treatment claim. *Shannon v. BellSouth Telecomms., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002).

Similarly, Plaintiff fails to show that any of the discipline he received affected the terms and conditions of his employment to the extent they would be considered adverse employment actions. In fact, the only action taken by Pemco that can be construed as an adverse employment action in this case is Plaintiff's termination. As previously set forth, Plaintiff was terminated pursuant to Company Rule 10 and the CBA after Plaintiff voluntarily quit. Plaintiff offers no evidence whatsoever that Pemco's consistent application of its policies and procedures had anything to do with Plaintiff's national origin.

It is undisputed that Plaintiff was allowed an extended leave to go to the Philippines during July and August of 2004 and Plaintiff received a pay increase in August of 2004. (Pl. Depo. at 122:10-22, 127:6-9). This is further evidence that none of the terms and conditions of Plaintiff's employment were affected by any of the actions alleged to be evidence of discrimination. Additionally, Plaintiff fails to present any similarly situated employee outside of his classification who was treated more favorably. Plaintiff simply has no evidence that his working conditions were different from any of his coworkers. In fact, Plaintiff conceded that he worked on only one of four identical crews that rotated through four different aircraft and he was not always assigned to work in the cargo area. (Pl. Depo. at 133:21-134:22, 136:1-17).

---

[8] Other courts in this circuit have taken this guidance from the Eleventh Circuit and concluded that in order for an action taken by management to be considered an "adverse employment action," it must impact the plaintiff's "financial position or status" or involve a change in pay or benefits. *See Coaker v. Home Nursing Services, Inc. a/k/a Saad's Healthcare Services*, 1996 U.S. Dist. LEXIS 1821, at *30-31; *see also Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1283 (11th Cir. 1999); *Price v. United Techs. Corp.*, 2000 U.S. Dist. LEXIS 21495, at *11 (S.D. Fla. Aug. 16, 2000)(holding that if a transfer in position does not result in a change in "working conditions, pay, benefits and labor grade," it does not constitute an adverse employment action).

Therefore, based on Plaintiff's failure to make a *prima facie* case of national origin discrimination, Pemco is entitled to complete summary judgment as a matter of law.

**B.    Pemco is Entitled to Summary Judgment Because Plaintiff's Discrimination Claim Also Fails As He Cannot Present *Any* Evidence, Much Less Substantial Evidence, that the Reasons Articulated For His Job Assignments, Working Conditions, Supervision and Termination Are Pretextual.**

Because Plaintiff clearly cannot establish his *prima facie* case for his discrimination claim as to his supervision, working conditions, job assignments, and termination, those claims must fail as a matter of law. Therefore, this Court need not address the pretext stage of analysis. However, even assuming Plaintiff can somehow satisfy his *prima facie* burden for his discrimination claims (which he clearly cannot), Pemco is *still* entitled to summary judgment.

Again, if a plaintiff successfully establishes a *prima facie* case, the burden shifts to the employer to produce a legitimate, non-discriminatory reason(s) for the challenged employment action. *McDonnell Douglas*, 411 U.S. at 802; *Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). That burden is "exceedingly light," *Holifield*, 115 F.3d at 1564,[9] and there is no question that Pemco has fully met that burden in this case as to all of Plaintiff's disparate treatment claims.

Once the defendant articulates a legitimate non-discriminatory reason for its actions, "the plaintiff must then present concrete evidence in the form of **specific facts** which show that the defendant's proffered reason is mere pretext." *Id*. (emphasis added). Mere conclusory allegations and assertions will not suffice. *Id*. Significantly, the plaintiff always bears the "ultimate burden of persuasion" - i.e., that the plaintiff's race was the reason for the challenged employment decisions. *St. Mary's Honor Center v. Hicks*, 509 U.S. 443, 499 (1993). In *Hicks*, the Supreme Court clarified the plaintiff's burden in proving that the reasons offered by the defendant for its

---

[9]  To satisfy that burden of proof, "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Burdine*, 450 U.S. at 254-55 (citation and footnote omitted).

employment decision were merely pretextual. The Supreme Court held that, contrary to prior holdings of many Circuits, a plaintiff's disbelief of the reasons proffered by the employer does not compel a finding of discrimination. Instead, the Court held that the plaintiff must show "both that the reason was false, and that discrimination was the real reason." *Id*. at 2752; *Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133 (2000). Thus, when faced with a motion for summary judgment, a plaintiff "cannot rely on attenuated possibilities that a jury would infer a discriminatory motive, but rather must come forward with sufficient evidence to establish a *prima facie* case and respond sufficiently to any rebuttal by the defendant to create a genuine issue of material fact." *Palmer v. District Board of Trustees*, 748 F.2d 595, 599 (11th Cir. 1984). Of course, as reflected in *Hicks*, the ultimate inquiry in a discrimination case is whether there is sufficient evidence that the defendant intentionally discriminated against the plaintiff. *See also Grigsby v. Reynolds Metals Co*., 821 F.2d 591, 595 (11th Cir. 1987).

Plaintiff has no evidence of pretext beyond his own subjective belief that he was treated unfairly by Pemco. Plaintiff offers no specific facts to rebut Pemco's legitimate, non-discriminatory reasons for his A & P mechanic job assignments, working conditions that apply to all employees equally, close supervision where Plaintiff's poor work performance is well-documented. Similarly, Plaintiff has no evidence whatsoever that his termination was related to his national origin. Plaintiff readily admitted he had no evidence that the only two people at Pemco who were the sources of Plaintiff's mistreatment (Plaintiff's supervisors), had anything to do with his termination. (Pl. Depo. at 131:2-5). Plaintiff also has no evidence that Jim Battcher enforced Company Rule 10 in his case as a pretext for discrimination. In fact, Plaintiff testified that Mr. Battcher had friendly talks with Plaintiff about the Philippines. (Pl. Depo. at 166:5-11). Simply put, the terms and conditions of Plaintiff's employment had nothing to do with his race or national origin. Plaintiff's subjective feelings that he "was not one of the boys," cannot, on its

face establish pretext.  Accordingly, even if Plaintiff establishes a *prima facie* case of disparate treatment, Pemco is entitled to summary judgment.

### C.    Plaintiff Fails to Present any Evidence of Hostile Work Environment.

Although he does not even allege this in his Complaint, it is worth noting Plaintiff's testimony does not even give rise to a hostile work environment claim.  The evidence, or lack thereof, clearly demonstrates that Plaintiff was not subjected to any racial harassment, much less harassment that could be considered "severe and pervasive."

Plaintiff can establish a violation of § 1981 by proving that racial discrimination has created a hostile or abusive work environment.  *See Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 66 (1986).  To establish a racially hostile work environment claim: (1) the employee must belong to a protected group; (2) the employee must have been subjected to racial harassment; (3) the harassment must have been based on race; (4) the harassment must have been sufficiently severe or pervasive to alter the terms and conditions of employment; and (5) there must be a basis for holding the employer liable for the harassment, either directly or indirectly.  *See Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742 (1998);  *Faragher v. City of Boca Raton,* 524 U.S. 775 (1998).  To determine whether an environment is hostile or abusive, the Court must look to the totality of the circumstances.  *See Harris v. Forklift Sys. Inc.,* 510 U.S. 17, 23 (1993).  This includes: (1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with an employee's work performance.  *Id*.; *Edwards v. Wallace Community College*, 49 F.3d 1517, 1521-22 (11th Cir. 1995).

To be actionable, the conduct must be so severe or pervasive that a reasonable person would find it hostile or abusive.  *See Oncale v. Sundowner Offshore Serv., Inc.,* 523 U.S. 75 (1998). The "mere utterance of an ... epithet which engenders offensive feelings in an employee

does not sufficiently affect the conditions of employment to implicate Title VII." *Harris*, 510 U.S. at 21-22 (*quoting Meritor*, 477 U.S. at 67). Instead, hostile work environment harassment occurs "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is "sufficiently severe and pervasive to alter the conditions of the victim's employment and create an abusive work environment.'" *Harris*, 510 U.S. at 21. According to the Supreme Court, "[w]e have made it clear that conduct **must be extreme** to amount to a change in the terms and conditions of employment." *Faragher*, 524 U.S. at 788 (emphasis added).

The Eleventh Circuit has explained that the severe and pervasive element of the hostile environment equation is the element that "tests the mettle of most ... harassment claims." *Gupta v. Florida Dept. of Regents*, 212 F.3d 571 (11th Cir. 2000) *cert. denied* 531 U.S. 1076 (2001).[10] The Eleventh Circuit has also held that, although harassment claims "present fact-intensive issues," motions for "summary judgment or judgment as a matter of law are appropriate to 'police the baseline for hostile environment claims.'" *Mendoza v. Borden, Inc.*, 195 F.3d 1238 (11th Cir. 1999), *cert. denied* 529 U.S. 1068 (2000)(*quoting Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 264 n.8 (5th Cir. 1999)).

Furthermore, "[t]he harassing conduct must create both an objectively hostile or abusive environment - one 'that a reasonable person would find hostile or abusive' - and a subjectively hostile or abusive environment - one that 'the victim ... subjectively perceive[s] ... to be abusive.'" *Fleming v. Boeing Co.*, 120 F.3d 242, 245 (11th Cir. 1997)(*quoting Harris*, 510 U.S. at 21-22). To survive summary judgment, Plaintiff must establish that a reasonable jury could find

---

[10] The Supreme Court has held that requiring strict proof of this element ensures that the law does not become a mere "general civility code." *See Faragher v. City of Boca Raton*, 524 U.S. 775 (1998). Furthermore, the Supreme Court has held that in gauging the objective severity of workplace conduct, the "inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by its target." *Oncale*, 523 U.S. at 81. The Court stated that the "real social impact of workplace behavior often depends on a constellation of

that the incidents alleged not only created a hostile atmosphere that was severe or pervasive to an objective person, but also that Plaintiff personally perceived the environment to be hostile. *See Meritor,* 477 U.S. at 67.

Plaintiff's only allegations that might give rise to a hostile work environment claim are the allegations that on two occasions two supervisors made comments to Plaintiff that were "derogatory and discriminatory." (Pl. Depo. at 86:13-87:23, 111:2-13). Importantly, Plaintiff can neither point to a specific instance when these mere utterances occurred, nor can he remember what was actually said. Plaintiff testified as follows:

> Q:    And specifically, what did he say on those two occasions?
>
> A:    I can't remember, but it was demeaning.

(Pl. Depo. at 86:21-87:1)(speaking of Mr. Cooper). Plaintiff further testified:

> Q:    You've testified that Mr. Cooper said it twice, but you don't remember what he said. How many times did Mr. Music make a derogatory comment?
>
> A:    Almost the same as—once or twice.
>
> Q:    And do you remember what he said?
>
> A:    No.

(Pl. Depo. at 111:2-10). At no time did Plaintiff need to leave work because the environment was unbearably unpleasant.[11] Plaintiff only remembers "feeling offended"—a feeling he "just ignored" and did not report to anyone in human resources. (Pl. Depo. at 87:21-88:3). As a matter of law, these statements fail to give rise to a hostile work environment claim.

---

surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Id*. at 81-2.

[11] Plaintiff's voluntary choice to quit his employment at Pemco also fails to establish that he was constructively discharged. *Rowell v. BellSouth Corp.*, 433 F.3d 794, 805 (11th Cir. 2005)("[T]he doctrine of constructive discharge enables an employee who has resigned to demonstrate that he suffered an adverse employment action by showing that the resignation was an involuntary response that was the product of intolerable working conditions.").

Additionally, an employer cannot be held liable for the type of harassment alleged here unless the employer knew or should have known of the harassment and failed to take prompt remedial action. *Kilgore v. Thompson & Brock Management, Inc.*, 93 F.3d 752, 754 (11th Cir. 1996). "An employer is directly liable for hostile environment ... harassment if it knew, or reasonably should have known, of the harassment and failed to take prompt remedial actions." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 647 (11th Cir. 1997). Plaintiff can establish that Pemco had notice of the harassment by proving that he complained to higher management or that the harassment was so pervasive that Pemco had constructive knowledge. *Kilgore*, 93 F.3d at 754. Any "remedial action" taken by Pemco must have been "reasonably likely to prevent the misconduct from recurring." *Id.* (*quoting Guess v. Bethlehem Steel Corp.*, 913 F.3d 463, 465 (7th Cir. 1990)).

It is undisputed that Pemco had a clear anti-harassment, nondiscrimination policy of which Plaintiff was aware. At no time prior to his initial termination did Plaintiff attempt to comply with Pemco's policy, and only then alleges to have partially complied. Plaintiff did not complain to any member of management or a union representative about adverse treatment until he was faced with not having a job. Accordingly, Pemco cannot be held liable for the alleged harassing actions of its supervisors.

Because Plaintiff utterly fails to present any evidence that his work environment was a hostile work environment, Pemco is entitled to complete summary judgment as a matter of law.

## <u>CONCLUSION</u>

Plaintiff has wholly failed to produce substantial evidence from which a reasonable jury could conclude that Pemco discriminated against him on the basis of his race, national origin, or alleged disability. Therefore, he cannot establish a *prima facie* case under the ADA, Title VII, or § 1981, and Pemco is entitled to summary judgment as to each of these claims. For all of these

alternate and individually adequate grounds, Pemco requests that this Court grant complete summary judgment in Pemco's favor as to all of Plaintiff's claims.

Respectfully submitted,

 /s/ John B. Holmes, III
Jeffrey A. Lee
John B. Holmes, III
Attorneys for Defendant Pemco World Air
Services, Inc.

OF COUNSEL:

MAYNARD, COOPER & GALE, P.C.
1901 Sixth Avenue North
2400 AmSouth Harbert Plaza
Birmingham, AL 35203-2618
Telephone: 205.254.1000
Fax: 205.254.1999

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was served by U.S. Mail, properly addressed and postage prepaid to:

     Wilfredo Camacho
     1608 Saddlebrook Lane
     Jacksonville, Florida 32221

this 21st day of July, 2006.

                                   /s/ John B. Holmes, III
                                 OF COUNSEL