# FREEDOM COURT REPORTING

## Page 1

1   IN THE UNITED STATES DISTRICT COURT
2        MIDDLE DISTRICT OF ALABAMA
3            SOUTHERN DIVISION
4
5   WILFREDO CAMACHO,
6        Plaintiff,
7
8   VS.        CIVIL ACTION
9            NO. 1:05 CV-503-T
10
11  PEMCO WORLD AIR SERVICES, INC.,
12
13       Defendant.
14
15  DEPOSITION OF WILFREDO CAMACHO
16
17       STIPULATIONS
18   IT IS STIPULATED AND AGREED, by
19  and between the parties, through their
20  respective counsel, that the deposition
21  of WILFREDO CAMACHO may be taken before
22  Scott Wilmeth, RPR, Commissioner, State
23  of Alabama at Large, at 1 Church Street,

## Page 2

1   Montgomery, Alabama, on the 19th day of
2   May, 2006, commencing at or about 10:35
3   a.m.
4        IT IS FURTHER STIPULATED AND
5   AGREED that the reading and signature to
6   the deposition by the witness is waived,
7   said deposition to have the same force
8   and effect as if full compliance had
9   been had with all laws and rules of
10  court relating to taking of depositions.
11       IT IS FURTHER STIPULATED AND
12  AGREED that it shall not be necessary
13  for any objections to be made by counsel
14  as to any questions, except as to form
15  or leading questions, and that counsel
16  for the parties may make objections and
17  assign grounds at the time of the trial,
18  or at the time said deposition is
19  offered in evidence, or prior thereto.
20       IT IS FURTHER STIPULATED AND
21  AGREED that notice of filing of the
22  deposition by the Commissioner is
23  waived.

## Page 3

1            I N D E X
2
3   EXAMINATION BY:            PAGE NO.
4   Mr. Holmes---------------------- 6
5
6
7
8         E X H I B I T S
9   DEFENDANT'S EXHIBIT NO.        MARKED
10  1 - Notice of Unemployment
11      Compensation Telephone
12      Hearing--------------------- 46
13  2 - Orientation Checklist--------- 65
14  3 - Safety Glasses New Hire
15      Orientation------------------ 73
16  4 - Statement for Issued
17      Safety Glasses-------------- 74
18  5 - 12-12-03 Warning Memo-------- 89
19  6 - 10-29-04 Warning Memo-------- 91
20  7 - Leave of Absence Notice------ 123
21  8 - Employee's First Report of
22      Incident--------------------- 151
23  9 - Supervisor's Incident Report- 155

## Page 4

1         E X H I B I T S
2          (CONTINUED)
3   DEFENDANT'S EXHIBIT NO.        MARKED
4   10 - Employee's First Report of
5       Incident--------------------- 156
6   11 - 11-3-04 Work Status Report-- 163
7   12 - 11-17-04 Work Status Report-- 176
8   13 - 11-17-04 Work Status Report-- 181
9   14 - 11-19-04 Work Status Report-- 191
10  15 - Harassment Policy------------ 196
11  16 - 12-7-04 Medical Record------- 228
12  17 - 11-30-04 Letter from
13      Battcher to Camacho---------- 235
14  18 - 12-27-04 Letter from Segler
15      to Camacho------------------- 241
16  19 - New Patient Information
17      Sheet----------------------- 250
18  20 - Copy of Check #029-849705---- 255
19  21 - Complaint-------------------- 263
20  22 - Dismissal and Notice of
21      Rights Notice---------------- 282
22  23 - Handwritten Pay Rate
23      Calculations----------------- 283

## 367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 5

1   BEFORE: Scott Wilmeth, RPR
2          Commissioner
3
4   APPEARING ON BEHALF OF THE DEFENDANT:
5   Mr. John B. Holmes, III
6   Maynard, Cooper & Gale
7   1901 6th Avenue North
8   AmSouth/Harbert Plaza, Suite 2400
9   Birmingham, Alabama 35203
10
11  Also Present: Francis X. Henry
12          George Barry, Law Clerk
13          Kathleen Camacho
14
15
16
17
18
19
20
21
22
23

Page 6

1          I, Scott Wilmeth, Registered
2   Professional Reporter and Commissioner,
3   State of Alabama at Large, acting as
4   commissioner, certify that on this date,
5   in accordance with Rule 30 of the
6   Alabama Rules of Civil Procedure and the
7   foregoing stipulations of counsel, there
8   came before me at 1 Church Street,
9   Montgomery, Alabama, on the 19th day of
10  May, 2006, WILFREDO CAMACHO, witness in
11  the above cause for oral examination,
12  whereupon the following proceedings were
13  had:
14
15          WILFREDO CAMACHO,
16  having been first duly sworn, was
17  examined and testified as follows:
18
19  EXAMINATION BY MR. HOLMES:
20  Q.      Mr. Camacho, will you please
21  state your full name for the record?
22  A.      My name is Wilfredo Silva
23  Camacho.

Page 7

1   Q.      Mr. Camacho, we've met
2   before, on a number of occasions. And
3   again, I'm John Holmes and I represent
4   Pemco in the lawsuit that you have filed
5   against Pemco. As you were made aware
6   on Monday at our hearing that we had
7   here in Montgomery, we're here to take
8   your deposition today. And the purpose
9   of the deposition, you may recall where
10  the judge described to you on Monday,
11  but the purpose is this is my
12  opportunity to ask you questions about
13  your lawsuit. And there are going to be
14  lots of questions today, and I'm going
15  to do my best to ask you questions
16  clearly, and so make sure that you
17  listen to my question and let me get it
18  all out before you answer, and I'll let
19  you finish your answer before I start
20  asking you another question. The court
21  reporter is here today. He's taking
22  down everything that's being said from
23  this point on, unless we take a break,

Page 8

1   so it's important that we not talk over
2   one another. Does that make sense?
3   A.      Yes.
4   Q.      Okay. As I said earlier,
5   there are going to be a lot of questions
6   today, and if you at any time don't
7   understand a question that I'm asking,
8   please tell me and I'll try to restate
9   it in a way that is a little clearer.
10  If you don't tell me that you don't
11  understand my question, I'm going to
12  assume that you did. The Judge talked
13  about that on Monday, that if you answer
14  a question, we're going to assume that
15  you understood the question. And as the
16  court reporter swore you in, you're
17  under oath, so this is the same thing as
18  if we were inside the courtroom,
19  testifying in front of the Judge, okay?
20  A.      Okay.
21  Q.      If at any time you want to
22  take a break, let me know and I'll try
23  to accommodate you. If there's a

2  (Pages 5 to 8)

# FREEDOM COURT REPORTING

Page 9

1  question on the table, I'd be looking
2  for an answer before we break. But
3  otherwise, we can get go ahead and get
4  started if you're ready.
5  A.    I'm ready.
6  Q.    Your date of birth is June 4,
7  1958?
8  A.    Correct.
9  Q.    And your Social Security
10  number is 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?
11  A.    Correct.
12  Q.    Have you ever been involved
13  in a prior lawsuit?
14  A.    No.
15  Q.    Have you ever filed an EEOC
16  charge prior to the one at issue in this
17  case?
18  A.    No.
19  Q.    Have you ever been involved
20  in any prior administrative proceedings?
21  A.    No.
22  Q.    Have you ever filed a
23  complaint with the Department of Labor?

Page 10

1  A.    No.
2  Q.    Have you ever filed for
3  bankruptcy?
4  A.    No.
5  Q.    Have you ever been convicted
6  of any crimes?
7  A.    No.
8  Q.    You currently live in
9  Jacksonville?
10  A.    Correct.
11  Q.    Do you have any family
12  members that live in Alabama?
13  A.    None.
14  Q.    Mr. Camacho, tell me, how far
15  did you get in school?
16  A.    College. I have a Bachelors
17  degree in accounting.
18  Q.    Any other school beyond
19  college?
20  A.    I went to vocational training
21  in Starke, Florida for a CDL Class A
22  license.
23  Q.    And is that a commercial

Page 11

1  driver's license?
2  A.    Commercial driver's license,
3  Class A.
4  Q.    And does that allow -- what
5  does Class A allow you to drive or
6  operate?
7  A.    18 wheelers, 53 foot beds.
8  Q.    When did you graduate from
9  college?
10  A.    I finished college in October
11  of '78, but the actual graduation rite
12  was made in approximately -- I can't
13  remember now, about June or May of 1979.
14  Q.    The following year?
15  A.    The following year.
16  Q.    Other than college and the
17  vocational training to get your Class A
18  CDL, what other vocational training have
19  you had?
20  A.    I had a lot of training and
21  schooling from the military.
22  Q.    You were in the service?
23  A.    Yes.

Page 12

1  Q.    And what branch?
2  A.    The Navy.
3  Q.    And what were the years of
4  your service?
5  A.    From April of 1987 to June of
6  1998. But prior to that, I was in the
7  Reserve.
8  Q.    And how long were you in the
9  Reserves?
10  A.    I believe from February to --
11  until the time I entered.
12  Q.    February 1987 until April?
13  A.    1987, yeah.
14  Q.    Okay. I'm sorry, did you say
15  '97 or '87?
16  A.    '87.
17  Q.    And what did you do during
18  your time in the Navy?
19  A.    I was what they call the
20  aviation machinist mate, jet engine.
21  Q.    And what kind of job duties
22  did you have as an aviation machinist?
23  A.    On my first tour of duty, we

3 (Pages 9 to 12)

# FREEDOM COURT REPORTING

Page 13

1 launched, recover, service, maintain,
2 inspect aircraft and its engine, remove
3 and replace various components of the
4 engine, wheels and brakes, a lot of
5 things; the fueling, remove and replace
6 of flight controls, exhaust, engine.
7 Q.    And were you a machinist
8 throughout your service?
9 A.    Yes.
10 Q.    And were you honorably
11 discharged?
12 A.    Yes.
13 Q.    What did you do from college,
14 graduating college in June of 1979 until
15 you entered the Navy?
16 A.    That college was earned while
17 I was still in the Philippines, so I was
18 first a bookkeeper and then an
19 accountant before coming over to
20 America.
21 Q.    And when did you come to
22 America?
23 A.    July of 1983, or I'd say

Page 14

1 June.
2 Q.    And what did you do when you
3 got to the United States?
4 A.    I was an accounts payable
5 clerk.
6 Q.    Who were you working for?
7 A.    I did work for Argo Electric
8 Supply.
9 Q.    And is that similar to the
10 work you were doing in the Philippines?
11 A.    Yes. Well, that one is --
12 accounts payable is just one segment. I
13 was doing the overall -- in the
14 Philippines, I was doing the overall
15 accounting cycle.
16 Q.    When did you go to Florida to
17 get your CDL?
18 A.    That was in 2003, I believe
19 it was. Yeah, 2003.
20 Q.    Prior to working for Pemco?
21 A.    Yes.
22 Q.    And how long did you work for
23 Argo Electric?

Page 15

1 A.    About a year.
2 Q.    And were you an accounts
3 payable clerk for that year?
4 A.    Yeah.
5 Q.    And why did you leave that
6 job?
7 A.    I kept coming back and forth
8 to the U.S., because I needed to -- I
9 wasn't married then, so I went back home
10 to get married.
11 Q.    So after a year at Argo
12 Electric, you moved back to the
13 Philippines to get married?
14 A.    Yeah.
15 Q.    And did you then come back to
16 the United States?
17 A.    Correct.
18 Q.    Did you return to Argo
19 Electric?
20 A.    Yeah, I believe, yeah.
21 Q.    Do you remember how long you
22 were there when you came back?
23 A.    I can't remember. Gee, I

Page 16

1 can't -- probably October.
2 Q.    Do you remember why you left
3 Argo the second time?
4 A.    Yes.
5 Q.    Tell me about that.
6 A.    I was terminated there.
7 Q.    For what reason?
8 A.    I can't remember, but it's
9 something like other people can do my
10 work faster than I am or --
11 Q.    Your understanding, it was
12 related to job performance?
13 A.    Yeah. In reality, they just
14 don't want to accept, because the -- I
15 had been producing a lot of payables for
16 payment, screening them and checking
17 them, and I guess they're not happy with
18 the payables that's coming their way.
19 Q.    You disagreed with the reason
20 they said they terminated you?
21 A.    Yes.
22 Q.    Did you file a lawsuit or --
23 A.    No.

4  (Pages 13 to 16)

# FREEDOM COURT REPORTING

Page 17

1 Q. -- talk to an attorney about
2 your termination?
3 A. No.
4 Q. Why not?
5 A. I'm just not that type of
6 person.
7 Q. Where did you go or what did
8 you do after you were terminated from
9 Argo Electric Supply?
10 A. I believe I did contracting
11 with temporary agencies.
12 Q. And where were you living at
13 this time?
14 A. In Los Angeles, California,
15 in Michelle Circle.
16 Q. Argo was located in Los
17 Angeles?
18 A. Yes.
19 Q. Okay. And the temporary
20 agencies that you worked for were also
21 in Los Angeles?
22 A. No, it was in -- I forget the
23 city's name.

Page 18

1 Q. Was it in California?
2 A. California, definitely, yeah.
3 But I believe it's Downey, Downey.
4 Q. After working for temporary
5 agencies, did you get a full-time job
6 somewhere else?
7 A. Went back to the
8 Philippines -- I had been going back and
9 forth to the Philippines at that time.
10 That's the reason why I don't hold that
11 long of employment.
12 Q. So before going into the Navy
13 or the Reserves, you were going back and
14 forth?
15 A. Right.
16 Q. From 1983 until 1987?
17 A. Right.
18 Q. And then after your discharge
19 from the Navy, what did you do?
20 A. I was — I got employed by a
21 company in California named — used to
22 be called Traker.
23 Q. Draker?

Page 19

1 A. Traker, T as in Tom, Traker
2 Flight Systems.
3 Q. And what were you doing for
4 Traker Flight Systems?
5 A. The same thing as I was doing
6 in the military. I was assigned in
7 Germany and we were launching,
8 recovering, servicing, maintaining
9 aircraft and its engine components and
10 parts, installing target parts.
11 Q. Is Traker a government
12 contractor?
13 A. Yes. Or, I'm sorry, it's a
14 private company that has a contract with
15 the German government, German military.
16 Q. And how long did you work for
17 Traker?
18 A. Until the year 2000,
19 December.
20 Q. So from June 1998 to December
21 of 2000 --
22 A. No, February '99.
23 Q. Oh, sorry. February --

Page 20

1 A. February 1999.
2 Q. February 1999 to December of
3 2000?
4 A. Uh-huh.
5 Q. And you were a machinist
6 throughout -- or an aircraft mechanic
7 during that entire time?
8 A. Yes.
9 Q. And why did you leave Traker
10 Flight Systems?
11 A. The German government were
12 imposing too much taxation. All of
13 us -- six of us resigned.
14 Q. And where did you go next for
15 work?
16 A. I worked for LSI, Logistic
17 Services, Incorporated, LSI. They're in
18 Florida, Jacksonville, Florida.
19 Q. And when did you begin
20 working for LSI?
21 A. January through March. It
22 was --
23 Q. Of 2001?

5  (Pages 17 to 20)

# FREEDOM COURT REPORTING

### Page 21

1  A.      Yes.  It's just a contract
2  thing.  I was -- when I came in, I was
3  towards the end of their contract.
4  Q.      And what were you doing for
5  LSI at the end of their contract?
6  A.      Same thing; working on
7  engine, jet engine, tearing them down
8  and building them up.
9  Q.      Was your title mechanic?
10  A.      No, logistic analyst.
11  Q.      And did you leave LSI
12  Logistics because the contract was up?
13  A.      Yeah, for that particular
14  project.
15  Q.      So were you laid off when
16  that was over?
17  A.      I can't say it's laid off,
18  because it's finished contract.
19  Q.      Right.  But all the people
20  working on that part of the contract --
21  A.      Yeah, yeah.
22  Q.      -- were finished with their
23  work?

### Page 22

1  A.      Correct.
2  Q.      Okay.  And where did you go
3  next?
4  A.      I believe I went to the Naval
5  Depot in Jacksonville.
6  Q.      In 2001?
7  A.      Uh-huh.
8  Q.      And what were you doing at
9  the Naval Depot?
10  A.      The same thing.  We were
11  working on jet engine, particularly F18
12  engine and the Stealth fighter.
13  Q.      And how long did you work at
14  the Naval Depot?
15  A.      I was a contractor there by
16  Raytheon.  I believe Raytheon was --
17  Raytheon Aerospace.
18  Q.      And how long were you a
19  contractor there?
20  A.      From May to July.
21  Q.      And why did you leave or what
22  happened in July of 2001?
23  A.      They were having -- the Naval

### Page 23

1  Depot was having problems with their
2  manuals, so they had asked us to stop
3  production, so they laid us off.  No,
4  they did not lay us off, but I decided
5  to go to another contractor which was
6  offering higher pay.
7  Q.      Who was that?
8  A.      Onsite, Onsite Aviation.
9  Q.      Was this also in
10  Jacksonville?
11  A.      Yes.  And I'm doing the same
12  job that I was on -- the very same job
13  that I was doing with Raytheon, with the
14  Naval Depot.
15  Q.      And is that analyst,
16  mechanic, machinist?  What was the
17  title?
18  A.      Jet engine mechanic.
19  Q.      And how long were you with
20  Onsite?
21  A.      Until September.
22  Q.      And what happened then?
23  A.      I applied for G.E.

### Page 24

1  Q.      You had previously applied
2  for G.E. while you were working for
3  Onsite?
4  A.      Yes, because I saw the ad in
5  the newspaper.
6  Q.      So in September of 2001, you
7  got hired at G.E.?
8  A.      Yes, I was hired.
9  Q.      You left Onsite to go to
10  G.E.?
11  A.      Correct.
12  Q.      And what were you doing at
13  G.E.?
14  A.      I was a fuel nozzle mechanic
15  for the power generating engine.
16  Q.      Also in Jacksonville?
17  A.      Yes.
18  Q.      And how long did you work for
19  G.E. as a fuel nozzle mechanic?
20  A.      Until February of 2001 --
21  2002.
22  Q.      And what happened in February
23  of 2002?

6  (Pages 21 to 24)

# FREEDOM COURT REPORTING

Page 25

1  A.  I was terminated there.
2  Q.  For what reason?
3  A.  For asking too many
4  questions.
5  Q.  Tell me about that.
6  A.  Yeah, they -- I and another
7  person was terminated, the other one
8  person being black, and the reason for
9  his termination was he was not saying,
10  "Good morning." It's outrageous reasons
11  for us to be terminated. But anyway,
12  that business of G.E. in Jacksonville
13  was just new to the area, but it's been
14  existing in other states, and we were
15  the one who set up the facility for that
16  kind of business to be set up in
17  Jacksonville.
18  Q.  That's what you were doing as
19  the fuel nozzle mechanic?
20  A.  Yes. First we were setting
21  up the place, then eventually we ended
22  up doing the receiving, tear down, build
23  up, testing, build up, cleaning and all

Page 26

1  the nine yards.
2  Q.  And in February of 2000, you
3  said you were terminated for asking too
4  many questions?
5  A.  Yes.
6  Q.  What --
7  A.  Because we didn't have any
8  manual, and so we just relied on the
9  engineers, two engineers, and so since
10  there were no guidance, I had to ask.
11  Q.  So you were asking questions
12  of the engineers that you otherwise
13  would just go to a manual to get answers
14  for?
15  A.  Correct.
16  Q.  And they felt like you were
17  doing that too frequently?
18  A.  Too frequently, yes. And
19  also, I was asking -- because right from
20  the very start, the understanding was
21  that they will rotate everybody who was
22  hired to different stages of the work,
23  so that everybody will learn it. But it

Page 27

1  didn't get into fruition. A lot of
2  these employees just jump into the kind
3  of work they like to do, and I end up
4  being in a place like -- what do you
5  call that? Sandblasting, sandblasting
6  the fuel nozzle body. And in that
7  process, you are in a small room,
8  enclosed room. You've got to put on
9  your protective gear with air, but the
10  air is obnoxious and the sand, you can
11  breathe in the sand and your mouth will
12  be sandy too. And you have to shovel
13  back to the tank what you have just
14  released.
15  So I felt it was unhealthy
16  for me to be there, and so I start
17  asking the question as to why the
18  rotation is not being implemented. I
19  even created the tool that they didn't
20  have there, and people loved that tool,
21  because it made the work faster, until
22  they were able to have it fabricated.
23  Q.  What was the reason you were

Page 28

1  told for your termination?
2  A.  That's it.
3  Q.  They told you you were asking
4  too many questions?
5  A.  Asking too many questions.
6  Q.  And did you file a lawsuit
7  against G.E.?
8  A.  No.
9  Q.  Did you complain to anybody
10  at G.E.?
11  A.  No.
12  Q.  Did you --
13  A.  In fact, I was complaining to
14  the union representative, union
15  representative. In fact, when we were
16  new, they enticed us to join the union,
17  I being the first one to join. But
18  eventually they did not honor my
19  membership, and I was wondering why, and
20  a new guy that was later on hired to
21  work not in our department, but in other
22  department, was the very first one to
23  get his membership, so --

7 (Pages 25 to 28)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 29

1  Q.        And what do you mean when you
2  say that they didn't honor your
3  membership?
4  A.        They kind of delayed it until
5  such time I was terminated.
6  Q.        So were you paying dues?
7  A.        No, they didn't accept my
8  dues, because I was not a member.
9  Q.        And was that related in any
10 way to your termination?
11 A.        I have an inkling it is, but
12 I cannot prove it.
13 Q.        Did you have any medical
14 problems or conditions that came about
15 as a result of doing sandblasting?
16 A.        None.
17 Q.        So you were able to do the
18 job?
19 A.        Yes.  But I told them that
20 they had to fix the air system and the
21 equipment, the protective equipment,
22 because you'll end up having sand in
23 your mouth and nose and your eyes.

Page 30

1  Q.        But you didn't have a
2  workers' compensation claim or any
3  on-the-job injury related to your work
4  in sandblasting, did you?
5  A.        No, none.  But I got injured
6  in there too.
7  Q.        At G.E.?
8  A.        Yeah.
9  Q.        And did you get medical
10 treatment for that injury?
11 A.        Yes, I did.
12 Q.        And did G.E. pay for that?
13 A.        Yes.
14 Q.        What kind of injury did you
15 have?
16 A.        We were done -- we were
17 finished with the product.  From the
18 stand, we were putting it in the box, in
19 the shipping box, so I was guiding
20 the -- it was -- because it's too heavy,
21 all those items are heavy, it has to be
22 hoisted, the overhead crane.  I was
23 guiding it so it's not going to swing.

Page 31

1  All of a sudden on one of the hooks to
2  the ear snapped back and it pinned my
3  thumb with it.
4  Q.        So an injury to your thumb?
5  A.        Yeah.
6  Q.        Okay.  And was that fully
7  resolved?
8  A.        Yeah.
9  Q.        Prior to working at G.E., did
10 you ever have any on-the-job injuries?
11 A.        None.
12 Q.        Or any other injuries?
13 A.        None.  Oh, in the Navy.
14 Q.        Tell me about that.
15 A.        While I was stationed in
16 Japan, on the housing, our housing is
17 taller -- the lower, the basement being
18 the trash area, I slipped in there and
19 broke my back.  I had broken bones and a
20 fracture.
21 Q.        And is that something that
22 still bothers you today?
23 A.        Yeah.

Page 32

1  Q.        Did that affect your work at
2  all at Pemco?
3  A.        Yeah, definitely.  But I just
4  tried to bear the pain.
5  Q.        Did you tell anyone at Pemco
6  that you had previously sustained a back
7  injury working for the Navy?
8  A.        Yeah.
9  Q.        Your lawsuit is not related
10 in any way to a back problem that you
11 had that -- anything that happened at
12 Pemco reaggravating your back or
13 anything like that?
14 A.        Well, it does too, because I
15 always end up being in an awkward
16 position, being in a very confined
17 space, where no air, no ventilation and,
18 you know, you're squished in and the
19 structure of the airplane is curved.
20 You can't see, so you have to find a way
21 to be able to do your job at the best
22 possible position.
23 Q.        But you were able to work and

8  (Pages 29 to 32)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 33

1  you said you worked through the pain?
2  A.    Yeah, yeah. But I'm not --
3  I'm just a person who don't complain,
4  because I like to work.  I have to give
5  subsistence for my family.
6  Q.    All right.  We'll come back
7  to your work at Pemco, but let's go back
8  to your termination from G.E.  What did
9  you do after that?
10  A.    I believe I worked for -- I
11  was unemployed at that time.
12  Q.    For how long?
13  A.    Until December.  Then January
14  of 2003 to March of 2003, I worked for
15  Maytag Aircraft Corporation, based in
16  Colorado Springs, but I was assigned in
17  Kuwait.
18  Q.    And what happened in March
19  2003?
20  A.    I left the company because of
21  the Embassy giving warning of the
22  dangers of war.
23  Q.    In Iraq?

Page 34

1  A.    Kuwait.
2  Q.    Oh, I'm sorry, Kuwait.
3  A.    But it is for the Iraq war.
4  Q.    I understand.  And what did
5  you do in March 2003?
6  A.    After that, I was unemployed.
7  Q.    Until October?
8  A.    Yes.
9  Q.    When you began working for
10  Pemco?
11  A.    Began at Pemco.
12  Q.    Any problems with your
13  employment at Maytag?
14  A.    No.
15  Q.    And what are you currently
16  doing?
17  A.    I'm currently unemployed.
18  Q.    And how long have you been
19  unemployed?
20  A.    Since March.
21  Q.    Of 2006?
22  A.    Yeah.
23  Q.    And what did you do -- let's

Page 35

1  start after you were terminated from
2  Pemco.
3  A.    Yes.
4  Q.    In, let's say the end of '04,
5  early '05, end of '04, what did you do
6  after that work-wise?
7  A.    I have no work.  I was
8  unemployed.
9  Q.    Well, you said that since
10  March of 2006.  What did you do in --
11  you were unemployed throughout all of
12  2005?
13  A.    Are you talking about after
14  Pemco or --
15  Q.    Yes.
16  A.    Yeah, after Pemco, I was
17  unemployed.  And then in August I got
18  employed by Northwest Airlines.
19  Q.    Right.  This is what I'm
20  asking about.  I want to talk about
21  everything since Pemco.
22  A.    I was unemployed from the
23  time I was terminated from Pemco till

Page 36

1  August.  And then August 19, I worked
2  for Northwest Airlines.  Well, at first,
3  I was a contractor with Avtech, and then
4  Northwest Airline hired us.  I became an
5  employee of Northwest October 7th.
6  Q.    But beginning in August, you
7  were working again?
8  A.    Beginning of August?
9  Q.    Beginning in August, you
10  started working again?
11  A.    19, August 19.
12  Q.    Okay.  And what were you
13  making?  What kind of pay were you
14  making?
15  A.    With Avtech, I was making $32
16  an hour.
17  Q.    From August 19 until October?
18  A.    Yeah.
19  Q.    And then what about at
20  Northwest?
21  A.    At Northwest, I started at
22  26.53.
23  Q.    And were you doing the same

9  (Pages 33 to 36)

# FREEDOM COURT REPORTING

Page 37

1 job; you were just working for
2 Northwest?
3 A.        Northwest is more -- it's on
4 the line, but the same thing as the
5 military.
6 Q.        And when you were working for
7 Avtech, did you work any overtime?
8 A.        Oh, yeah. You were working
9 12 hours on, seven days a week.
10 Q.        And have you given me records
11 of the pay you've received from Avtech?
12 A.        Yes.
13 Q.        And also from Northwest
14 Airlines?
15 A.        Yes.
16 Q.        And if I wanted to know how
17 much money you made total from those
18 companies, I've got that?
19 A.        Yes.
20 Q.        And how long did you work for
21 Northwest Airlines?
22 A.        Until March of this year.
23 Q.        And did you have the same

Page 38

1 position throughout?
2 A.        Yes.
3 Q.        And did your pay stay at
4 26.53?
5 A.        Yes. That's the max.
6 Q.        And what happened in March of
7 2006?
8 A.        I'm unemployed up to the
9 present time.
10 Q.        I understand. But why did
11 you leave Northwest Airlines?
12 A.        I was terminated too.
13 Q.        For what reason?
14 A.        From what the manager said,
15 that I am not at par with the rest, his
16 expectation.
17 Q.        Did you agree with that?
18 A.        No.
19 Q.        Tell me what about you not
20 being up to par with the rest or not
21 meeting the manager's expectations that
22 you disagree with.
23 A.        Well, the company is under

Page 39

1 bankruptcy and strike, and so the
2 tension is up and demand is high.
3 There's not much manpower. And us being
4 new, we don't know their rules and
5 regulations and policies. Tensions are
6 high, and so we have to meet the strict
7 deadlines. And with that, you end up
8 making mistakes. And you've got to
9 research your procedures and all that
10 through their computer, order parts.
11 And the way I work is I really work as
12 right as possible, to the best of my
13 ability, and it seems like they don't
14 want it that way.
15 Q.        They want speed?
16 A.        They want speed, at the
17 expense of the way I see safety. But I
18 just didn't contest.
19 Q.        Tell me what you mean you did
20 not contest.
21 A.        Meaning giving a reason why
22 something like -- at that time, he wrote
23 me up. He wrote me on three different

Page 40

1 occasions. And from those write-ups, he
2 based his termination. But our -- the
3 termination was not something -- well,
4 it was cordial. It's not something
5 like -- what do you call that? It's not
6 like -- it's a friendly thing.
7 Q.        All right. Are you able to
8 go back to work there if you want to?
9 A.        I believe so, if there's a --
10 if they would -- if there's a need.
11 Because of the bankruptcy right now,
12 they're streamlining everything.
13 Q.        Did you have any problems
14 working for Avtech or Northwest
15 Airlines, as far as your physical
16 condition was concerned?
17 A.        Same thing when I was with
18 Pemco, you know, the pain on my back,
19 you know, to the legs down.
20 Q.        Related to your injury from
21 the Navy?
22 A.        Yes.
23 Q.        But you were able to work

10 (Pages 37 to 40)

# FREEDOM COURT REPORTING

Page 41

1 through that?
2 A.    Yes.
3 Q.    That didn't stop you from
4 working 12 hours a day, seven days a
5 week at Avtech?
6 A.    No, no, no, I don't want to
7 stop working.
8 Q.    I've also -- again, you gave
9 me a lot of documents before we began
10 the deposition, and it appears that
11 there are employment applications for
12 other jobs.
13 A.    Yes.
14 Q.    Tell me, where else have you
15 applied to work since Pemco?
16 A.    A lot.  I can't remember.  I
17 don't have any record of that.
18 Q.    The records that you've given
19 me, are they complete records of all the
20 jobs that you've applied for?
21 A.    Some only, because the rest,
22 I don't know whether they're at.
23 Q.    Are you currently trying to

Page 42

1 find work?
2 A.    Yes, definitely.  Actually,
3 there's one -- two that I'm considering.
4 Q.    You have job offers that
5 you're considering?
6 A.    Yes, one in Diego Garcia
7 overseas, and the other one is in
8 Maryland, DyneCorp.
9 Q.    Doing mechanic?
10 A.    Same thing.
11 Q.    Aircraft mechanic?
12 A.    Yes, line maintenance, just
13 like Northwest and the military.
14 Q.    And how long have you had
15 those two job offers?
16 A.    Currently, the DyneCorp is
17 still -- I still have to finish up the
18 application, and they've been waiting
19 for it.  But because of all these things
20 right now, I put it aside.  I have to
21 concentrate on putting all this
22 paperwork together, looking for
23 attorneys and all that.

Page 43

1 Q.    Is it your understanding that
2 if you finish the application for
3 DyneCorp and send it in, that you have a
4 job?
5 A.    I can say it's 80 percent.  I
6 don't want to say 100 percent.
7 Q.    80 percent chance.  What
8 about the overseas job?
9 A.    I'd say 50 percent.
10 Q.    So these are jobs you're
11 currently applying for?
12 A.    Yes.
13 Q.    Okay.  Have you had any job
14 offers for employment since January of
15 2005 that you have turned down?
16 A.    No.  January 2005, what was
17 that?
18 Q.    A month after your
19 termination from Pemco?
20 A.    No, no, no.
21 Q.    You also applied for
22 unemployment benefits after your
23 termination from Pemco?

Page 44

1 A.    Yes.
2 Q.    What about after -- since
3 March of this year?  Have you been
4 drawing unemployment?
5 A.    I did apply from Minnesota,
6 but they said I -- at the time I applied
7 with them, they said I don't qualify,
8 because they have a certain quarter
9 earnings that they base upon, and so
10 they told me to go to Arizona and apply
11 in Arizona.
12 Q.    And have you done that?
13 A.    Yes, I did.
14 Q.    And are you currently drawing
15 unemployment from Arizona?
16 A.    Just for two weeks, and I
17 stopped claiming, because I've been
18 engrossed with these things.
19 Q.    What other income have you
20 had, other than unemployment you
21 received from the State of Alabama
22 following working for Pemco --
23 A.    I didn't have anything from

11 (Pages 41 to 44)

# FREEDOM COURT REPORTING

**Page 45**

1  Alabama.
2  Q.       Okay.  So you never got
3  unemployment from the State of Alabama?
4  A.       No, no.
5  Q.       And we'll talk about that in
6  more detail.  Any other income that
7  you've received other than what we've
8  already talked about?
9  A.       None.  I have to use up my
10  401K.
11  Q.       You're currently living off
12  your 401K?
13  A.       As soon as I lost my job from
14  Pemco.
15  Q.       Do you receive any kind of
16  stipend or payment from the Navy?
17  A.       Disability pay, yes.
18  Q.       And how much disability pay
19  do you get from the Navy?
20  A.       Currently, it's 218 a month.
21  Q.       And has that been true since
22  January of 2005?
23  A.       It changes, because of the --

**Page 46**

1  every year, they have inflation factor,
2  so --
3  Q.       What was your disability
4  payment per month in -- let's start with
5  December of 2004.
6  A.       They go by the rating.  I'm
7  rated 20 percent, so whatever the
8  government calculated, I don't know.
9  Q.       You don't remember what that
10  amount was?
11  A.       But like 218 is the highest
12  right now, because of the --
13  Q.       For a 20 percent rating?
14  A.       Yeah, but it's calculated
15  with inflation on it.  So if you go
16  backwards, it would be lower, by -- like
17  I'd be 210 the last time, prior to 218.
18  Q.       210 was your 2005 rate?
19  A.       Yeah, yeah, because 218 is
20  the current right now.
21      (Whereupon, Defendant's
22      Exhibit Number 1 was
23      marked for identification.)

**Page 47**

1  Q.       (By Mr. Holmes)  Mr. Camacho,
2  I'm going to give you what I'm marking
3  as Defendant's Exhibit 1 to your
4  deposition.
5  A.       What does it mean?
6  Q.       And this is a collection
7  of -- this is a multipage document that
8  I've put -- that I stapled from the
9  documents that you gave me this morning.
10  A.       Uh-huh.
11  Q.       And I'd just like for you to
12  review that and confirm for me that
13  those were documents you received from
14  the Department of Industrial Relations
15  of the State of Alabama and
16  correspondence that you sent to the
17  Department of Industrial Relations.
18  A.       Yes, these are my
19  correspondence to the Department --
20  State of Alabama.
21  Q.       And the Department of
22  Industrial Relations denied your request
23  for unemployment benefits?

**Page 48**

1  A.       Beg your pardon?
2  Q.       The Department of Industrial
3  Relations denied your request for
4  unemployment following your termination
5  from Pemco?
6  A.       Yes.
7  Q.       And you disagreed with that
8  determination?
9  A.       Yes.
10  Q.       And you appealed that
11  determination?
12  A.       I tried to appeal, but I
13  believe I ran out of time.  That's why I
14  was not able to appeal.
15  Q.       Tell me what you mean by
16  running out of time.
17  A.       They set up a date for me --
18  I was in the process of appealing and
19  they gave me a date and I was not able
20  to meet that date for the telephone
21  interview.  And they based their -- I
22  believe, from what I understand, they
23  based their denial -- that denial, based

12  (Pages 45 to 48)

# FREEDOM COURT REPORTING

Page 49

1  on what Mr. Battcher had said or, you
2  know, account of --
3  Q.      Do you remember why you
4  missed the telephone conference?
5  A.      I can't remember.
6  Q.      You were not working at the
7  time?
8  A.      No, no.
9  Q.      And was it your understanding
10  that when you missed that telephone
11  conference --
12  A.      I lose.
13  Q.      -- you would waive your right
14  to appeal?
15  A.      I don't know that, but I know
16  I lost.
17  Q.      And did you try to appeal
18  that loss?
19  A.      No, because they said if you
20  don't meet it, that's it, so I did not
21  appeal.
22  Q.      And do you disagree with that
23  finding?

Page 50

1  A.      Yes, definitely.
2  Q.      You first began work with
3  Pemco in October of 2003; correct?
4  A.      As a contractor with
5  Airplanes, Incorporated, October 1st to
6  November 3, I believe. And then they
7  laid me off November 3, and then --
8  November 3 or 7, something like that.
9  It was a Thursday.
10  Q.      You were -- I'm sorry, tell
11  me the name of the company again.
12  Airplane --
13  A.      Airplanes, Incorporated, a
14  contractor for Pemco.
15  Q.      And what were you doing for
16  Airplanes, Incorporated?
17  A.      I was assigned to Pemco.
18  Q.      And what kind of work were
19  you doing?
20  A.      Doing the tear-down and
21  build-up of the airplane, like --
22  Q.      You were a mechanic?
23  A.      A mechanic, yeah.

Page 51

1  Q.      And you said you were laid
2  off in November, either 3rd or 7th?
3  A.      Yeah, the 3rd or the --
4  3rd or 4th, and then the night --
5  because I worked second shift, the night
6  that I was informed by Mr. Briody, later
7  on that night, he said that -- he asked
8  me if I'm interested to work directly
9  for Pemco. I said, "Yes." And so I was
10  hired that day, but Pemco back-dated it
11  to October 1st, since I've been working
12  with them since October 1st.
13  Q.      You got seniority rights back
14  to October 1st?
15  A.      I guess that's what it is.
16  Q.      When you were working for
17  Airplanes, Inc., who was your
18  supervisor?
19  A.      Let's see, in Pemco --
20  Q.      Was it a Pemco employee?
21  A.      Yeah, yeah.
22  Q.      Okay.
23  A.      I was assigned to Pemco since

Page 52

1  October 1st. Airplanes, Incorporated is
2  just the one that supplies manpower. So
3  ever since, I was working in Pemco since
4  October 1st.
5  Q.      So although Airplanes, Inc.
6  sent you your paycheck for a month, you
7  were reporting to and supervised by
8  Pemco supervisors?
9  A.      Correct.
10  Q.      And you mentioned a Mr.
11  Briody?
12  A.      Yes.
13  Q.      Was that your supervisor from
14  October 1, 2003, going forward?
15  A.      I believe at that time he was
16  a supervisor manager, something like
17  that. Oh, the supervisor then was --
18  the crew leader was Mr. Woods and the
19  supervisor was Mr. Briody.
20  Q.      And when you say "crew
21  leader," are you talking about a lead
22  man?
23  A.      A lead man, yeah.

13  (Pages 49 to 52)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 53

1 Q.      So he's an hourly employee, a
2 member of the union, but --
3 A.      I don't know.  I don't know
4 all --
5 Q.      As far as you know, he was
6 directing your work?
7 A.      Yes.
8 Q.      And his title was lead man?
9 A.      Yes.
10 Q.      Do you remember Mr. Woods'
11 first name?
12 A.      No, but he's one jolly,
13 chubby guy, real good person.
14 Q.      And is that who directly
15 supervised your work?
16 A.      Yes, both him and Mr. Briody.
17 Q.      And is Mr. Woods white,
18 black?  What's --
19 A.      Both of them are white.
20 Q.      Both are white?
21 A.      Uh-huh.
22 Q.      And you said Mr. Woods was
23 jolly.  Did you get along well with him?

Page 54

1 A.      Yes.
2 Q.      And what about Mr. Briody?
3 A.      Yes.
4 Q.      And what kind work were you
5 doing for the month that you were
6 technically an employee of Airplanes,
7 Inc.?
8 A.      From October 1?
9 Q.      Yes.
10 A.      I was assigned in Hangar 7.
11 At that time, we were working on TNT
12 airplane and I was assigned to do the
13 cargo, forward and aft, installing the
14 fiberglass liners; same thing on the
15 cabin.  And then it was moved to Hangar
16 11, the paint shop.  So it's like in
17 conjunction with painting, we were
18 working in there, trying to rush the
19 airplane.
20 Q.      How long were you in Hangar
21 7?
22 A.      Probably a week or less.
23 Q.      So your first week was in

Page 55

1 Hangar 7, and then you were moved to
2 Hangar 11 --
3 A.      Yes.
4 Q.      -- to do the same work, but
5 in the area where they were also
6 painting?
7 A.      Painting, yeah, because they
8 need to rush the airplane.  It keeps
9 going back and forth, but eventually, we
10 stayed longer in Hangar 11.
11 Q.      You go wherever the airplane
12 is?
13 A.      Where the airplane is.
14 Q.      And during that first few
15 weeks installing the fiberglass liners
16 in the cargo area, did you have any
17 problems with that?
18 A.      Yes, yes.
19 Q.      What's that?
20 A.      I was itching and irritable,
21 because it hurts.
22 Q.      Well, you were irritable, as
23 in you were upset and angry with people

Page 56

1 or you were irritated?
2 A.      Irritated on the skin.
3 Q.      Your skin was irritated?
4 A.      Yeah.
5 Q.      And what kind of protective
6 gear were you wearing?
7 A.      None.
8 Q.      What did you wear to work?
9 A.      Heavy clothes.
10 Q.      Jeans, work clothes?
11 A.      Denims, safety shoes, long
12 sleeves.
13 Q.      Did you have a hard hat?
14 A.      No.
15 Q.      What about safety glasses?
16 A.      No, at that time, none.
17 Q.      Did you later get safety
18 glasses?
19 A.      Yes.
20 Q.      Was that in November, when
21 you were hired by Pemco?
22 A.      Yeah.
23 Q.      What about other protective

14  (Pages 53 to 56)

# FREEDOM COURT REPORTING

Page 57

1  gear? Was that -- did that come later?
2  A.     Yes, because about two
3  weeks -- about two weeks from being
4  employed, after two weeks of October,
5  somebody told me that -- because I had
6  been complaining to people that I can't
7  tolerate this fiberglass thing, they
8  said, "Oh, there's a supply shop in
9  Hangar 15." So every time that I had
10  the chance to go to Hangar 15 to borrow
11  tools from the tool crib, I passed by
12  the supply area to get this protective
13  equipment.
14  Q.     And what kind of equipment
15  were you getting from the supply shop in
16  Hangar 15?
17  A.     Buffing -- what do you call
18  that? It's a buffing -- a polishing
19  grinder.
20  Q.     That's the safety equipment?
21  A.     Oh, no. You said the tools.
22  Q.     No, I said when you were
23  going to get the tools in Hangar 15,

Page 58

1  what did you get from the supply shop?
2  A.     Oh, the coveralls, the
3  earplugs, the goggles and mask, nose
4  mask, and gloves, latex gloves.
5  Q.     Had you worn that same kind
6  of safety equipment for any of the work
7  you had done before working at Pemco, at
8  other employers?
9  A.     Yes.
10  Q.     So you were familiar with all
11  that protective gear?
12  A.     Yes.
13  Q.     And even though you were
14  technically employed by Airplanes, Inc.
15  in October of 2003, Pemco was supplying
16  you with this equipment when you went to
17  Hangar 15?
18  A.     Yes.
19  Q.     And who all were you talking
20  to about the irritation that you were
21  having with the fiberglass?
22  A.     One is --
23  Q.     And again, I want to focus on

Page 59

1  your first two weeks, when you said that
2  the first couple of weeks you were
3  talking to people.
4  A.     Yeah. His name -- he's an
5  old guy. I believe his name is Jerry.
6  Q.     Jerry was a co-worker?
7  A.     Yes.
8  Q.     What about Mr. Woods or Mr.
9  Briody? Did you ever talk to them about
10  the irritation that you were having?
11  A.     Yeah, yeah, the -- Mr. Woods
12  also said about the Hangar 15.
13  Q.     And how often did you go to
14  Hangar 15 to get supplies from the
15  supply shop?
16  A.     It depend on the reason why I
17  have to go there, like borrowing this
18  buffer, the polisher. And most of the
19  time, that's what I've been borrowing in
20  there, because I have to -- me and Jerry
21  have to polish the leading edge of the
22  slats, the stabilizer, the rudder.
23  Q.     And was that every day, every

Page 60

1  two days? How often?
2  A.     Almost every day, at the
3  time, after we went to the paint shop.
4  Q.     When you were in Hangar 11 --
5  A.     Yes.
6  Q.     -- you were going to Hangar
7  15 almost every day?
8  A.     Oh, no, to 15, no. To Hangar
9  11.
10  Q.     Right. And what I meant to
11  ask you, and if I wasn't clear, I'm
12  sorry, how often were you going to the
13  supply shop and getting protective gear
14  in October of 2003?
15  A.     Once a -- probably in a
16  week's time, probably three times.
17  Q.     And the equipment that you
18  were getting, the coveralls, the
19  earplugs, the goggles, the masks, the
20  gloves, were those things that lasted
21  longer than one shift?
22  A.     No, no, it breaks easy.
23  Q.     So none of those things you

15 (Pages 57 to 60)

# FREEDOM COURT REPORTING

Page 61

1  kept over for the next day?
2  A.      No, no. Those are
3  disposable, and by the day's end, it's
4  either torn or you need to -- a
5  replacement, and it's also tough with
6  perspiration.
7  Q.      In October of 2003, did
8  anybody tell you you could not go to the
9  supply shop to get that equipment?
10  A.      Nobody, except Mr. Woods and
11  Jerry.
12  Q.      They told you you can't go?
13  A.      No, they told me there's a
14  supply.
15  Q.      Right. And I'm asking if
16  anybody at Pemco ever told you in
17  October of 2003 that you cannot go to
18  the supply shop?
19  A.      Nobody, nobody.
20  Q.      And you were able to get the
21  supplies if you needed them?
22  A.      Sometimes, yes; sometimes no,
23  when they are out of stock or if there's

Page 62

1  nobody in the -- at the window.
2  Q.      At any point in October of
3  2003, did you have to stop working
4  because of your exposure to fiberglass?
5  A.      No. I just kept on going.
6  The airplane was being rushed.
7  Q.      Did you have to get any
8  medical treatment in October of 2003 for
9  your exposure to fiberglass?
10  A.      No.
11  Q.      You mentioned that you were
12  laid off in the beginning of November by
13  Airplanes, Inc.
14  A.      Not by Airplanes, Inc.; by
15  Pemco.
16  Q.      Okay. I wasn't clear on
17  that. Tell me about --
18  A.      Like Pemco can -- let's say
19  if I'm a contractor, Pemco can always,
20  always lay off people and then hire
21  people, so come and go.
22  Q.      At the beginning of November
23  of 2003, when you were laid off, it was

Page 63

1  your understanding that Pemco was
2  telling Airplanes, Inc. that they don't
3  need you anymore?
4  A.      I believe they didn't even
5  tell Airplanes, Inc., because that
6  night, I was just told, "You're laid
7  off." But they -- Mr. Briody asked me
8  if I want to work the whole night.
9  I said, "Yes." And before
10  the night ended, he asked me if I wanted
11  to work directly for Pemco, and I said,
12  "Yes." And he said he's going to talk
13  to Mr. Dennis about it.
14  Q.      Who told you that you were
15  laid off?
16  A.      Mr. Briody.
17  Q.      So in the same night Mr.
18  Briody told you, "You're laid off" --
19  A.      Correct.
20  Q.      Said, "Even though you're
21  laid off, do you want to complete your
22  shift?"
23  A.      Right.

Page 64

1  Q.      And then at sometime
2  thereafter --
3  A.      Before the night ended, the
4  shift ended, he asked me --
5  Q.      He came back to you and said,
6  "Do you want to work directly for
7  Pemco?"
8  A.      Yes, during break time, he
9  asked me if I wanted to work for Pemco
10  and I replied, "Yes."
11  Q.      Did that seem odd to you,
12  that you had been laid off, and then
13  within the same shift, they were
14  offering you a job?
15  A.      No, because it's not only me
16  who was laid off that night; other
17  contractors. So I had been asking
18  people too. They said that Pemco would
19  just hire first from contractors. They
20  wanted to see how the person is, and
21  then from there, offer the job, so --
22  Q.      So working for Airplanes,
23  Inc. at Pemco's facility was, in your

16  (Pages 61 to 64)

# FREEDOM COURT REPORTING

Page 65

1 mind, like a probationary period?
2 A.    Yes.
3 Q.       Where they would evaluate
4 your work and make a judgment of whether
5 or not they wanted to make you a
6 permanent offer?
7 A.    Yes.  And actually, that was
8 also included, right from October 1st,
9 as the probationary period.
10 Q.       Despite the issues you were
11 having with the fiberglass, you accepted
12 the job to work for Pemco when Mr.
13 Briody offered it to you that night?
14 A.    Correct.
15 Q.       And you knew that continuing
16 working for Pemco in that job would
17 involve working with fiberglass?
18 A.    Yes.
19     (Whereupon, Defendant's
20     Exhibit Number 2 was
21     marked for identification.)
22 Q.    (By Mr. Holmes)  Let's talk
23 about the beginning of your time when

Page 66

1 you were technically a Pemco employee.
2 And I'm going to give you some documents
3 and I'm going to go through these one by
4 one.  And if you'll -- I'm handing you
5 now Defendant's Exhibit 2 to your
6 deposition.  And if you'll take a
7 moment, please, and review that
8 document.  And, Mr. Camacho, let me know
9 when you've finished reviewing it.
10 A.    Yeah, I'm done.
11 Q.       Have you had an opportunity
12 to review Defendant's Exhibit 2 to your
13 deposition?
14 A.    Yes.
15 Q.       And if you'll look at the
16 bottom of Defendant's Exhibit 2 and
17 confirm for me that that is your
18 signature?
19 A.    Yes.
20 Q.       And the date is October 2,
21 2003?
22 A.    Yes.
23 Q.    This is an orientation

Page 67

1 checklist.  Do you recall going through
2 orientation at Pemco on October 2nd,
3 2003?
4 A.    Yes.
5 Q.       And there's a list of -- this
6 checklist has a number of documents and
7 policies and procedures listed, and
8 they're boxes with check marks next to
9 them.  Are those your check marks?
10 A.    I really don't know.
11 Q.       Do you remember covering
12 these policies and --
13 A.    Yeah, some -- yeah, I'd say
14 we covered them.
15 Q.       And if you'll look under the,
16 "Reviewed and Discussed," there is --
17 the third policy listed -- well, the
18 second policy is a harassment statement,
19 and the third policy is an Equal
20 Employment Opportunity Policy.  Do you
21 remember talking about those in your
22 orientation?
23 A.    Probably.  I cannot remember,

Page 68

1 but more than likely.
2 Q.    It's fair to say that the
3 policies and procedures that are checked
4 on this checklist that you signed on
5 October 2 of 2003, that those are
6 policies you covered?
7 A.    I believe so, yes.
8 Q.       And you also see under the,
9 "Employment With Pemco Summary," which
10 includes the following topics, under
11 the, "Reviewed and Discussed," part,
12 that, "Employment at will, workplace
13 violence."  Do you see those?
14 A.    Yes.
15 Q.       Do you know what "employment
16 at will" means?
17 A.    Only after I was terminated
18 here.
19 Q.       And what is your
20 understanding of what "employment at
21 will" is, if you have one?
22 A.    Well, from what I was told is
23 that at any time, they can fire you for

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 69

1  whatever reason; and at the same time,
2  you can leave the work for whatever
3  reason, without any advance notice.
4  Q.      And according to this
5  checklist, that was covered during
6  orientation?
7  A.      Yeah.
8  Q.      And do you remember hearing
9  about that in orientation?
10  A.      No.  That's why I don't
11  understand it, only after I was
12  terminated.
13  Q.      Did you know during your
14  employment at Pemco that if you got a
15  better job somewhere else, that you
16  could leave if you wanted?
17  A.      Yeah, you're free to leave.
18  But the way I understand, you've got to
19  put in at least advanced notice.
20  Q.      One of the other topics were
21  safety rules on here.  Do you remember
22  talking about safety during your
23  orientation?

Page 70

1  A.      Yes.
2  Q.      And workers' compensation, do
3  you remember talking about that?
4  A.      No.
5  Q.      Do you understand what
6  workers' compensation is?
7  A.      Only now.  Actually, it's
8  still vague for me.
9  Q.      Well, when you worked for
10  G.E. and you were hurt on the job, did
11  you understand what workers'
12  compensation was?
13  A.      No.
14  Q.      Did you have to pay for any
15  of your medical benefits you received
16  after you injured your thumb at G.E.?
17  A.      No.
18  Q.      The company paid for that?
19  A.      I believe they did, yes.
20  Q.      I want to go back to
21  something.  You said that prior to
22  working for Pemco in 2003, I believe you
23  said you were unemployed.

Page 71

1  A.      Yes.
2  Q.      Did you ever work for Fed Ex?
3  A.      Yes.
4  Q.      We missed that one.
5  A.      We did?  Yeah, that's right.
6  Q.      Tell me about your employment
7  at Fed Ex.
8  A.      It's not employment with Fed
9  Ex.  It's business that -- they put in
10  an ad for business proposals, like you
11  will be a contractor for them.  You buy
12  your own truck and they supply you the
13  routes and they give you X amount of
14  money for your truck, your gas and
15  maintenance and that's it.
16  Q.      And you did that for --
17  A.      I did that, I can't remember
18  for how long.  I believe it was in
19  February -- October to February,
20  something like that.
21  Q.      So you had a contract with
22  Fed Ex that said, "I will do all
23  these -- I will deliver packages, pick

Page 72

1  up packages, et cetera, and in turn, as
2  part of the contract, you'll pay me
3  whatever amount"?
4  A.      Well, at that time, it's not
5  a contract.  What they gave me was like
6  an employment form, so it's just like
7  testing the water.  Once you have
8  learned the business, then they will be
9  the one to help you finance for the
10  truck or to get the truck and they will
11  supply you with the route.  But
12  throughout that time, I was able to
13  gauge that it's not going to be
14  profitable for me.  It's just Fed Ex
15  that's going to be profiting from it and
16  I will be just breaking even, so it's
17  not a business.
18  Q.      But during that time, you
19  were doing some work related to Fed Ex?
20  A.      Yes.
21  Q.      And you were getting paid by
22  Fed Ex?
23  A.      Yes, yes.

18 (Pages 69 to 72)

# FREEDOM COURT REPORTING

Page 73

1  Q.        And you're just saying it's
2  not an employment arrangement?
3  A.        No.
4  Q.        It's a contract?
5  A.        Yes.
6  Q.        Or a contractor arrangement?
7  A.        Contractor arrangement, but
8  what they asked us to fill out is like
9  an application form, so that they can
10 verify everything what you're writing
11 there.  And even in the wee hours of the
12 night, I'll be working, delivering
13 packages, when others are not.
14 Q.        Did you have any issues with
15 anyone at Fed Ex during your time?
16 A.        No.
17 Q.        Any injuries on-the-job or
18 problems delivering packages?
19 A.        No, none.
20          (Whereupon, Defendant's
21          Exhibit Number 3 was
22          marked for identification.)
23 Q.        (By Mr. Holmes)  Okay.  Mr.

Page 74

1  Camacho, I'm going to show you what I've
2  marked as Defendant's Exhibit 3 to your
3  deposition, and I'll ask you to take a
4  moment and review that.
5  A.        I'm finished.
6  Q.        Okay.  Thank you.  Can you
7  confirm for me that on the bottom of
8  Defendant's Exhibit 3 to your
9  deposition, that's your signature?
10 A.        Yes.
11          (Whereupon, Defendant's
12          Exhibit Number 4 was
13          marked for identification.)
14 Q.        (By Mr. Holmes)  Let me give
15 you Defendant's Exhibit 4.  And if
16 you'll confirm for me that that's your
17 signature on that page.
18 A.        This is my signature.
19 Q.        And did you receive safety
20 glasses on October 1, 2003?
21 A.        Yes, and they were broke the
22 second day, because they are not that
23 tough.

Page 75

1  Q.        You broke both pairs?
2  A.        No, just one pair.
3  Q.        Just one pair?
4  A.        The clear one.
5  Q.        And were you able to get
6  additional safety glasses?
7  A.        No, only after, when I can
8  get to Hangar 15.
9  Q.        And how long did that take?
10 A.        After two weeks.
11 Q.        So you had two pairs of
12 safety glasses beginning October 1,
13 2003.  The first pair broke within a
14 day?
15 A.        After second day.
16 Q.        After the second day.  And
17 then you had the tinted ones, though,
18 for another week?
19 A.        Yes.
20 Q.        And did you wear those?
21 A.        No.  It's dark, and I work at
22 night.
23 Q.        Did you ask for more safety

Page 76

1  glasses?
2  A.        No, because of the fast pace
3  work.
4  Q.        Did anybody ever ask you why
5  you weren't wearing safety glasses?
6  A.        No.
7  Q.        Were other employees not
8  wearing safety glasses?
9  A.        Yes.  It's a common thing.
10 Q.        The condition, skin condition
11 that you had or -- and by that, I mean
12 the irritation that you had in working
13 with the fiberglass, has that ever
14 affected your eyes?
15 A.        Yes, because it will become
16 red and tears.
17 Q.        And when you wore safety
18 glasses, did that still happen?
19 A.        Yes, because it's not really
20 sealed.  It's just like a regular
21 eyeglass; still can go in.
22 Q.        And you're wearing eyeglasses
23 today.  Have you always worn eyeglasses?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 77

1  A.      No, it's only lately that
2  I've been wearing eyeglasses.
3  Q.      During your work for Pemco,
4  did you wear eyeglasses?
5  A.      No.
6  Q.      Did you ever take a physical,
7  prior to working for Pemco?
8  A.      Yes.
9  Q.      And did you pass that
10 physical?
11 A.      Yes.
12 Q.      Were there any physical
13 restrictions placed on you?
14 A.      None.
15 Q.      And was that prior to October
16 of 2003?
17 A.      Yes, before being hired,
18 you've got to go through physical.
19 Q.      Prior to October 1, 2003, had
20 you ever worked around fiberglass
21 before?
22 A.      No.
23 Q.      Were you aware of any

Page 78

1  irritation that you had with fiberglass?
2  A.      No.
3  Q.      But after working there for
4  approximately a month before becoming a
5  Pemco employee, you did become aware of
6  that?
7  A.      Not really.  I was not aware
8  until somebody told me it's because of
9  the fiberglass.
10 Q.      The itchiness that you were
11 feeling, you didn't associate that with
12 the fiberglass?
13 A.      No, no, I have no idea.
14 Q.      When did you become aware of
15 that?
16 A.      When I was complaining that I
17 can't sleep, I'm irritated.  And, you
18 know, they told me it's because of the
19 fiberglass.  I said, "Why?  What does it
20 do?"
21         "Well, it goes to your skin
22 and pricks you."
23 Q.      And when did you have this

Page 79

1  conversation?
2  A.      After the second week.  They
3  told me to take a cold shower, which I
4  did every day, and still it doesn't fix
5  it.  I have to throw my clothes -- I had
6  to roll, you know, the masking tape all
7  over my body before taking a shower.
8  Q.      And did you talk to Jerry
9  about this?
10 A.      Yeah.
11 Q.      Is that the person who was
12 telling you that you needed to take a
13 cold shower and those things?
14 A.      Yeah, yeah.
15 Q.      Did you ever talk to Mr.
16 Briody about this?
17 A.      No.
18 Q.      Did you ever talk to anybody
19 in personnel?
20 A.      Yes.  I cannot remember the
21 other peoples' names, but they said,
22 yeah, it's because of the fiberglass.
23 And Mr. Woods, for one, so --

Page 80

1  Q.      That was another person that
2  you talked to about the fiberglass?
3  A.      Yes, yes.
4  Q.      And what about the -- when
5  you wore the coveralls, did that help?
6  A.      Not really, because it goes
7  through.  It penetrates.
8  Q.      So the fiberglass penetrates
9  the coveralls?
10 A.      Yeah, it's only very thin,
11 paper-like with pores.
12 Q.      And is that what other
13 employees were wearing?
14 A.      Yes.
15 Q.      And did any employees have
16 other coveralls that they brought that
17 were their own?
18 A.      I didn't see anything.  It's
19 just all white.
20 Q.      What was your job title when
21 you became a Pemco employee?
22 A.      A&P mechanic.
23 Q.      And what does that stand for?

20  (Pages 77 to 80)

# FREEDOM COURT REPORTING

Page 81

1  A.      Airframe and power plant
2  mechanic.
3  Q.      And was Mr. Briody your
4  supervisor?
5  A.      Yes.
6  Q.      And was he your same
7  supervisor throughout your employment?
8  A.      No.
9  Q.      How long were you supervised
10 by Mr. Briody?
11 A.      About a month.
12 Q.      During October -- in October
13 of 2003?
14 A.      Yeah, because after we
15 finished the TNT aircraft, they sent me
16 to Mr. B.J. Watson, B.J. Watson's crew.
17 And after a week with Mr. Watson, I was
18 recalled by Mr. Briody to the TNT
19 aircraft, because they have some
20 problems, so we need to finish it up.
21 And then after the airplane was
22 delivered, took off, I was sent back to
23 Mr. Watson.  And when I came back, they

Page 82

1  said that there was a reorganization of
2  the crew of Mr. Watson, and so I no
3  longer worked for Mr. Watson and they
4  send me to Mr. Gary Cooper.
5  Q.      The problems with the TNT
6  aircraft that you testified about when
7  you said Mr. Briody called you back
8  after being with Mr. Watson for one
9  week, were those problems related to any
10 of the work that you had done?
11 A.      No, no, other work that needs
12 to be finished.
13 Q.      It was work that had not yet
14 been completed, but they needed help?
15 A.      Right, they needed help, any
16 manpower that they can get.
17 Q.      What were the things that you
18 were doing for Mr. Watson on his crew?
19 A.      Lubing the gears, the landing
20 gears, the slots, the flaps.
21 Q.      Is that all within the job
22 description and duties of an A&P
23 mechanic?

Page 83

1  A.      Yes.
2  Q.      How did you get along with
3  Mr. Watson?
4  A.      Very good.
5  Q.      And what about his crew?
6  A.      Very good.
7  Q.      Any problems with your work,
8  as far as you know, at this point?
9  A.      No.
10 Q.      What about with Gary Cooper?
11 Tell me about what you were doing for
12 his crew.
13 A.      The same thing.  We were
14 assigned to the Northwest Airlines DC9
15 aircraft, same thing with Mr. Watson.
16 We do the cargo, the whole airplane.
17 But then again, Mr. Cooper always
18 assigned me to the cargo and to areas
19 that are, you know, tight and
20 uncomfortable place to be in.
21 Q.      Were other employees assigned
22 to cargo as well?
23 A.      Yes.

Page 84

1  Q.      You weren't the only one
2  doing cargo work?
3  A.      No.
4  Q.      Have you ever complained to
5  Mr. Cooper about your job assignments?
6  A.      No.
7  Q.      Did you ever complain to
8  anybody at the union about your job
9  assignments?
10 A.      No.
11 Q.      Did you ever go to HR and
12 tell them that you didn't like your job
13 assignments?
14 A.      No.
15 Q.      Are you contending that Mr.
16 Cooper was giving you these job
17 assignments based on your national
18 origin?
19 A.      Yes, because that night, just
20 being on the first day with him, he
21 already warned me.  He was intimidating
22 me.
23 Q.      What do you mean by "he

21 (Pages 81 to 84)

# FREEDOM COURT REPORTING

Page 85

1  already warned me"?
2  A.      He said I'm slow.
3  Q.      Explain to me how him saying
4  that you're slow has anything to do with
5  you being Philippino.
6  A.      Well, probably because I am
7  not born and raised in America, the way
8  the American individual is being raised,
9  the tradition, the culture, the
10 discipline is being imparted to each and
11 every one. He kind of expect that from
12 a person, to a person like me, but since
13 I'm foreign born, he -- to him, I do not
14 meet that classification. And to him, I
15 am not worth.
16 Q.      You are not what, I'm sorry?
17 A.      Not worth.
18 Q.      I don't understand what you
19 just said. Not --
20 A.      Not worth being in the same
21 category as an American, like, you
22 know --
23 Q.      I don't know, Mr. Camacho,

Page 86

1  and that's one of the reasons we're here
2  today, is for me to understand what
3  you're talking about and what you're
4  complaining about. And what I'd like to
5  know, did Mr. Cooper ever say anything
6  to you about being Philippino?
7  A.      Yes.
8  Q.      Tell me the things that he
9  said to you.
10 A.      I remember, he had the
11 degenerating comments, you know, but not
12 that often.
13 Q.      How many times did he say --
14 and I think you mean derogatory
15 comments?
16 A.      Derogatory, yeah.
17 Q.      Not very often, is that --
18 A.      No.
19 Q.      One, two times?
20 A.      Probably two times.
21 Q.      And specifically what did he
22 say on those two occasions?
23 A.      I can't remember, but it is

Page 87

1  demeaning.
2  Q.      Did you ever hear him say
3  anything to anybody else about
4  Philippinos or you specifically?
5  A.      Could be.
6  Q.      Did you hear him say
7  anything?
8  A.      No. Oh, wait. Probably in
9  other conversation that him and his
10 buddies -- you know, like ordinary
11 talks.
12 Q.      But you can't remember
13 anything specifically that he said?
14 A.      Yes, yes.
15 Q.      That's --
16 A.      Like it is something
17 demeaning and it offended me.
18 Q.      So you remember feeling
19 offended?
20 A.      Yes.
21 Q.      And what did you do when you
22 felt offended?
23 A.      I'd just ignore it.

Page 88

1  Q.      Did you go to HR and tell
2  them that you felt offended?
3  A.      No.
4  Q.      Did you complain to anybody
5  about Mr. Cooper?
6  A.      No.
7  Q.      Did you quit work and say,
8  "I'm going to go home today, because I
9  can't be here"?
10 A.      No, but every day is like I
11 don't want to go to work, but I have to
12 work.
13 Q.      Did you ever ask anybody to
14 work in a different department or report
15 to a different supervisor?
16 A.      No.
17 Q.      Do you remember anything else
18 that Mr. Cooper said to you, other than
19 the first night, telling you that you're
20 slow?
21 A.      The third day, he gave me a
22 written warning, and he doesn't even
23 know me well. He gives the warning. I

22  (Pages 85 to 88)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 89

1  was just on my third day. My first day
2  and third day.
3  Q.        He gave you a written
4  warning?
5  A.        Yes.
6  Q.        Did you give me a copy of
7  that?
8  A.        I don't have a copy myself.
9  Q.        Okay. So you've gotten other
10  warnings, but the one you're
11  specifically talking about that Mr.
12  Cooper gave you the third day you worked
13  for him --
14  A.        Is from the company.
15         (Whereupon, Defendant's
16         Exhibit Number 5 was
17         marked for identification.)
18  Q.        (By Mr. Holmes) Okay. Let
19  me show you what I'm marking as
20  Defendant's Exhibit 5 to your
21  deposition. If you'll take a moment and
22  review that.
23  A.        I'm finished.

Page 90

1  Q.        Is this the warning that
2  you're talking about?
3  A.        I'm not quite sure.
4  Q.        It appears to be dated
5  December 12th of 2003. Is that about
6  the time frame that you began working
7  for Mr. Cooper?
8  A.        No, no, I was already working
9  for him on December 12th. See, the TNT
10  airplane was delivered on November 13
11  and I went back to Mr. Watson, and then
12  they told me that I need to -- they sent
13  me to Mr. Cooper, to work for Mr.
14  Cooper.
15  Q.        So Defendant's Exhibit 5 is
16  something else?
17  A.        Could be.
18  Q.        Do you remember receiving a
19  verbal warning or consulting from Mr.
20  Cooper on December 12, 2003?
21  A.        No.
22  Q.        Do you think it happened and
23  you just don't remember?

Page 91

1  A.        No, I don't think it
2  happened.
3  Q.        So you think that Defendant's
4  Exhibit 5, that never happened?
5  A.        Yes, because I don't recall
6  this one here.
7  Q.        Okay. You don't know either
8  way, because you don't remember?
9  A.        That could be true.
10         (Whereupon, Defendant's
11         Exhibit Number 6 was
12         marked for identification.)
13  Q.        (By Mr. Holmes) Let me mark
14  another document for you, and this is
15  one that you gave me for today. This is
16  Defendant's Exhibit 6 to your
17  deposition. If you'll take a moment and
18  review that, please.
19  A.        Yes, I'm finished.
20  Q.        And I realize we're jumping
21  ahead here, but that date on Defendant's
22  Exhibit 6 to your deposition is October
23  29th, 2004. Do you remember receiving

Page 92

1  this verbal warning?
2  A.        Yes.
3  Q.        And did you disagree with
4  that warning?
5  A.        There's a big thing about
6  this warning. It's not only me who were
7  involved. There were other crew that
8  was involved in this, specifically Mr.
9  Gary Riddle. He's, I believe, a
10  policeman, at the same time working for
11  Pemco. And he was tasked to do the
12  forward cargo in spraying the CIC or
13  corrosion inhibiting compound. At first
14  he thought he was to be assigned the aft
15  cargo, and we told him it's only me and
16  another guy, and he's not supposed to be
17  there. So he asked and then he found
18  out that he's supposed to work in the
19  forward. But when he was finished, he
20  was still to work with us.
21         At the time, we were cleaning
22  the aft cargo. We were not done, but we
23  were being rushed. So knowing that he

23  (Pages 89 to 92)

# FREEDOM COURT REPORTING

Page 93

1  will spray the CIC, it will be hitting
2  the cables and pulleys, which is a
3  critical area, so I put in strips of
4  rags.  He saw it, took it over from the
5  spray, so it's not going to corrode the
6  cables.  So being advanced on this day,
7  things are already -- you know, like I
8  said, I don't feel like working every
9  day, because I'm intimidated and being
10  harassed and discriminated, to -- when
11  he will apply the CIC, people has to be
12  away, because this is a very toxic
13  substance, and basically you have to
14  notify and post a sign, to get the
15  people out.  We were being rushed.
16      And so after putting the
17  rags, we came out and he started
18  spraying.  For me not to be looked upon
19  as being idle, I have to ask for another
20  job, which is by nature, that's me,
21  because I don't want to be standing
22  around.  So I asked for another job.  I
23  was given a lubricating job.  Towards

Page 94

1  the end, I was -- I finished the job by
2  the end of the night.  And Mr. Gary
3  Riddle signed the paperwork as complete,
4  meaning that you have to inspect the
5  area before you sign, everything, that
6  things are removed, but he signed it
7  complete, and towards that night, you
8  know, I forgot these things.  It was
9  there too.  I am -- I can say that, you
10  know, I should have checked it too.
11      So the following day, when
12  they cycle the cables, it went through
13  and it jumped on the pulley.  It jumped
14  off the pulley, so they have to install
15  it back.  That's the thing.  And that
16  following day, that night, October 29,
17  they said that they're going to give us
18  verbal warning.  I was given a written
19  verbal.  Mr. Riddle was not.  I was
20  fired.  He was not.  He was just changed
21  to day shift.  And because I -- that
22  night too, I told -- because when they
23  gave this thing (indicating), Mr.

Page 95

1  Briody --
2  Q.     "This thing," Defendant's
3  Exhibit 6?
4  A.     Yes, Defendant's Exhibit 6.
5  Q.     Okay.
6  A.     There was -- the first one
7  was a conference between Mr. Riddle, the
8  shop steward, Mr. Gipner, Mr. Briody
9  and Mr. Dewayne Music, Mr. Dewayne Music
10  being the new supervisor at that time
11  already replacing Mr. Cooper.  He was
12  verbally counselled, but not in writing.
13  I was --
14  Q.     Who?  You're speaking of Mr.
15  Riddle?
16  A.     Mr. Riddle, yeah.
17  Q.     Okay.
18  A.     I was written up a verbal
19  warning, so --
20  Q.     Do you have any idea whether
21  or not Mr. Riddle had received any prior
22  discipline?
23  A.     I don't have any idea.

Page 96

1  Q.     Did you work with Mr. Riddle
2  frequently?
3  A.     Yes.
4  Q.     Did you ever see him getting
5  disciplined or any verbal counseling?
6  A.     No, the only time that I saw
7  is when, on this day --
8  Q.     On October 29?
9  A.     October 29.
10  Q.     2004?
11  A.     Uh-huh.
12  Q.     And you said that you should
13  have gone back and checked.  Is that why
14  you signed this?
15  A.     Yes.
16  Q.     And is that your signature on
17  Defendant's Exhibit 6?
18  A.     Yes.
19  Q.     Let's go back to October --
20  A.     See, because I'm already --
21  you know, on this one, like I said,
22  every day is a day that you don't feel
23  like working, because you're already

24  (Pages 93 to 96)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 97

1  intimidated and harassed and
2  discriminated upon.
3  Q.    And that's what I want to
4  understand, Mr. Camacho. I want to go
5  back to when you started working for Mr.
6  Cooper --
7  A.    And you commit a mistake.
8  Q.    I'm sorry?
9  A.    And you commit a mistake like
10  this one.
11  Q.    You said that the first night
12  you worked for Mr. Cooper, he warned you
13  that you were slow?
14  A.    Yes.
15  Q.    And that was intimidating to
16  you?
17  A.    Yes. Not only that, but the
18  way he would deliver and, you know, his
19  looks and the way he delivered it, you
20  know, he could have been more friendly
21  in saying that -- if he really finds me
22  slow, he could have said it in a better
23  way.

Page 98

1  Q.    You didn't like the way he
2  delivered the message?
3  A.    No. It's like I said, he
4  belittles you.
5  Q.    Were there any other
6  Philippino employees at Pemco during
7  your time there?
8  A.    Yes. Not an employee, but a
9  contractor, but towards the end, but he
10  is not in my crew.
11  Q.    And do you remember that
12  person's name?
13  A.    Not really. He has a
14  foreign -- I mean an American last name.
15  Q.    Did you ever have a
16  conversation with him about any
17  treatment he had received or felt like
18  any discrimination he had experienced?
19  A.    No, I never talk about it.
20  Q.    Did he ever tell you, "Mr.
21  Camacho or Wilfredo, I'm being harassed
22  because I'm Philippino"?
23  A.    We never talk about things

Page 99

1  like that, so I don't know. I mean he
2  never --
3  Q.    He never said that to you?
4  A.    No.
5  Q.    How many people were on your
6  crew that reported to Mr. Cooper?
7  A.    I say 13.
8  Q.    Were there any other foreign
9  born employees on his crew?
10  A.    Yes.
11  Q.    How many of the 13?
12  A.    Probably two more.
13  Q.    And do you remember --
14  A.    Well, sometimes three.
15  Q.    Do you remember those
16  employees?
17  A.    Yes, one is Mr. -- a Sudanese
18  guy, Saudi -- Saudi or something, but
19  the first name, I think, is Malick
20  (phonetic spelling).
21  Q.    And he's from the Sudan?
22  A.    Yes.
23  Q.    Okay. What other --

Page 100

1  A.    The other one is an
2  Ethiopian, Mr. Adams. And the third guy
3  that came in later, meaning it's not Mr.
4  Cooper who was the supervisor, but
5  towards the end, before my termination,
6  was an Indian guy and I can't remember
7  his name. But he didn't last.
8  Q.    Did you ever see the Sudanese
9  gentleman or the Ethiopian gentleman
10  ever be treated differently because of
11  their national origin?
12  A.    Well, they complained to me.
13  Q.    The three of you discussed
14  these issues that you felt you were
15  having?
16  A.    Yes.
17  Q.    How long did you work for Mr.
18  Cooper?
19  A.    Well, he was our supervisor
20  until May.
21  Q.    So from sometime in November,
22  maybe October, November of '03, late '03
23  till May '04?

25  (Pages 97 to 100)

# FREEDOM COURT REPORTING

Page 101

1  A.     Yeah.
2  Q.     Mr. Cooper was your direct
3  supervisor?
4  A.     Yeah.  And at the same time,
5  Mr. Music was being trained.  I think he
6  came in about February.  He was being
7  trained to take over the crew.
8  Q.     Tell me what other things Mr.
9  Cooper did that you felt like were
10 harassing you based on your national
11 origin.
12 A.     Well, he will be with you all
13 the time.  He would be looking at
14 your -- wherever you are.  He will
15 follow you.  He knows he assigned you to
16 that area, and you will see him pop his
17 head from time to time.  I mean how can
18 you work with that?  If he assigns you
19 work, he should be trustful enough that
20 that work is to be done.  But even when
21 you go just for -- to the restroom, he
22 would be following where you are.  He
23 does not do that to anybody that are his

Page 102

1  buddies, or anybody even not his buddy,
2  but his wife.
3       I mean it's so -- you will
4  feel uneasy and instead of you
5  concentrating on your job, it's imposing
6  something on you that would, you know,
7  make you uneasy.  That's why, like I
8  said, I don't feel like coming back to
9  work every day, but I have no choice but
10 for work.  In spite of that, I don't
11 want to complain.  I just kept going.  I
12 just ignore him.
13 Q.     When you went through
14 orientation, you talked about in
15 orientation an anti-harassment policy.
16 A.     Probably they did.  I just
17 can't remember.
18 Q.     Did you understand that Pemco
19 had a nondiscrimination anti-harassment
20 policy?
21 A.     Yes, yes.
22 Q.     Did you understand that Pemco
23 is an equal employment opportunity

Page 103

1  employer?
2  A.     Yes.
3  Q.     And you never complained to
4  anybody about Mr. Cooper?
5  A.     No.
6  Q.     Anything else Mr. Cooper did
7  to you or said that you felt like was
8  discrimination or harassment?
9  A.     Well, that's it.  That's
10 every day, like I said, all throughout
11 my employment with Pemco.  And it's not
12 just Mr. Cooper; even Mr. Music.
13 Q.     Well, and I want to get to
14 that.  Let's focus on Mr. Cooper for a
15 moment.  Anything else you want to say
16 about Mr. Cooper before we move on to
17 whoever else you identify?
18 A.     Well, he never stopped.  He
19 never stopped doing that.
20 Q.     Watching your work or --
21 A.     Yeah, watching me or the
22 other foreign -- like Mr. Saudi and the
23 Ethiopian guy.  That's why the Ethiopian

Page 104

1  guy, Mr. Adams, requested for him --
2  he's been requesting to be transferred
3  to a day shift or to a different crew,
4  because he feels intimidated too and
5  harassed.  And the same thing with Mr.
6  Saudi something, the Sudanese guy.  He's
7  been pulling up requests and both of
8  them have been denied several times, but
9  eventually Mr. Adams was transferred.
10 Q.     Are they asking for transfers
11 or were they submitting job bids for
12 other jobs?
13 A.     No, requesting for transfer
14 because of the situation with the group,
15 with the supervisor.
16 Q.     With your crew?
17 A.     Yes.
18 Q.     And were there any problems
19 with any of your co-workers or was it
20 Mr. Cooper?
21 A.     Just Mr. Cooper.  The crew
22 was getting along fine.
23 Q.     Who was Mr. Cooper's

26 (Pages 101 to 104)

# FREEDOM COURT REPORTING

Page 105

1  supervisor?
2  A.     That, I don't -- oh, Mr.
3  Briody.
4  Q.     That's who Mr. Cooper
5  reported to?
6  A.     I believe so, because Mr.
7  Briody became the shop -- oh, at the
8  time, it was an old man. I can't
9  remember his name. And then Mr. Briody,
10 I don't know when did Mr. Briody took
11 over his job.
12 Q.     You said you had a pretty
13 good relationship with Mr. Briody?
14 A.     Yes.
15 Q.     Did you ever go talk to him
16 about Mr. Cooper?
17 A.     No.
18 Q.     Let's talk about Mr. Music.
19 A.     Okay.
20 Q.     Tell me what complaints you
21 have about Mr. Music, if any.
22 A.     It's the same thing. He was
23 trained by Mr. Gary Cooper. I believe

Page 106

1  all information that Mr. Gary had
2  probably related to Mr. Music, as far as
3  like myself.
4  Q.     As far as your work
5  performance?
6  A.     No -- yeah, work performance,
7  the -- how I am, how to deal probably
8  with me. Because the same thing, he
9  would be looking for you. And he
10 knows where he assigned you. He would
11 be popping his head from time to time.
12 It's just like he's your security guard
13 there. While you're working, he's
14 watching you. It's very intimidating.
15 And then there would be a time, he gave
16 me this job and then he would time me
17 right there (indicating).
18 Q.     This was Mr. Music?
19 A.     Music, yes.
20 Q.     Would you --
21 A.     He would time me. And then
22 there was even a time when I'd say the
23 crew leader was not there, so it was

Page 107

1  only Mr. Music, who has to delegate the
2  job to each and every worker. He could
3  not delegate. He doesn't know who to
4  give what. And he asked among the crew
5  who has a license, an FAA license, A&P
6  license. I raised my hand and another
7  person, Mr. Jim Jones, raised his hand.
8  There were only two of us among the crew
9  who are licensed. And all of a sudden,
10 because he asked at the time the day
11 shift was, you know, wrapping up things,
12 and the supervisor on the day shift was
13 about to leave, and he has to stop him.
14 I don't know the name of the supervisor.
15 He has to stop him and ask his favor
16 to -- you know, the stack of work loads
17 to be given to people. He interrupted
18 that supervisor about the -- who -- that
19 supervisor was the one who asked for the
20 license. And all of a sudden, when I
21 and Mr. Jones raised our hands up and
22 said we are licensed to do this job, all
23 of a sudden Mr. Music said, "No, he's

Page 108

1  not capable of doing that." He stopped
2  the other person from giving the job to
3  me, and in the presence of the crew,
4  several times. And then there were also
5  times, like --
6  Q.     Can I stop you there for one
7  second and ask you some follow-up
8  questions about what you've said?
9  A.     Sure.
10 Q.     Do you remember who the day
11 shift supervisor was that was asking
12 about the license?
13 A.     I don't know his name, but if
14 I see him, I can point to him.
15 Q.     And was he trying to give you
16 the job or did he just ask who has a
17 license?
18 A.     He asked who has a license.
19 He does not know us.
20 Q.     And you raised your hand?
21 A.     And raised my hand.
22 Q.     And at that point Mr. Music
23 said, "Mr. Camacho is out. He's not

27 (Pages 105 to 108)

# FREEDOM COURT REPORTING

Page 109

1  capable --"
2  A.        He didn't say "out." "He's
3  not capable of doing that."
4  Q.        When you testified a couple
5  of moments ago about Mr. Music being
6  trained by Mr. Cooper with regards to
7  how to deal with you, did you ever hear
8  any of that or see any of that?
9  A.        No, no.
10 Q.        This is your speculation?
11 A.        Yes. In fact, Mr. Music was
12 very good at first. He would even buy
13 boxes of pizzas if somebody would be
14 kind of teasing, "You know, we need some
15 food," he would buy several boxes for
16 the crew.
17        And so at one point, I even
18 told him, "If you don't mind, people
19 might just take advantage of you if you
20 keep on doing this. You'd better stop."
21 I told him that. That was just my
22 comment to him.
23 Q.        And what did he say when you

Page 110

1  were trying to give him that advice?
2  A.        He didn't say anything. He
3  didn't say anything.
4  Q.        So he was buying pizzas for
5  the crew and you told him, "I think
6  people are going to take advantage of
7  you"?
8  A.        Yes, because he's -- you
9  know, him being new to the crew, he
10 wants to be --
11 Q.        Accepted by the crew?
12 A.        Accepted, there we go.
13 Q.        Did Mr. Music, at any point
14 during your employment at Pemco, make
15 any derogatory comment to you about your
16 race or your national origin?
17 A.        Yes. But same thing, from
18 jokes from people, but I just ignore
19 things like that, because I'm hurt.
20 Q.        Mr. Camacho, I need to know
21 how often this happened. I need to know
22 was this every day, was this -- you've
23 testified --

Page 111

1  A.        No, not every day.
2  Q.        You've testified that Mr.
3  Cooper said it twice, but you don't
4  remember what he said. How many times
5  did Mr. Music make a derogatory comment?
6  A.        Almost the same as -- once or
7  twice.
8  Q.        And do you remember what he
9  said?
10 A.        No.
11 Q.        You just remember you felt
12 offended?
13 A.        Yes.
14 Q.        And at any time when Mr.
15 Cooper or Mr. Music were popping their
16 head into the cargo area where you were
17 working or observing your work, at any
18 time, did they say anything to you about
19 the work you were doing?
20 A.        Yes, "Hurry up. Finish the
21 job. You're slow."
22 Q.        Ever say anything about your
23 race or being from the Philippines?

Page 112

1  A.        I'd say, yes, I think because
2  it's Philippino.
3  Q.        They said --
4  A.        I am more than -- about 70
5  percent that I can say yes.
6  Q.        Well, and I'm -- I want to be
7  clear. You're saying that during those
8  times when they were commenting to you
9  about hurrying up, they actually told
10 you, "Hurry up. You're slow because
11 you're a Philippino"?
12 A.        Uh-huh, yes.
13 Q.        And you're 70 percent sure
14 that they said that?
15 A.        Yes, yes.
16 Q.        Okay.
17 A.        There was even a time, again,
18 on the cargo compartment, it was kind of
19 relating what he was doing when he was a
20 mechanic. He said, "Oh, I love this job
21 here. And I end up sleeping. Hey, you
22 guys, you're lucky you're assigned
23 there. You can kind of snooze in

28 (Pages 109 to 112)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

### Page 113

1 there."
2    I said, "No, I don't do
3 that." And then there were even times
4 when --
5 Q.    And I'm sorry, who told you
6 this?
7 A.    Mr. Music.
8 Q.    And do you remember about
9 when this conversation took place?
10 A.    When he was fairly new.
11 Q.    And explain to me how that
12 comment about you being able to sleep in
13 the cargo is in any way related to your
14 national origin.
15 A.    Well, he was saying it in
16 general there, that kind of comment
17 there, because he was saying when he was
18 a mechanic, being assigned those -- you
19 know, when people cannot see you, you
20 can kind of snooze in there without
21 being known.
22 Q.    And you thought that was
23 intimidating for him to tell you that?

### Page 114

1 A.    No, I was not -- I was not
2 viewing that as a -- well, it is
3 derogatory to me, because he's implying
4 that, "You guys are sleeping there or,
5 you know, you're taking your sweet time
6 to work there, so you can rest."
7 Q.    That's how you understood
8 what he was saying?
9 A.    Yes, because that was the
10 implication.
11 Q.    He didn't say that, but that
12 was what you understood him to be
13 implying?
14 A.    Yes, because it was very
15 clear to me that that is his
16 implication, because he said, "You guys
17 can do that." He was just saying when
18 he was working with UPS as a mechanic,
19 he was doing it, and then he followed
20 it, "And you guys, you're lucky you're
21 working here."
22    And another connotation to
23 that was that, you know, it's just like

### Page 115

1 he's making it nice that we are working
2 there, that -- you know, out of the view
3 from people.
4 Q.    Do you think it's possible
5 that he was just telling a story about
6 himself, from when he worked at UPS?
7 A.    He said that story about
8 himself and then he said that for us, to
9 kind of follow that; that, you know, the
10 big chances of us doing it is very high.
11 Also, another situation is like --
12 Q.    Was this with Mr. Music?
13 A.    Yes.
14 Q.    Okay.
15 A.    Another situation is another
16 guy, an avionics personnel, his name is
17 Mr. Brewster, he heard what Mr. Music
18 was -- told me that I can only do menial
19 jobs, and so Mr. Brewster, every time
20 that we end up working at arm's length
21 or in the vicinity, he would joke on me,
22 saying, "Hey, you're just capable of
23 doing menial jobs." I mean --

### Page 116

1 Q.    And I'm trying to -- let me
2 stop you there for one second, if I can.
3 I'm trying to understand how that
4 sequence happened. Mr. Brewster is one
5 of your co-workers?
6 A.    Not from our crew. He's an
7 independent crew that can go from one
8 work area to another, because they're
9 avionics, so if like our crew would need
10 an avionics personnel to work on a
11 problem with regard to avionics, then
12 their supervisor will fill people, one
13 or two. You know, let's say our crew
14 would need them. Then I'm working in
15 the area and then he's there and then
16 he'll be teasing me about it.
17 Q.    And Mr. Brewster told you
18 that Mr. Music had told Mr. Brewster
19 that you could only do menial jobs?
20 A.    Yes, because he heard it when
21 I and Mr. Music was conversing, and then
22 he was there.
23 Q.    Okay. So you --

29 (Pages 113 to 116)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

**Page 117**

1  A.      And then, so hearing it,
2  every time we ended up working together,
3  he would comment on that, "You can just
4  do menial job."
5  Q.      Did you ever tell him, "Mr.
6  Brewster, you know, I don't like that"?
7  A.      No, no, I never complained.
8  I tried to ignore things, because I just
9  want to work and earn a living for my
10  family.
11  Q.      What else did Mr. Music do or
12  say to you that you felt was
13  discriminating against you on the basis
14  of your national origin?
15  A.      None -- none -- whatever I
16  said, that's it.
17  Q.      Okay.  So we're done with Mr.
18  Music, as far as your national origin is
19  concerned?
20  A.      Right.  But there was also an
21  instant -- what was that?  I lost it.  I
22  can't remember.
23  Q.      If you do, please tell me.

**Page 118**

1  A.      Yes.
2  Q.      Because I'd like to hear
3  about it.
4  A.      Yes.
5  Q.      Any other employee at Pemco
6  that you felt was discriminating against
7  you or harassing you on the basis of
8  your national origin other than Mr.
9  Cooper and Mr. Music?
10  A.      I never heard anyone, you
11  know, except Mr. Brewster joking, but,
12  you know, I ignore it.
13  Q.      And you didn't -- and you
14  thought that Mr. Brewster was just
15  teasing you?
16  A.      Yes.
17  Q.      You didn't take that to be
18  mean on his part?
19  A.      Well, it hurts me, but, you
20  know, I find it belittling, even if it
21  is -- probably to him, it's a joke.  It
22  hurts.
23  Q.      And did you say anything to

**Page 119**

1  anybody about Mr. Brewster?
2  A.      No.
3  Q.      And how long was Mr. Music
4  your supervisor?
5  A.      Until I was fired.
6  Q.      So from February, he was a
7  supervisor in training?
8  A.      In training.
9  Q.      Until May of '04?
10  A.      Uh-huh.
11  Q.      Is that when he became your
12  supervisor full-time?
13  A.      Yes.
14  Q.      And then from May of '04
15  until your termination at the end of
16  '04 --
17  A.      October 29 -- I mean until
18  November 3.
19  Q.      Of '04?
20  A.      Of '04.  Oh, I remember now,
21  because sometime in June, I had an
22  emergency.  My wife's mother died, and
23  they are from the Philippines.  I went

**Page 120**

1  on an emergency leave, and then came
2  back after a month, I believe, and then
3  after 13 days, my wife's father died, so
4  it's a back to back emergency leave,
5  emergency situation, that when I came
6  back in August, I kind of observed that
7  he changed from, you know, being jolly
8  to me personally.  And in August of that
9  same month, I was sent by him to the
10  safety office, where the fire department
11  is, so that they want me to qualify on
12  that -- spraying the CIC, so I had to
13  take this breathing test or something.
14  And I did that, but I failed.
15      And the gentleman said, "That
16  something's blocking your airway," he
17  did at the end, and I failed.  We did it
18  several times, we tried it, and I
19  failed.  And then he showed me the
20  result.
21      I said, "How come this is not
22  my name and -- but the badge is my
23  badge?"

30 (Pages 117 to 120)

# FREEDOM COURT REPORTING

### Page 121

1    He said, "Oh, don't worry
2 about it. It's okay. That's you."
3    Okay. And so I went back to
4 the Hangar 15 and told Mr. Music about
5 failing the test. And he right away
6 said I intentionally failed it because I
7 don't -- he said that I don't want to be
8 assigned to that spraying of the CIC.
9    I said, "No, I'm not
10 intentionally failing this thing. I am
11 concerned that I failed." But he took
12 it like I was intentionally failing it.
13 Q.    Did you want to receive the
14 CIC qualification so you could do that?
15 A.    Of course; because it's
16 another qualification that I can put
17 down.
18 Q.    Do you get paid more to do
19 that?
20 A.    I do not.
21 Q.    Do you remember how much you
22 got paid at Pemco when you began?
23 A.    It should be in there. I

### Page 122

1 believe it's 17.22, basic rate, and 25
2 cents for each license, so that's 50
3 cents, and 15 cents difference, night
4 differential. And overtime is time and
5 a half after 40 hours. I'm not sure
6 about the double time. I don't
7 understand that.
8 Q.    Did you work weekends?
9 A.    Yes.
10 Q.    Did you get pay increases
11 during your employment at Pemco?
12 A.    Only -- that was in August of
13 2005, when they had that CBA --
14 Q.    2004?
15 A.    Oh, I'm sorry, 2004, when
16 they had -- I think it's already
17 included in the CBA. I don't know.
18 Q.    Cost of living increase?
19 A.    I don't know exactly.
20 Q.    All employees got?
21 A.    All employees automatically,
22 yes.
23 Q.    Did you work on the night

### Page 123

1 shift your entire time?
2 A.    Yes.
3 Q.    You said that after you got
4 back from the Philippines in August
5 2004, there was -- that's when Mr. Music
6 was no longer being nice to you?
7 A.    Yes.
8 Q.    Was everything okay before
9 then?
10 A.    Yes.
11 Q.    So the problems with Mr.
12 Music were sometime in August 2004 and
13 after?
14 A.    Yes.
15 Q.    And the problems with Mr.
16 Cooper were from the end of '03 until
17 May of '04?
18 A.    Yes.
19 Q.    So between May of '04 until
20 August of '04, no problems?
21 A.    No problems.
22    (Whereupon, Defendant's
23    Exhibit Number 7 was

### Page 124

1    marked for identification.)
2 Q.    (By Mr. Holmes) Let me show
3 you what I'm marking as Defendant's
4 Exhibit Number 7 to your deposition.
5 And if you'll take a moment and review
6 that.
7 A.    Yes.
8 Q.    You've had a chance to review
9 Defendant's Exhibit 7?
10 A.    Just today.
11 Q.    Sure. Is this what you were
12 talking about, the leave of absence that
13 you requested to return to the
14 Philippines?
15 A.    Yes.
16 Q.    And you did indeed take this
17 leave?
18 A.    Beg your pardon?
19 Q.    You did take this leave?
20 A.    Yes, yes.
21 Q.    Okay. And Pemco was willing
22 to let you go to the Philippines?
23 A.    Actually, at first, not. But

31 (Pages 121 to 124)

### 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 125

1  I told Mr. Music I would leave, no
2  matter what. If they need to fire me at
3  that time, I will accept it.
4  Q.       Who did you go to, to request
5  this leave of absence? To Mr. Music?
6  A.       To Mr. Music.
7  Q.       Did you ever talk to anybody
8  in human resources?
9  A.       No, because it is very
10 abrupt. I had to go back to
11 Jacksonville that night. See, we were
12 already walking out of the building and
13 he was about to go to the other hangar
14 while I was out there.
15 Q.       "He" is Mr. Music?
16 A.       Mr. Music. And I received a
17 call about the death, and I exclaimed,
18 you know, and he overheard it, and then
19 he came to me and asked me what's going
20 on. I said, "My mother-in-law just died
21 and I need to go to the Philippines
22 right away."
23       So that night, I told him,

Page 126

1  "I'm not going to be able to work,
2  because I have to go to the
3  Philippines." And that night, I had to
4  go to Jacksonville, so we could
5  arrange -- my wife and I could arrange
6  the plane and all those things. And we
7  left right away.
8  Q.       And the -- you left right
9  away and you -- what was your
10 understanding of when you would be back?
11 Did you have one?
12 A.       I don't have any
13 understanding how long will it take.
14 Q.       When did you tell Pemco, "I'm
15 coming back"?
16 A.       I never -- I thought I -- I'm
17 not sure, but I think I told him that
18 I'll be back three to four weeks after.
19 Q.       And then you returned in
20 July?
21 A.       Yes. After 13 days, my
22 father-in-law died.
23 Q.       Let me -- and I'm sorry for

Page 127

1  both of your family's losses, but let me
2  ask you about -- is July 11 when you
3  returned to Pemco or the day after, July
4  12, 2004, when you returned from your
5  first trip to the Philippines?
6  A.       Yeah, because my
7  mother-in-law died in June and my
8  father-in-law died in July, the same
9  day, July 22.
10 Q.       When you got back on or about
11 July 12, 2004, you were back at work?
12 A.       Possibly. I can't remember a
13 date, but --
14 Q.       You were back at work before
15 your father-in-law passed?
16 A.       Right.
17 Q.       And were there any problems
18 with returning to work when you came
19 back?
20 A.       No, none.
21 Q.       Nobody said anything about
22 you being away? Nobody complained about
23 you going to the Philippines?

Page 128

1  A.       Nobody.
2  Q.       No comments from Mr. Music
3  about you being gone?
4  A.       None.
5  Q.       And then you said on July
6  22nd, I believe, of 2004 --
7  A.       22nd, same date.
8  Q.       Same day, one month later?
9  A.       One month later.
10 Q.       Your father-in-law passed?
11 A.       Right.
12 Q.       And did you ask to go back to
13 the Philippines?
14 A.       Yes, I asked Mr. Music.
15 Q.       And were you allowed to go
16 back?
17 A.       He was kind of hesitant at
18 that time already, because I was out the
19 first time for quite sometime, and then
20 he was hesitant.
21       And I told him, "If I'm going
22 to be laid off, so be it. I have to
23 go."

32  (Pages 125 to 128)

# FREEDOM COURT REPORTING

Page 129

1 Q.    And did you go?
2 A.    I did go.
3 Q.    And you came back?
4 A.    I came back.
5 Q.    And how long were you in the
6 Philippines the second time, after your
7 father-in-law passed?
8 A.    I came back August 13. That
9 was the day I traveled back, and I
10 believe it was a weekend, and so I end
11 up working that following Monday. I
12 don't know the date.
13 Q.    And when you got back in
14 August, any problems from anybody about
15 being in the Philippines?
16 A.    I didn't understand.
17 Q.    Did anybody give you any
18 problems when you returned the second
19 time?
20 A.    No, no, no, nobody. In fact,
21 they were all very sympathetic. They
22 even gave cards and some money. They
23 all chipped in.

Page 130

1 Q.    This was your crew?
2 A.    Yes.
3 Q.    What about Mr. Music?
4 A.    I don't know. I don't have
5 any idea, because --
6 Q.    You don't know who put in --
7 A.    Who put into the pot. But
8 nevertheless, I thanked everyone for it,
9 because I don't have any idea who put
10 what.
11 Q.    Do you feel like your
12 national origin had anything to do with
13 your termination?
14 A.    Yes, because it's a
15 compounded thing, already, of what had
16 been happening; and also, they found a
17 way with that October 29 and then the
18 medical reason, injury at work, so --
19 Q.    You've testified that two
20 people were the sources of the problems
21 for you at Pemco with regard to your
22 national origin, Mr. Cooper and Mr.
23 Music.

Page 131

1 A.    Correct.
2 Q.    Do you know if either Mr.
3 Cooper or Mr. Music had anything to do
4 with the decision to terminate you?
5 A.    I don't have any idea, but
6 probably the top management are talking
7 about it. I have no idea:
8         MR. HOLMES: Why don't we go
9 off the record.
10        (Whereupon, a recess
11        was taken.)
12 Q.    (By Mr. Holmes) Mr. Camacho,
13 you testified earlier that you were
14 given job assignments that you felt like
15 were based on your national origin; is
16 that right?
17 A.    Yes.
18 Q.    Okay. I want to get a little
19 more information from you on that and
20 explain for me what evidence you have to
21 support that.
22 A.    Well, one is the supervisor
23 always assigned us to the dirtiest job.

Page 132

1 Q.    Let's specify which
2 supervisor.
3 A.    Both of them, Mr. Gary Cooper
4 and Mr. Dewayne Music.
5 Q.    And what jobs did Mr. Cooper
6 assign you? I think you said "us." So
7 are there others?
8 A.    Yes, just like the Sudanese
9 personnel and Ethiopian person.
10 Q.    Mr. Adams?
11 A.    Mr. Adams, yeah.
12 Q.    Tell me about the jobs that
13 Mr. Cooper assigned you to that you
14 claim were the dirtiest or the --
15 A.    Doing the lab, the cleaning
16 of the spill of --
17 Q.    This is the lavatory in an
18 airplane?
19 A.    The laboratory on the
20 airplane, underneath the flooring, so
21 basically, we're inside the cargo
22 compartment or the -- whether it's
23 forward or aft, and also the -- whether

33  (Pages 129 to 132)

# FREEDOM COURT REPORTING

Page 133

1  on top of the -- inside the cabin, on
2  nooks and crannies, on the -- we call it
3  E&E, electronic and equipment bay. It's
4  just back of the forward baggage
5  compartment, and also in the nose
6  landing gear, in places where nobody
7  wants. Definitely a lot of the people
8  who would be assigned to those places,
9  you could hear them, you know -- how do
10  you say that?
11  Q.      Complain?
12  A.      Not -- yeah, complain, but
13  they don't complain probably to the
14  supervisor, but you'll hear them
15  disgruntled about it.
16  Q.      So there were other people
17  assigned to work in these areas also?
18  A.      Yes, yes. But mainly like
19  myself, the Ethiopian, Mr. Adams and
20  Mr. -- his first name is Mr. Malick.
21  Q.      Did you ever work on any of
22  the other parts of the airplane?
23  A.      Yes, I worked on the main

Page 134

1  landing gear, the lubrication of the
2  main landing gears, the wing, the slats,
3  the flaps. And doing the lubrication
4  means you'll end up being covered with
5  all those grease. It's not a fun job.
6  It's a dirty job.
7  Q.      And did other people not have
8  to do lubrication?
9  A.      Well, they -- sometimes they
10  end up doing, when like there's not
11  really much work to be done, to be
12  assigned to them, so the supervisor has
13  no choice but to give them that, so that
14  they will end up having a job. Same
15  thing on my part. It doesn't mean that
16  I'm on the cargo compartment all the
17  time. Sometimes I'm being assigned on
18  the cabin, you know, because there might
19  be no job available at that time to give
20  to me, so whatever job is left that
21  needs to be done, of course, they have
22  no choice but to assign it to me.
23  Q.      In those instances where you

Page 135

1  work in the cabin, somebody else is
2  working in the cargo, somebody else is
3  doing the lubrication?
4  A.      No, no. Sometimes yes,
5  sometimes yes.
6  Q.      How many --
7  A.      But the majority of the time,
8  I see my name is written on there. You
9  know, you can guess right away I got
10  that job.
11  Q.      What do you mean your name is
12  written on it?
13  A.      Your name is written that
14  you're going to be doing the cargo
15  cleaning.
16  Q.      There's a work order
17  somewhere?
18  A.      Yeah.
19  Q.      And, "Wilfredo Camacho," is
20  written on cargo?
21  A.      Yes.
22  Q.      And other employees are
23  assigned to other parts?

Page 136

1  A.      Yes.
2  Q.      How many airplanes were there
3  in the facility at any given time?
4  A.      Four all the time on that
5  particular hangar, all the time.
6  Q.      And when you're working in
7  the cargo of one plane, other workers
8  are working in the cargos of the other
9  planes?
10  A.      Yes, other crews. They have
11  their own job assignments.
12  Q.      So there are four crews?
13  A.      Right.
14  Q.      And on those other crews,
15  were white people, employees assigned to
16  work in the cargo, that you know of?
17  A.      Yes, yes.
18  Q.      Did you ever hear Mr. Cooper
19  or Mr. Music say anything derogatory to
20  Mr. Adams or to the Sudanese gentleman
21  that you worked with?
22  A.      Mr. Malick? Yes, but I'm not
23  very clear, because like Mr. Malick,

34 (Pages 133 to 136)

# FREEDOM COURT REPORTING

Page 137

1  you'll end up hearing him and the
2  supervisor be in a loud voice talking
3  together, so the -- Mr. Malick would be
4  answering back the supervisor, so that
5  he could explain his side.
6  Q.     Like an argument?
7  A.     Argument is -- yeah, I'd say
8  that, yeah.  But I don't want to listen
9  on those things.  I can hear it, but
10  not --
11  Q.     So you can hear it, but
12  you're not paying attention to what
13  they're saying?
14  A.     Right, right.  You know, the
15  sound, the intonation, but --
16  Q.     Did Mr. Malick or Mr. Adams
17  complain to anybody about Mr. Cooper or
18  Mr. Music?
19  A.     I believe so.
20  Q.     Do you know who they -- do
21  you have any evidence that they did?
22  A.     They had been telling me that
23  they been requesting to be moved to a

Page 138

1  different crew or a different shift,
2  because they're fed up with the
3  supervisor, how they are being treated,
4  and they just want to stay away from
5  that crew.
6  Q.     I understand that's what they
7  were telling you, but when they were
8  asking for the transfers, were they
9  saying, "I don't want to work for Mr.
10  Cooper," or, "I don't want to work for
11  Mr. Music because he is harassing me or
12  intimidating me"?
13  A.     Yes.
14  Q.     That's what they told you
15  they said?
16  A.     Yes, yes.  And eventually,
17  Mr. Adams got his wish.  He was
18  transferred to another crew -- I mean
19  another department, probably, but it's
20  not in our hangar.  It's in a different
21  hangar.
22  Q.     Let's talk about your skin
23  condition and the timing of what you

Page 139

1  were dealing with and the experience
2  that you had, starting back in November.
3  We've talked about this a little bit
4  today, but you testified about having
5  only been there a couple of weeks,
6  realizing that you were having some
7  irritation of your skin and you were
8  itchy, I believe you said, and that you
9  spoke with Mr. Woods, your lead man, you
10  spoke with Jerry, your co-worker, and
11  maybe others about that.  Take me from
12  there to whatever you experienced going
13  forward.
14  A.     Every day is the same
15  situation.  Even if I'm not in the cargo
16  compartment, you know, working upstairs,
17  meaning inside the cabin, like working
18  on those floorboards on those -- like
19  floorboards, the -- like the up pressure
20  bulkhead, where we used also fiberglass,
21  it irritates.
22  Q.     There's fiberglass
23  everywhere?

Page 140

1  A.     Basically, yes.
2  Q.     And when you were working for
3  Mr. Cooper, you were allowed to get the
4  protective gear that was issued from the
5  supply shop?
6  A.     Yes.  That reminds me, like
7  on October 29, on the -- 2004, on the
8  talks that we had, I mean after the
9  talks -- wait.  During that day, during
10  that meeting with Mr. Briody, Mr.
11  Dewayne Music, Mr. Gipner, the shop
12  steward, myself, Mr. Briody questioned
13  one of the procedures that I had been
14  doing to protect myself and others.
15  Like he said, "You're not supposed to be
16  wiping off those fiberglass, because
17  it's a waste of time."
18  I told him it doesn't take
19  that long to wipe both sides of the
20  fiberglass before I carry it and install
21  it, because carrying it and installing
22  it means you've got to hug this
23  fiberglass (indicating), I mean close

35 (Pages 137 to 140)

# FREEDOM COURT REPORTING

## Page 141

1  range with your hands and with your
2  body, fight it out and how to install
3  it. They don't want me to do that
4  procedure. I told them that I'm trying
5  to minimize, as much as possible, this
6  fiberglass be airborne and from us
7  getting in contact with it.
8      Well, he said, "No, don't do
9  that."
10      After that, the same thing
11  with Mr. Music. They know I -- at the
12  start of the day, when the work load has
13  been given to each and every one, I
14  would end up just like anybody else who
15  would line up to the supply window to
16  get the supply -- I mean the coverall or
17  other safety equipment that they need to
18  do their job. Mr. Music even said for
19  me not to stay in that line and I'm not
20  supposed to wear that; it's a waste of
21  time.
22      I said, "This is for my
23  protection and I'm just following what

## Page 142

1  the company wants."
2      It's good the company have
3  all this written safety regulation, this
4  harassment, but it's never being
5  implemented or enforced. You could hear
6  sometimes manager says, "Be safe out
7  there." But, you know, it's up to that
8  point.
9      Like if somebody needs to
10  have goggles, they'll just walk by. The
11  safety rule is there. It's never being
12  implemented, whether it's because the
13  individual doesn't like it, to wear it,
14  because it's a hinderance to their job.
15  Same thing with coveralls. So only
16  people who are concerned about their
17  safety are the ones that you can see
18  wearing these things.
19  Q.    And you were concerned about
20  your own safety?
21  A.    Definitely. Not just about
22  my own, but for others.
23  Q.    Well, certainly with your

## Page 143

1  skin condition, you were concerned about
2  your own skin?
3  A.    Of course, definitely. But
4  I'm trying to also kind of help out
5  others by not exposing them as much as I
6  can, like that wiping off the fiberglass
7  so it's not going to get airborne. But
8  I was reprimanded in doing that. They
9  stopped me from doing that and they be
10  watching me. And same thing with Mr.
11  Briody. At that point, he was watching
12  every move I do.
13  Q.    Doesn't Mr. Briody and the
14  other supervisors -- don't they watch
15  all the employees, to supervise their
16  work?
17  A.    They do, but not like my
18  situation, because I already had this
19  thing with them, so it's just like I'm a
20  red flag to them if I am to put it in an
21  example.
22  Q.    Let's go before October of
23  2004. Let's talk about between November

## Page 144

1  2003 up to October 2004.
2  A.    Okay.
3  Q.    Let's talk about that period
4  and any issues that you had with regard
5  to not wearing your protective gear or
6  not being able to get protective gear.
7  You didn't have any of those during that
8  time period, did you?
9  A.    No, there are situations,
10  like I said, when, say, they're out of
11  stock or the person is not there to
12  issue out, probably to go to the
13  bathroom or not; I don't know.
14  Q.    And how often did that
15  happen?
16  A.    No, not that often, though.
17  Q.    Most of the time --
18  A.    Most of the time you can have
19  it.
20  Q.    And when you need it, and
21  you're able to determine when you need
22  it, you go and you get it and put it on
23  and go back to work and no problems?

36 (Pages 141 to 144)

# FREEDOM COURT REPORTING

Page 145

1  A.     Yes, no problems.
2  Q.     And were there times when you
3  chose not to wear some of the protective
4  gear?
5  A.     No, the only thing that I
6  would not wear, like, because I'm on
7  confined spaces, like the goggles, you
8  can't see what you're doing.
9  Q.     So --
10  A.     So you'll end up removing it
11  for the time being and then putting it
12  on. But after that, you wear your
13  goggles again.
14  Q.     So you would take them off so
15  you could do the job and then put them
16  back on?
17  A.     Correct, when you can see the
18  item that you can do.
19  Q.     And you got to decide when
20  that happened?
21  A.     Yes.
22  Q.     When you'd take them off and
23  put them back on?

Page 146

1  A.     Yes, because you're in a
2  place that, how can you perform this job
3  if you cannot see it. And if something
4  is like -- if your goggles is bumping
5  into one of those structures?
6  Q.     Is it hot in the summertime?
7  A.     Definitely. Even during
8  wintertime, it's hot in there.
9  Q.     Do some people choose not to
10  wear coveralls because it's hot?
11  A.     Yes, yes.
12  Q.     And were there days when you
13  chose not to wear coveralls because it
14  was hot?
15  A.     No, whether -- whether during
16  summertime or wintertime, I do wear
17  them, and every night I'm soaked with
18  perspiration and all dirtied up. People
19  have been questioning me, "Why do you
20  keep on wearing that? Why do you let
21  this thing happen to you by -- like
22  you're taking a bath from your own
23  perspiration?"

Page 147

1          I said, "I'm trying to
2  protect myself."
3  Q.     These are your co-workers
4  asking you this?
5  A.     Yes. Even the supply
6  personnel can testify that I'm always
7  there getting the protective gears that
8  I need. Even the personnel from the
9  tool crib, they'll be able to say who
10  borrowed the vacuum cleaner the most.
11  Q.     And what does that refer to?
12  A.     The vacuum cleaner for
13  cleaning. That means to say I got the
14  job -- the dirtiest job again, day in,
15  day out.
16  Q.     Using a vacuum cleaner is the
17  dirtiest job?
18  A.     Yes, because that thing can
19  propel dirt and fiberglass all over.
20  Q.     It doesn't have a filter on
21  it?
22  A.     No. It has a filter before,
23  but somehow, you know, people just

Page 148

1  remove it, because it's clogging. It's
2  not working right, so --
3  Q.     Did you ever complain to
4  anybody about the vacuum cleaner not
5  having a filter?
6  A.     Yes.
7  Q.     Who?
8  A.     In the tool crib.
9  Q.     You complained to who, I'm
10  sorry?
11  A.     In the tool crib, the
12  personnel in the tool crib.
13  Q.     And did you get a different
14  vacuum cleaner?
15  A.     Yes.
16  Q.     Is it safe to say that any
17  time you had a problem with any
18  equipment, either personal safety
19  equipment or equipment that you were
20  getting from the tools, if you ever had
21  a problem and you addressed it with the
22  appropriate people, that you'd get the
23  situation fixed?

37 (Pages 145 to 148)

# FREEDOM COURT REPORTING

Page 149

1  A.    Yes, it get fixed, but not
2  that quick. There's a gap. Like, for
3  example, the fixture, lighting fixture,
4  you need those lights to perform your
5  job. A lot of them have busted light
6  bulbs and it takes time before one can
7  be fixed. I mean --
8  Q.    And is that part of your job,
9  fixing those?
10  A.    No, it's not part of our job.
11  Q.    Somebody else fixes those?
12  A.    It has to be the tool crib or
13  other people. As far as I understand is
14  the tool crib personnel is supposed to
15  be doing that, unless they have other
16  crews maintaining those things.
17  Q.    Did you ever ask for anything
18  that you were denied?
19  A.    None that I can think of,
20  except -- well, pardon me. Going back
21  to that day when I went to see Dr.
22  Sewell the second time.
23  Q.    Let's talk about when you're

Page 150

1  still working.
2  A.    No.
3  Q.    And we'll get to Dr. Sewell.
4  I want to come to that.
5  A.    Okay.
6  Q.    Prior to October 29, 2004,
7  did you ever --
8  A.    October 29, okay.
9  Q.    October 29, 2004, did you
10  ever complain to anybody about sores or
11  things that you had on your arms and
12  legs?
13  A.    Yes, I been complaining about
14  it.
15  Q.    Did you complain to your
16  supervisor about it?
17  A.    No, I just relay to friends.
18  Q.    Your co-workers?
19  A.    Meaning co-workers.
20  Q.    The first time you ever
21  complained to a management person at
22  Pemco was on October 29, 2004?
23  A.    Yes, I'd say that.

Page 151

1        (Whereupon, Defendant's
2        Exhibit Number 8 was
3        marked for identification.)
4  Q.    (By Mr. Holmes) All right.
5  Let me give you what I'm marking as
6  Defendant's Exhibit 8 to your
7  deposition. And this is -- you provided
8  this to me this morning, and so this is
9  the only copy I have. And if you'll
10  take a look at Defendant's Exhibit 8,
11  and let me know when you've had a chance
12  to review it and are ready, please.
13  A.    Yes, I'm ready.
14  Q.    Tell me if you recognize
15  Defendant's Exhibit 8.
16  A.    Yes, I recognize Exhibit 8.
17  Q.    This is something that you
18  gave me this morning?
19  A.    Correct.
20  Q.    And this is something your
21  signature is on?
22  A.    Correct.
23  Q.    And tell me what Defendant's

Page 152

1  Exhibit 8 is.
2  A.    Defendant's Exhibit 8 says,
3  "Describe the incident --" oh, going
4  back, "What was the employee doing at
5  the time of the incident? Working at
6  Gilliner fiberglass."
7  Q.    This is a First Report of
8  Incident; right?
9  A.    Yes.
10  Q.    And this is what the company
11  writes down -- they fill this out when
12  you complain to them about your sores?
13  A.    Correct.
14  Q.    And this is the first
15  complaint that you made to Pemco?
16  A.    Correct.
17  Q.    Management?
18  A.    Correct.
19  Q.    And what happened after you
20  complained about this?
21  A.    I told them, like when we
22  were on that meeting on October 29, that
23  I need to go to the doctor because I

38  (Pages 149 to 152)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 153

1 can't tolerate it anymore.
2 Q.      So during the disciplinary
3 meeting that you had, the verbal
4 warning, you brought up this issue that
5 you had these sores and you also said,
6 "I need to go to the doctor"?
7 A.      Yes.
8 Q.      What was the response?
9 A.      At first, they were reluctant
10 about it, but later on, Mr. Briody said,
11 "Yeah, go ahead and go to the doctor."
12 And Mr. Music was also hesitant about
13 it. And in fact, while doing these -- I
14 was just not able to get a copy of it
15 like --
16 Q.      When you say "this," are you
17 referring to Defendant's Exhibit 8?
18 A.      I'm sorry, not 8. Another
19 form.
20 Q.      Okay.
21 A.      Which remind me that --
22 because Mr. Avery, the personnel from
23 fire and safety, came in, was called

Page 154

1 in -- in fact, I informed him I informed
2 Mr. Avery that, "How do I need -- how do
3 I get to a doctor?"
4      And he said, "We need to fill
5 out accident report."
6      And then that same night --
7 Q.      That conversation with Mr.
8 Avery happened before the disciplinary
9 meeting that you had that's Defendant's
10 Exhibit 6?
11 A.      Correct, but on the same day.
12 Q.      Okay. Go ahead.
13 A.      Actually, on the start of the
14 day, of the work.
15 Q.      Okay. So you talked to Mr.
16 Avery. Mr. Avery said, "We need to fill
17 out an accident report"?
18 A.      Correct.
19 Q.      And then what happened?
20 A.      And so he came back with the
21 form and we were filling this one out,
22 after we had the meeting that night
23 and -- but anyway, during that meeting,

Page 155

1 I informed Mr. Briody that I need to go
2 to the doctor, you know, so something
3 can be done about it.
4 Q.      And what happened?
5 A.      Yeah, eventually said, "Go
6 ahead and go to the doctor," which I
7 did.
8 Q.      Did you that day?
9 A.      No, November 3.
10      (Whereupon, Defendant's
11      Exhibit Number 9 was
12      marked for identification.)
13 Q.      (By Mr. Holmes) Okay. Let
14 me show you what I'm marking as
15 Defendant's Exhibit 9 to your
16 deposition.
17 A.      I'm ready.
18 Q.      Okay. Defendant's Exhibit 9
19 is the Supervisor's Incident Report?
20 A.      Correct.
21 Q.      And that appears to be filled
22 out by Dewayne Music?
23 A.      Correct.

Page 156

1 Q.      And so Dewayne filled that
2 out after you told him about your
3 condition?
4 A.      Correct. He fill this one
5 out while Mr. Avery was there in the
6 office.
7      (Whereupon, Defendant's
8      Exhibit Number 10 was
9      marked for identification.)
10 Q.      (By Mr. Holmes) And let me
11 give you Defendant's Exhibit 10. Is
12 this what Mr. Avery filled out?
13 A.      Yes.
14 Q.      So there was no shortage in
15 paperwork of documenting your complaint
16 about your condition?
17 A.      I don't -- yes, there's no
18 deficiency there, unless there are other
19 forms that need to be filled out, which
20 I don't know.
21 Q.      As far as you know, you
22 complained to your supervisors or
23 management personnel. They filled out

39 (Pages 153 to 156)

# FREEDOM COURT REPORTING

Page 157

1 the forms.
2      You said, "I need to go to
3 the doctor."
4      They said, ultimately, "You
5 can go to the doctor." And then you
6 went to the doctor?
7 A.     Correct.
8 Q.     And you went to PrimeCare?
9 A.     PrimeCare.
10 Q.     Okay.
11 A.     Because that is, I believe,
12 the company contracted medical clinic.
13 But then again, before we go any
14 further, before I forget it, there was
15 another form of a Supervisor's Incident
16 Report. You know, I saw it, like any --
17 on one of the lines. I just can't see
18 it from here. It says, "Any
19 recommendation." I was there when Mr.
20 Music -- the three of us, Mr. Music, Mr.
21 Avery and myself was there in the same
22 room, filling out forms, and Mr. Avery
23 was interviewing me. And at the same

Page 158

1 time, Mr. Music was asking Mr. Avery
2 about, like, what recommendation that
3 needs to be done. He put in there,
4 "termination." He wrote it,
5 "termination." I saw it. But I never
6 get a chance to get a copy of it.
7 Q.     Do you have any idea what
8 form that was that Mr. --
9 A.     Almost the same thing as this
10 (indicating). That's why I'm trying to
11 look for that area here that says,
12 "Recommendation."
13 Q.     I'm looking at Defendant's
14 Exhibit 9 to your deposition. And one
15 of the lines that the immediate
16 supervisor is to complete is, "What
17 corrective action should be taken?" Is
18 that what you're talking about?
19 A.     No. The word
20 "Recommendation" was clear. And then
21 look at this. On the Defendant's
22 Exhibit Number 9, the question was, "Was
23 personal protective equipment required?"

Page 159

1 He put in there at first, "Tyvek
2 coveralls." And he crossed it out and
3 he wrote, "None."
4      Pemco has all the safety
5 rules implemented, written up, and then
6 supervisor's recommendation is none.
7 Q.     You don't know whether or not
8 coveralls were required, do you?
9 A.     It's required.
10 Q.     It was optional, wasn't it,
11 for you to go get those coveralls?
12 A.     It's not optional. Safety
13 equipment is required, whether it be a
14 goggles, a coverall, glove, safety
15 boots. It is required. We're following
16 the safety regulation.
17 Q.     Well, you've said all along
18 that it was your choice to go get the
19 coveralls or not.
20 A.     That's right, because I want
21 to protect myself in compliance with
22 what the company requires.
23 Q.     Where is it written that

Page 160

1 coveralls are required to do your job?
2 A.     Well, I believe when you say
3 "safety gears," it encompasses all the
4 safety things that you can apply to
5 yourself.
6 Q.     That's your interpretation of
7 what safety gear includes?
8 A.     Yes.
9 Q.     The required safety gear --
10 A.     Required.
11 Q.     -- in your mind, includes
12 coveralls?
13 A.     Correct.
14 Q.     You don't know if there's a
15 policy out there that says that
16 coveralls are required? That's your
17 interpretation?
18 A.     Safety gears is safety gears,
19 and it encompass all of this safety
20 things that are issued by the company.
21 Because if this is not included, so why
22 is the company issuing them for people
23 to use? It is OSHA's requirement, in

40 (Pages 157 to 160)

# FREEDOM COURT REPORTING

Page 161

1 compliance with OSHA.
2 Q.     It's your understanding that
3 OSHA requires coveralls?
4 A.     They may not specifically say
5 it, but safety gears is safety gears.
6 Q.     I think I understand you, Mr.
7 Camacho. I follow you, when you're
8 saying what your interpretation of the
9 safety gear is.
10 A.     So in this, you can see he
11 crossed it out.
12 Q.     Are you aware that there are
13 some jobs that require additional safety
14 gear than other jobs?
15 A.     There could be.
16 Q.     So --
17 A.     Whatever the nature of the
18 job is.
19 Q.     Right. So an A&P mechanic
20 might have -- is that right? Does
21 that --
22 A.     Correct.
23 Q.     Okay. An A&P mechanic might

Page 162

1 have one set of safety equipment and an
2 electrician might have a completely
3 different set of safety equipment?
4 A.     Correct.
5 Q.     And you're telling me that
6 it's your understanding that an A&P
7 mechanic is supposed to have coveralls
8 on?
9 A.     Correct, depending on the job
10 being done.
11 Q.     Right. And you, in fact,
12 were wearing coveralls?
13 A.     Correct. I religiously put
14 on my protective gears.
15 Q.     On October 29, 2004, you were
16 wearing your coveralls?
17 A.     Correct.
18 Q.     So it doesn't really matter
19 whether or not they were required,
20 because you were wearing them?
21 A.     It's the nature of the job.
22 Q.     Let's talk about your doctor
23 visit. You said you went on November

Page 163

1 3rd, 2004; is that correct?
2 A.     Correct.
3 Q.     And was that at the end of
4 your shift? Do you remember?
5 A.     No, it was in the morning
6 when I went. My shift starts at 3:30.
7     (Whereupon, Defendant's
8     Exhibit Number 11 was
9     marked for identification.)
10 Q.     (By Mr. Holmes) Let me give
11 you what I'm marking as Defendant's
12 Exhibit 11 to your deposition. If
13 you'll take a moment and look at that.
14 A.     I'm ready.
15 Q.     Let me do this. I'm going to
16 pull apart this second page.
17 A.     Yeah, I never see the second
18 page.
19 Q.     This is a different date
20 also. So we'll just go with the single
21 page of Defendant's Exhibit 11.
22 A.     Okay.
23 Q.     And we may make that other

Page 164

1 one a separate exhibit. Is Defendant's
2 Exhibit 11 the form that you brought
3 back with you to Pemco after you went to
4 see Dr. Sewell?
5 A.     Correct.
6 Q.     And tell me about your visit
7 with Dr. Sewell.
8 A.     The normal thing. I went
9 first -- I was seen first by the
10 assistant, taking your vital signs,
11 everything. After that, I have to wait
12 to see Dr. Sewell. And he inspected me.
13 He saw all the sores and scars and
14 flare-ups, wounds that I had.
15 Q.     And you were able to tell him
16 about everything? He listened to
17 everything you had to say about your
18 condition and experience you had had?
19 A.     What do you mean by that?
20 Q.     Well, just when he was
21 talking to you and examining you, you
22 told him everything you could about your
23 condition?

41 (Pages 161 to 164)

# FREEDOM COURT REPORTING

Page 165

1  A.        He asked me what's the
2  problem and I told him that I think I
3  got exposed to fiberglass all along and
4  it's only now that I would like to seek
5  treatment for it.
6  Q.        And what were you diagnosed
7  with?  What did he tell you?
8  A.        He said, "Stay away from, as
9  much as possible, limited exposure to
10 fiberglass."  And he gave me some
11 medication and he told me to come back
12 two weeks later, November 17, for a
13 follow-up.
14 Q.        And did you return to work?
15 A.        Yes, that -- oh, I'm sorry.
16 After seeing Dr. Sewell, I went back to
17 the HR, to Mr. Battcher's office.  And
18 it's not yet my time to work at that
19 time, so, you know --
20 Q.        It was still before your
21 shift?
22 A.        Before my shift.
23 Q.        And what happened when you

Page 166

1  talked to Mr. Battcher?
2  A.        Well, the intonation was
3  totally different.
4  Q.        I'm sorry, what did you --
5  A.        The intonation of talks was
6  not good.  Well, first it was.  It
7  was -- it was friendly, friendly talks.
8  Like he said that he was in the service
9  before during the Vietnam War and that,
10 you know, he visited the Philippines
11 sometime as an R&R during the war.
12 Q.        Was that the first time you
13 had ever met Mr. Battcher?
14 A.        Yes.
15 Q.        Was that the first time you
16 had ever been in the HR office?
17 A.        Yes.  I had been in that
18 office, meaning that building, but in
19 the -- like in the training room and
20 also in the reception area, but not in
21 the -- Mr. Battcher's office.
22 Q.        And your conversation with
23 Mr. Battcher after you returned from Mr.

Page 167

1  Sewell's office on November 3rd, 2004
2  was friendly, initially?
3  A.        On November 3rd?
4  Q.        Yes.
5  A.        Yes, initially.  And then
6  after that --
7  Q.        What else happened in that
8  conversation?
9  A.        On that conversation, you
10 know, he told me not to go back to work
11 until after I see Dr. Sewell on the
12 17th.
13 Q.        Was it your understanding
14 that Dr. Sewell said, "Don't go back to
15 work for two weeks"?
16 A.        No, he said, "You can go back
17 for work provided you have limited
18 exposure to fiberglass."  And he told me
19 that, "If you could ask the company for
20 extra protective gears to accommodate
21 your situation, it would be better for
22 you."  But he said, "I cannot promise
23 you that they will do that.  Just try to

Page 168

1  ask, and there's nothing wrong in
2  asking, if you can be accommodated for
3  that situation."
4         And so when Mr. Battcher and
5  I were talking, I relay what Dr. Sewell
6  have told me to say, you know, if I can
7  be accommodated.  And Mr. Battcher said
8  no, because I would be a precedent to
9  other people.
10 Q.        You would be what, I'm sorry?
11 A.        A precedent.
12 Q.        A precedent?  You would be
13 setting a precedent?
14 A.        Yeah, I would be setting a
15 precedent for other people to be doing
16 the same, asking him for special
17 protective gears.
18 Q.        Was it your understanding
19 from this form, Defendant's Exhibit 11,
20 that you're supposed to limit your
21 exposure to fiberglass, if possible?
22 A.        Yes, that's what he told me.
23 Q.        And I mean that includes not

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 169

1  working with fiberglass, doesn't it?
2  A.    Well, when he say, "limit
3  exposure as much as possible," if you
4  can do away with it, so much the better,
5  but he cannot guarantee that there will
6  be no fiberglass around.  So that's why
7  he said, "Limit as much as possible, and
8  from that too, if you can avoid working
9  in the areas like that, to ask for extra
10 protective gears, so that you will be
11 protected."
12 Q.    And what other type of gear?
13 A.    He said there are things that
14 you can wear.  I don't know what it's
15 called, but something that you could
16 wear on your sleeves and on your pants.
17 It's -- he was even referring to
18 something like what the firemens are
19 wearing.
20 Q.    Who, I'm sorry?
21 A.    The firemen.
22 Q.    The firemen?
23 A.    Yeah.

Page 170

1  Q.    And did you ask Mr. Battcher
2  for this extra gear?
3  A.    Yes, I did.
4  Q.    Did you describe what kind of
5  gear you wanted to wear?
6  A.    No, because I have no idea.
7  I don't know what kind of gears that
8  they can provide, how much it costs or
9  whatnot.  I just ask if they can
10 accommodate me to have extra gears, so
11 that I can be protected from the
12 fiberglass.
13 Q.    And what did Mr. Battcher say
14 in response to that?
15 A.    He said, "We cannot give any
16 extra protective gears to you, because
17 it would become a precedent and we will
18 not go to the expense of buying those
19 gears."
20 Q.    Did you ask for any other
21 kind of accommodation?
22 A.    Yes, I asked, "If you cannot
23 do that, then is there any way that you

Page 171

1  could, say, for example, assign me to
2  office job or whether even as a
3  messenger, where I can be at least away,
4  if not total, from fiberglass."
5         He said, "No personal -- no
6  job that we can give to you."
7         I even told him that somehow
8  I understand accounting and I can do
9  messenger job, but he said no.
10 Q.    Were you aware of any vacant
11 jobs at the time?
12 A.    No, no, I was just
13 offering -- giving an idea that, you
14 know, they might have not thought about,
15 so that's why I was saying there might
16 be other jobs that you can put me on.
17 I'm -- you know, so that I will be at
18 least away from the fiberglass.
19 Q.    Assuming there were no
20 vacancies, would you want them to create
21 a job for you?
22 A.    No, all I'm asking is put me
23 anywhere that I can fit into.  I'm not

Page 172

1  saying, "Create a job for me."
2  Q.    Well, if there are no jobs
3  and you want them to put you in the
4  office and there's no office job,
5  wouldn't that be essentially creating a
6  job for you?
7  A.    Can you rephrase that,
8  please?
9  Q.    If there's no vacancy, if
10 you're not asking for a specific vacant
11 job, but you want to be put into an area
12 to work, is that not the same as asking
13 for them to make up a job for you?
14 A.    No.  I'm just asking if
15 there's any.  I'm not imposing on them
16 to give that job to me.  All I want is
17 for me to work continuously so I can
18 provide.
19 Q.    And Mr. Battcher told you
20 they didn't have any jobs?
21 A.    They don't, yeah.
22 Q.    And so what happened after
23 that?

43 (Pages 169 to 172)

# FREEDOM COURT REPORTING

Page 173

1  A.    He said, "Don't come to work
2  until after you've seen Dr. Sewell on
3  your next appointment time. But for the
4  time being, we'll work on your workers'
5  compensation."
6  Q.    Do you know if Dr. Sewell
7  told Jim Battcher or anyone else at
8  Pemco that you were supposed to be off
9  work for two weeks?
10  A.    I'm not aware of those
11  things.
12  Q.    And you said that Mr.
13  Battcher said, "You'll be off for two
14  weeks until you return to see Dr.
15  Sewell, during which time we're going to
16  pay you workers compensation"?
17  A.    No, he just said, "Don't
18  worry about a thing. We will work out
19  your workers' compensation. And don't
20  even bother calling, because we know
21  that you're not going to be working
22  until you see Dr. Sewell."
23  Q.    And you understood that you

Page 174

1  were going to be paid for those two
2  weeks through workers' compensation?
3  A.    That's what he said.
4  Q.    And you, in fact, were paid?
5  A.    Not later. Like towards the
6  end of December.
7  Q.    You were paid?
8  A.    Yes.
9  Q.    Okay. What did you do during
10  that two weeks from November 3rd of 2004
11  to the time you returned to see Dr.
12  Sewell?
13  A.    I was trying to observe
14  myself, you know, like I said, those
15  masking tape, rolling the masking tape
16  all over your body, taking cold showers,
17  all that. And --
18  Q.    You were doing this every day
19  during those two weeks?
20  A.    Every day, yeah.
21  Q.    You were putting masking tape
22  on your body?
23  A.    Rolling the masking tape all

Page 175

1  over your body before taking a cold
2  shower.
3  Q.    Did you use any of the
4  medicines that Dr. Sewell prescribed to
5  you?
6  A.    No, definitely I told myself
7  to Dr. Sewell, "I did not use the
8  medication, because I really want to
9  find out if it is -- the fiberglass is
10  causing these things to me." So I told
11  him that. And so he wrote that, that --
12  no, he didn't wrote that. I don't know
13  if he write it or not.
14  Q.    He wrote you a prescription
15  for medicine and you said, "I'm not
16  going to take it"?
17  A.    No, no. At that time when he
18  wrote the prescription, I didn't say
19  that I will not use it.
20  Q.    Got you.
21  A.    I wanted to use it, but I'd
22  like to make sure first if this
23  fiberglass is really the one that is

Page 176

1  causing this problem.
2  Q.    So you wanted to see if those
3  two weeks -- once you knew that you
4  weren't going back to work, you wanted
5  to see if your condition would resolve
6  itself without the medicine?
7  A.    Correct, correct.
8  Q.    And did you go back to see
9  Dr. Sewell in two weeks?
10  A.    Yes, I came back on November
11  17. It was late in the afternoon
12  already. And he gave a clearance for me
13  to go back to work.
14        (Whereupon, Defendant's
15        Exhibit Number 12 was
16        marked for identification.)
17  Q.    (By Mr. Holmes) Mr. Camacho,
18  I'm now marking Defendant's Exhibit 12
19  to your deposition. This is a two page
20  document. If you'll take a moment and
21  review that.
22  A.    What's this "ROS"? What does
23  "ROS" mean? What's "WDWN male"?

44 (Pages 173 to 176)

# FREEDOM COURT REPORTING

Page 177

1    Q.    Mr. Camacho, I'm not sure.
2  This is a medical record from Dr.
3  Sewell, and I'm not a doctor.
4    A.    No, I thought these things
5  was discussed to you -- or I don't know.
6  Yeah, this is the first time for me to
7  see the second page here. I don't even
8  have a copy of that and I don't even
9  understand all the abbreviation here,
10  so --
11    Q.    Well, let's look at
12  Defendant's Exhibit 12. The first page
13  of Defendant's Exhibit 12, is this a
14  copy of the document you took back to
15  Pemco on --
16    A.    November 18th.
17    Q.    November 18th is when you
18  went back?
19    A.    Correct.
20    Q.    Okay. So you do recognize
21  the first page of Defendant's Exhibit
22  12?
23    A.    Correct.

Page 178

1    Q.    And the second page, you've
2  never seen before?
3    A.    I've never seen this until
4  today.
5    Q.    But it says at the bottom
6  that -- it's got, "Dictated not
7  reviewed, Joseph H. Sewell, M.D." ?
8    A.    What this mean when it says,
9  "Dictated but not reviewed."
10    MR. HOLMES: Let's go off the
11  record.
12    (Whereupon, an off the
13    record discussion was
14    held.)
15    Q.    (By Mr. Holmes) In reviewing
16  the second page of Defendant's Exhibit
17  12 to your deposition, does the things
18  that are stated in here by Dr. Sewell --
19  is this consistent with the conversation
20  that you had with him on November 17th?
21    A.    Pretty much, yeah.
22    Q.    For example, when you said
23  that -- the doctor says, "Is not using

Page 179

1  the Zyrtec and the cream as instructed,
2  was hoping to just limit exposure to see
3  if his symptoms improved," that's what
4  you were testifying about a moment ago;
5  correct?
6    A.    Correct. Meaning that the
7  time frame that I was out, the two weeks
8  only, that after that, I did apply this
9  medication. But only on those two weeks
10  time frame.
11    Q.    And, Mr. Camacho, were you
12  better during those two weeks, doing the
13  tape and the cold showers and no other
14  treatment?
15    A.    It's not totally, but
16  definitely I can say there was an
17  improvement.
18    Q.    And was that enough to
19  satisfy, in your mind, that fiberglass
20  was the cause?
21    A.    Correct.
22    Q.    And also, further down on
23  page two of Defendant's Exhibit 12 to

Page 180

1  your deposition, Dr. Sewell states,
2  "Also discussed that if he is not able
3  to limit exposure, he may choose to find
4  other employment."
5    A.    Are you talking under the
6  assessment plan?
7    Q.    No, sir, I'm looking at the
8  second paragraph. I say "second
9  paragraph." There's a gap.
10    A.    Uh-huh, okay. Where were
11  you?
12    Q.    Well, I'll just let you read
13  this entire paragraph, because I want to
14  ask you about it.
15    A.    Okay.
16    Q.    Did Dr. Sewell tell you that
17  if you're not able to limit your
18  exposure to fiberglass, that you should
19  consider other employment?
20    A.    Yes, he said that.
21    Q.    And did you agree with that?
22    A.    Yes.
23    Q.    Mr. Camacho, Defendant's

45 (Pages 177 to 180)

# FREEDOM COURT REPORTING

Page 181

1  Exhibit -- the first page of Defendant's
2  Exhibit 12, was this document later
3  resubmitted with additional writing on
4  it?
5  A.        No resubmission was made,
6  because the original was given to me.
7  Q.        Do you remember there being a
8  document that looks like one of these
9  work status reports that says, "No
10  exposure to fiberglass"? Was that a
11  different doctor?
12  A.    No.
13         (Whereupon, Defendant's
14         Exhibit Number 13 was
15         marked for identification.)
16  Q.        (By Mr. Holmes) I'm going to
17  mark this. This is Defendant's Exhibit
18  13 to your deposition. And this is one
19  of the documents that you produced to me
20  this morning.
21  A.    Correct.
22  Q.        And if you'll compare 12 and
23  13 and tell me where 13 came from.

Page 182

1  A.    Okay. Defendant's Exhibit 13
2  came from the office of Dr. Sewell. On
3  November 18, when I went to see
4  doctor -- went to see Mr. Battcher, the
5  office, to give him the original consult
6  that was given to me by Dr. Sewell the
7  day before, because Dr. Sewell cleared
8  me to go back to work, and so I went
9  there to the lobby and was told to wait,
10  and I waited for a long time.
11  Q.        The lobby at where?
12  A.        Where the HR office is. And
13  I waited long and I asked the lady if I
14  can have a copy made of the original, so
15  that I can have a file for my own, and
16  it took her a long time before coming
17  back to me. I believe at that time,
18  Mr. -- she went to Mr. Battcher and
19  showed it, and Mr. Battcher called the
20  clinic and probably talked to Dr. Sewell
21  to add on, "No exposure to fiberglass,"
22  on the consult. I don't know what
23  transpired. I don't know if that's

Page 183

1  really what happened.
2  Q.        You're just not sure?
3  A.        Definitely I'm not sure,
4  because I don't know if that's exactly
5  what happened.
6  Q.        Did you get Defendant's
7  Exhibit 13 from Dr. Sewell's office?
8  A.        Yes, the original. I was --
9  I have the original with me. And so --
10  Q.        So they --
11  A.        So Dr. Sewell, I'm just
12  quoting now, after I learned it, Dr.
13  Sewell instructed his nurse to write,
14  "No exposure to fiberglass," on the pink
15  copy, which is a duplicate copy, the
16  copy that they file.
17  Q.        Is that what his nurse told
18  you?
19  A.    Yes.
20  Q.        Or is that what Dr. Sewell
21  told you?
22  A.    Both.
23  Q.    Okay.

Page 184

1  A.        We'll go back sometime -- so
2  the nurse told me that Dr. Sewell
3  ordered her to write this and fax it to
4  the office of Mr. Battcher. And so when
5  the lady, secretary from Mr. Battcher's
6  office came out with a copy -- original
7  and copy, she gave it to me and I was
8  accommodated to see Mr. Battcher at the
9  time. And so I hand to Mr. Battcher the
10  original, so that he --
11  Q.        The original of Defendant's
12  Exhibit 13?
13  A.        Correct, the original of
14  Defendant's Exhibit 13, correct.
15  Q.    Okay.
16  A.        I hand it to Mr. Battcher,
17  the original --
18  Q.        On what day was this?
19  A.        November 18.
20  Q.    Okay.
21  A.        I handed it to him and he
22  took it and read it and put it side by
23  side with the fax copy that was sent to

46 (Pages 181 to 184)

# FREEDOM COURT REPORTING

Page 185

1  his office and the original consult that
2  I handed to him.
3          And he said, "How come your
4  copy is not the same as mine?"
5          I said, "What? What do you
6  mean by that?"
7          He said, "It doesn't read
8  exactly the same as mine."
9          And I said, "How could that
10 be? I have the original. And how could
11 you have a copy? I have the original."
12 Well, I asked him, "Can I take a look at
13 it?"
14         He handed it to me, and sure
15 enough, I found this words under the
16 Dependent's Exhibit 13, the statement
17 saying -- the added statement saying,
18 "No exposure to fiberglass."
19 Q.       And I want to be very clear
20 here, Mr. Camacho. The one that said,
21 "No exposure to fiberglass," was the one
22 that you had given Mr. Battcher?
23 A.       No, the one without.

Page 186

1  Q.       Defendant's Exhibit 12?
2  A.       Defendant's Exhibit 12,
3  that's the one that -- the original.
4  Q.       Okay. And then Defendant's
5  Exhibit 13 was the faxed copy?
6  A.       The faxed copy.
7  Q.       That Mr. Battcher had gotten
8  from Dr. Sewell's office?
9  A.       Well, it was a faxed copy at
10 that time, a flimsy, rolling fax copy.
11 Q.       But you found out later that
12 Dr. Sewell's office did, in fact, send
13 that document?
14 A.       Correct. Probably, like I
15 said, during the time frame that -- when
16 I was there waiting for so long, that --
17 Q.       Do you know that?
18 A.       Yes, because Mr. Battcher
19 told me that he received a faxed copy
20 from the doctor's office. And then I
21 even told Mr. Battcher that afternoon,
22 that same day, November 18, that I will
23 go back to the clinic and clarify the

Page 187

1  matter from Dr. Sewell, and I even asked
2  him for a copy of this -- this faxed
3  copy from him, and he declined it.
4  Q.       Who declined?
5  A.       Mr. Battcher. He doesn't
6  want me to have a copy of his fax.
7  Q.       I understand there -- let's
8  sort of get beyond the paperwork issue
9  and what paper came when. Your
10 understanding from Dr. Sewell was, after
11 visiting with him on November 17th,
12 2004, that you could return to work at
13 Pemco?
14 A.       Correct.
15 Q.       But you had restrictions, and
16 those restrictions were that you had to
17 limit your exposure to fiberglass?
18 A.       Correct.
19 Q.       And you had talked about
20 having additional safety gear in order
21 to do that or finding a job that didn't
22 expose you to fiberglass?
23 A.       That was on the first

Page 188

1  meeting.
2  Q.       Right. But after the second
3  meeting, had that changed at all?
4  A.       Yes. He said, "You are clear
5  to go back to work, provided you could
6  limit yourself to the fiberglass."
7  Q.       And that's what I want to
8  understand.
9  A.       Because I informed Dr.
10 Sewell, from what transpired between me
11 and Mr. Battcher on the first time, that
12 Mr. Battcher declined any extra
13 protective gears, so I informed Dr.
14 Sewell about that.
15 Q.       And what did Dr. Sewell say?
16 A.       And he said, "Well, you can
17 just either, you know, try to limit
18 yourself, exposing yourself or even to
19 the extent of buying yourself the
20 protective gears."
21 Q.       Or finding another job?
22 A.       He didn't say that on the
23 second, but on the first -- on the

47 (Pages 185 to 188)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 189

1  first --
2  Q.      Let me stop you there on that
3  point, and let's look at the second page
4  to Defendant's Exhibit 12, which we've
5  already talked about.
6  A.      Right.
7  Q.      It was on November 17, where
8  he said, "If you can't limit yourself,
9  your exposure to fiberglass, you might
10 should think about finding another job"?
11 A.      Correct.
12 Q.      Okay.  And I just want you to
13 confirm that for me.
14 A.      Correct, that's what he said.
15 But this is the first -- on this page
16 two of Exhibit -- Defendant's Exhibit
17 12, like I said, it's the first time for
18 me to see this paper.
19 Q.      Well, but you've testified
20 that you remember him telling you that?
21 A.      On our first meeting.
22 Q.      The first meeting?
23 A.      Yes.  Not on the second

Page 190

1  meeting.
2  Q.      Okay.  So are you saying he
3  didn't say that in the second meeting or
4  you just don't remember?
5  A.      I just don't remember,
6  probably.  But I clearly remember on the
7  first meeting.
8  Q.      Okay.  Let's talk about after
9  the second meeting, your understanding
10 was you could return to work if you --
11 provided that you were limited to your
12 exposure to fiberglass?
13 A.      Correct.
14 Q.      And you went to Mr. Battcher
15 and Mr. Battcher said what?
16 A.      "There's no job for you."
17 Q.      "Because all of our jobs have
18 fiberglass"?
19 A.      Correct.
20 Q.      And you went back to the
21 doctor after Mr. Battcher told you that,
22 didn't you?
23 A.      Yes.

Page 191

1  Q.      And --
2  A.      But before I went back, I
3  asked him plainly, "Could you please
4  tell me in plain English, what do you
5  mean by that?"
6          He said, "I am terminating
7  you at your job."
8  Q.      Because there are no jobs for
9  which you were qualified that didn't
10 expose you to fiberglass?
11 A.      Yeah.
12         (Whereupon, Defendant's
13         Exhibit Number 14 was
14         marked for identification.)
15 Q.      (By Mr. Holmes) Let me show
16 you what is Defendant's Exhibit 14, if
17 you'll take a look at that.
18 A.      This is the first time for me
19 to see this Defendant's Exhibit 14.  I
20 never have this one.  It says, "Amended
21 11-17-04."  I never see this one or Dr.
22 Sewell giving this to me.
23 Q.      Well, you have an opportunity

Page 192

1  to review it now, and if you'll take
2  your time and look at it.
3  A.      Okay.
4  Q.      This is Defendant's Exhibit
5  14.  The first page and the second page
6  are entirely consistent with what Dr.
7  Sewell told you on November 17th, aren't
8  they?
9  A.      Yes.
10 Q.      Okay.  On your November 17
11 appointment with Dr. Sewell, did he say
12 anything to you about having not used
13 your medicine that he prescribed you in
14 your first meeting?
15 A.      No.  I was the one who tell
16 him -- who told him that I did not use
17 the medication for those two weeks time
18 frame.
19 Q.      And what I'm asking is did he
20 say anything in response to you about
21 that?
22 A.      He said, "You have to use it.
23 You have to use this medication, so that

48  (Pages 189 to 192)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 193

1 it will help you out."
2 Q.    "If you want to get
3 completely better, you should use the
4 medicine"?
5 A.    He didn't say completely, but
6 he said "improve."
7 Q.    It would help?
8 A.    Yeah, it would help.
9 Q.    As opposed to using tape and
10 taking cold showers?
11 A.    Yeah.
12 Q.    And after November 17, 2004,
13 did you start using the medicine?
14 A.    Oh, yeah, definitely.
15 Actually, I'm out of it.
16 Q.    When you had your meeting
17 with Mr. Battcher on November 18, 2004
18 and he told you, "I have no jobs for
19 you. The doctor says —"
20 A.    No —
21 Q.    "— no exposure to
22 fiberglass"?
23 A.    No, he said, "Limit exposure

Page 194

1 to fiberglass."
2 Q.    He says, "Limit exposure to
3 fiberglass. You can be around it
4 provided you wear protective gear"?
5 A.    Correct.
6 Q.    Mr. Battcher said, "I have no
7 job for you. You're terminated"?
8 A.    Correct.
9 Q.    Then what happened?
10 A.    Actually, Ms. Gerri Paulk was
11 there, and I was already starting to —
12 starting to tell Mr. Battcher and Ms.
13 Paulk about the situation at work, how I
14 am being treated, and Mr. Battcher just
15 right away went out of the office. And
16 then Ms. Gerri Paulk was there. I was
17 able to relay a portion, but definitely
18 they understood that I was complaining
19 about — starting to complain about the
20 harassment and discrimination to them.
21 Q.    That had been going on for
22 over a year?
23 A.    Yes.

Page 195

1 Q.    And this was the first time
2 you were saying anything —
3 A.    Yes.
4 Q.    — to them about it?
5 A.    Yes.
6 Q.    Let's make sure that you wait
7 till I finish my question before you
8 answer, just so it's clear on the record
9 for the court reporter.
10 A.    Okay. I'm sorry.
11 Q.    No, it's fine. And I may
12 remind you again, and that's all I'm
13 doing. So what did you tell Gerri
14 Paulk?
15 A.    About the situation that is
16 going on, but I was not totally — it
17 was just a portion. And then Mr.
18 Battcher came back and he's trying to
19 push me out already at that time, push
20 out not physical, but, "We have no work.
21 You're terminated. Get out. Here's a
22 piece of paper. You check out in the
23 tool crib. You can go back to the

Page 196

1 plant. Give me your badge and go back
2 to the plant and clear from the tool
3 crib."
4 Q.    And did you leave?
5 A.    Yes.
6 Q.    And you went back —
7 A.    I surrendered the badge. I
8 took the paper that he was handing it to
9 me, so that I can clear from the tool
10 crib, and then I hang around for a few
11 minutes at the lobby. I was trying to
12 read the posters on the bulletin boards.
13 And I even asked Ms. Gerri Paulk if I
14 can get a copy of, like, the harassment
15 paperwork that was on the bulletin
16 board, because it states there the name
17 Mr. Battcher and Ms. Gerri Paulk being
18 the point of contact for this harassment
19 and discrimination.
20         But she just — she said, "We
21 cannot give it to you."
22         (Whereupon, Defendant's
23         Exhibit Number 15 was

49 (Pages 193 to 196)

# FREEDOM COURT REPORTING

Page 197

1 marked for identification.)
2 Q. (By Mr. Holmes) Mr. Camacho,
3 let me show you what I'm marking as
4 Defendant's Exhibit 15 to your
5 deposition. And if you'll confirm for
6 me that that was the policy that you
7 were talking about.
8 A. Yes, this one here
9 (indicating).
10 Q. You're holding the second to
11 the last page?
12 A. Yes.
13 Q. And that's Supplement A to
14 Defendant's Exhibit 15; is that correct?
15 A. That's correct.
16 Q. And this is what you were
17 talking to Ms. Paulk about on November
18 18th, 2004, is that Mr. Battcher was
19 somebody that you were supposed to
20 complain to?
21 A. Correct.
22 Q. And --
23 A. Ms. Gerri Paulk too.

Page 198

1 Q. And are there bulletin boards
2 at Pemco?
3 A. Yes, in the lobby.
4 Q. Are there bulletin boards in
5 the hangars?
6 A. Yes.
7 Q. Have you seen this document
8 before?
9 A. No.
10 Q. Had you --
11 A. It could be in the hangar
12 too, but didn't get to see it, and it so
13 happened at that time --
14 Q. You never noticed it?
15 A. Never noticed, no. It could
16 be posted. I was just there in the
17 lobby, because I was waiting for a long
18 time, and that's when I noticed it.
19 Q. That was the -- on November
20 18th, you were waiting there for a long
21 time, that's when you noticed it?
22 A. Correct.
23 Q. Was there any reason that you

Page 199

1 waited a year before you started
2 complaining about the treatment you had
3 been --
4 A. No, there was no --
5 Q. -- experiencing?
6 A. No.
7 Q. Did you ever join the union
8 at Pemco?
9 A. At Pemco? Yes, as far as I
10 can remember, yes.
11 Q. And you understood that the
12 union represented you as a dues paying
13 member?
14 A. Yes, I believe they were
15 deducting the union dues.
16 Q. From your paycheck?
17 A. From my paycheck.
18 Q. Did you ever talk to a union
19 steward or a union representative about
20 the treatment that you were
21 experiencing?
22 A. No.
23 Q. Did you ever talk to the

Page 200

1 union steward or a union representative
2 about your skin condition?
3 A. No. Oh, excuse me. The
4 first question that you asked, if I ever
5 talked to somebody --
6 Q. Talked to a union
7 representative or official?
8 A. Official? There was one
9 person. He is an inspector. I cannot
10 remember his last name or his first
11 name. He's a skinny guy, looking like a
12 cowboy. I talked to him about my
13 situation, but not totally; how I am
14 being treated.
15 Q. When did you have that
16 conversation?
17 A. Toward the end, even prior to
18 October 29.
19 Q. Was that Danny Docett?
20 A. Danny Docett is the person --
21 that's the person that on the day that I
22 was fired, when I was already at the
23 hangar, he was -- he's a day shift shop

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 201

1  steward that I ended up bumping into,
2  and I asked for his help. But prior to
3  this October 29, 2004, I remember
4  talking to -- I just can't remember his
5  name. He's a cowboy looking skinny guy.
6  Q.     And did you tell this
7  inspector the same things that you've
8  told me today, that --
9  A.     Not all; partial of what's
10 going on.
11 Q.     Did you ask to file a
12 grievance?
13 A.     No, no.
14 Q.     Did you discuss filing a
15 grievance with him?
16 A.     No.
17 Q.     Did you tell him you were
18 interested in complaining to other
19 people?
20 A.     No.
21 Q.     But you understood that you
22 could file a grievance --
23 A.     Yes.

Page 202

1  Q.     -- and that the union would
2  represent you?
3  A.     Correct.
4  Q.     Did you ever receive a copy
5  of the Collective Bargaining Agreement?
6  A.     Yes.
7  Q.     Were you physically able to
8  do your job throughout your employment
9  at Pemco?
10 A.     Yes, in spite of the pain.
11 Q.     Were there any days where if
12 pain was so bad, or for whatever reason,
13 the skin condition was so bad that you
14 couldn't work?
15 A.     I'd like not to work, so that
16 I would be relieved, but I have no
17 choice but to work.
18 Q.     You physically could work?
19 A.     Yes.
20 Q.     You might prefer not to,
21 but --
22 A.     I'd prefer not to.
23 Q.     But physically, you could?

Page 203

1  A.     Yes.
2  Q.     Did you ever tell any of your
3  supervisors that you were unable to
4  work?
5  A.     No.
6  Q.     Did you personally dislike
7  anybody at Pemco?
8  A.     No.
9  Q.     Mr. Cooper?
10 A.     No.
11 Q.     Mr. Music?
12 A.     No, in spite of the fact of
13 what they're doing to me.
14 Q.     Do you think they disliked
15 you?
16 A.     Yes.
17 Q.     Personally?
18 A.     Personally. But let me say
19 too that towards the end, I don't know
20 if it is just Mr. Cooper's trying to
21 play it along, but he turned out to be a
22 little bit better. He -- you know, he
23 kind of started talking, you know,

Page 204

1  friendly talks.
2  Q.     This is when he was no longer
3  supervising you?
4  A.     Yes.
5  Q.     So when he wasn't your
6  immediate supervisor, towards the end of
7  your employment, you had friendly
8  conversations with him?
9  A.     Not as much; only when he
10 would visit and I happened to be there.
11 But still, all his buddies, they all,
12 every day -- or I can't say "every day."
13 Most of the time they go out, you know,
14 even in the parking lot drinking after
15 work, you know, like they're buddy
16 buddy. And I happen not to be -- I
17 don't drink. I don't smoke. I have no
18 vices. I'm out of the -- I'm out of
19 that situation then.
20 Q.     And was that a source of
21 sadness for you, when you were working
22 at Pemco?
23 A.     No.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 205

1 Q.        Did you feel excluded because
2 you weren't buddy buddy with your
3 co-workers?
4 A.        No, no.
5 Q.        What about Mr. Music?  Did
6 you ever --
7 A.        Well, there were times --
8 Q.        Towards the end of your
9 employment, were you, like with Mr.
10 Cooper, where things were better?
11 A.        No.  It's the opposite.  Mr.
12 Music was good at the start and became
13 worse towards the end.
14 Q.        Worse at following you around
15 and watching you and --
16 A.        Timing me and --
17 Q.        Timing you?
18 A.        Commenting that I can just do
19 menial job, that I'm not capable of
20 doing the job, in front of people.
21 Q.        Work performance issues?
22 A.        No, it's not performance
23 issues.  I don't know where he gets all

Page 206

1 this thing that he be saying and doing.
2 Q.        You disagree with what he's
3 saying?
4 A.        Yes.
5 Q.        But the types of things that
6 he was saying concern your work
7 performance or his perception of your
8 ability to work?
9 A.        Probably his perception to my
10 ability.  Oh, also, there was also time
11 when I was done with my work.  Like I
12 said, once I'm done with my work, I ask
13 for another job and he was inside the
14 office and he -- all of a sudden, he
15 commented out of nowhere, without me
16 asking him or -- I just asked him about
17 what work can he give me.  And all of a
18 sudden he said, "So you're a big man
19 now?"  I don't understand.  I didn't say
20 anything, but I was just asking for a
21 job.  And he said, "Oh, so you're a big
22 man now?"  I don't know.
23 Q.        And that was offensive to

Page 207

1 you?
2 A.        Yes.
3 Q.        And did you think that had
4 anything to do with you being
5 Philippino?
6 A.        Yes.
7 Q.        And connect those for me,
8 because I don't see --
9 A.        Well, the perception of a
10 foreigner is somebody probably, in his
11 mind or somebody's mind who is
12 discriminatory, that a foreigner could
13 not understand the work being asked, the
14 procedure that needs to be followed, the
15 safety that needs to be implemented.  I
16 believe that they could not grasp the --
17 even a foreigner can outperform their
18 abilities.
19 Q.        And that relates to you being
20 a big man?
21 A.        A foreigner.
22 Q.        A big man?  Is that what that
23 means?

Page 208

1 A.        In all the aspects that we
2 have just discussed.
3 Q.        At some point after November
4 18, 2004, you ran into Dr. Sewell?
5 A.        Say that again, please.
6 Q.        At some point after November
7 18th, 2004, you ran into Dr. Sewell?
8 A.        No, on the same day.
9 Q.        Same day?
10 A.        Yes.
11 Q.        Tell me about that.  You left
12 Pemco --
13 A.        I left -- do you want me to
14 discuss too at the time when I was taken
15 out of the office and then sent to the
16 tool crib or do you want that one later
17 on?
18 Q.        No, I'd like to hear that
19 too.
20 A.        Okay.  Then I'll start there.
21 Q.        Okay.  Let's walk through
22 that day.
23 A.        Let's walk through that day.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 209

1 Q.      From you leaving HR.
2 A.      Okay. So I got the paperwork
3 from Mr. Battcher, the one that he
4 handing to me. I already surrendered my
5 badge. And so he instructed me to go to
6 the tool crib, so that I can clear my
7 tools and get out of the plant and
8 that's it, right? So when I went to the
9 plant in the Hangar 15, that's where I
10 work, I happened to --
11 Q.      Where the supply shop was?
12 A.      Where the supply window, shop
13 is. I happened to bump into Mr. Docett.
14 Q.      Danny Docett?
15 A.      Danny Docett, the first shift
16 shop steward, on that same crew, day
17 shift crew, but on that same work area.
18 And so I asked him if he is the shop
19 steward for day shift on that crew, and
20 he said yes. And so I asked him for
21 help, because I told him I was just
22 fired, and he was shocked.
23      "For what reason?"

Page 210

1      And I told him that I was
2 fired due to the injury I sustained and
3 due to the medical reason. And so
4 because he was busy, he said, "Here's my
5 notebook. Why don't you write in a
6 place where nobody will bother you,
7 where you can write and explain the
8 situation."
9      And so I did, took his
10 notebook, went to the -- if this is my
11 workplace (indicating), the break room
12 was on the other end. That's where I
13 went.
14 Q.      This is all in the Hangar 15?
15 A.      All in the Hangar 15.
16 Q.      So the break room in Hangar
17 15?
18 A.      Correct, on the other end of
19 where I work, and that's where I sat
20 down there by the lunch table and
21 started writing. And in the process, I
22 was only up to page five of what I was
23 writing, there were two security guards

Page 211

1 that came in. One is uniformed, old
2 white guy, and the other one is a black
3 civilian attire. And the old man said
4 that Mr. Battcher was looking for me and
5 he wants me to check out of the tool
6 crib. I explained to them that I'm just
7 writing the situation, so I can tell
8 Mr. -- I can hand the book, notebook to
9 Mr. Docett so that he can help me out.
10 And so they insisted that I get out and
11 check out from the tool -- took my tools
12 to the tool crib, which I did. But I
13 was already in line -- I followed their
14 instruction. I went to the tool crib
15 and went in line. While in line, I
16 thought about having the things that I
17 wrote copied, so I made a photocopy.
18      And then as I got out of the
19 office where the Xerox machine was, in
20 the aisle, I saw Mr. Battcher on the
21 telephone, on his cell phone talking.
22 And since I knew that he wants to see
23 me, I walk in his front, so that he

Page 212

1 could see me, that I'm there, waiting
2 for him to tell me whatever he wants to
3 tell. And I thought that it would take
4 him sometime before he end his
5 conversation over the phone, so I was in
6 the process of going back to the line of
7 the tool crib, but I decided to come
8 back, and at that point he was just
9 finishing his conversation. And when he
10 started talking to me, he was in a loud
11 voice, embarrassing me in front of
12 people. Like another person there was
13 Mr. Lam, L-a-m, Mr. Lam. He was there
14 when Mr. Battcher was shouting at me to
15 go back in line.
16 Q.      In line for what?
17 A.      So that I can clear my tools,
18 so that I would have a clearance from
19 the tool crib.
20 Q.      How long did you spend
21 writing in Mr. Docett's notebook?
22 A.      I'd say a good 15 minutes.
23 Q.      What happened after Mr.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 213

1  Battcher told you to get back in line?
2  A.    I went back in line. But I
3  was so embarrassed. And it's just like,
4  you know, I have no face to show. He
5  treated me like criminal. And so I went
6  in line and I was given the clearance.
7  All along, he was there standing,
8  looking at me. And so I -- after I had
9  been cleared, I started going out,
10 walking towards the gate. And I just
11 took -- I left the toolbox with the
12 security guard so I can get my vehicle
13 and get it inside the gate and so
14 where -- so that I can load my box, my
15 toolbox.
16         When I came back, Mr.
17 Battcher was there again. He was really
18 anxious to see that I am out, totally
19 out of the plant. So that's what I did.
20 I got out and went to the clinic of Dr.
21 Sewell. And that's where I started
22 talking to the nurse and the nurse
23 confirmed that it was Dr. Sewell's order

Page 214

1  to add on that writing, the writing of,
2  "No exposure to fiberglass."
3  Q.    So you went back to Dr.
4  Sewell's office?
5  A.    Yes. At that time, Dr.
6  Sewell was with another patient. And so
7  all along, I was conversing with the
8  nurse.
9  Q.    Right. And why did you go
10 back to Dr. Sewell's office, I'm sorry?
11 A.    For me to see really and to
12 get a copy of the duplicate where she
13 wrote on.
14 Q.    Right. Basically to clarify
15 the discrepancy with Mr. Battcher's copy
16 and your copy?
17 A.    Correct.
18 Q.    Okay.
19 A.    And then I took off, because
20 Mr. -- Dr. Sewell was busy. And then
21 this is the point wherein that same
22 night was the opening night of Circuit
23 City, and actually there was a race car

Page 215

1  driver there, Martin something, a race
2  car driver, and people lined outside the
3  store for hours. And I was there at
4  about 7:00 -- finally was able to go
5  inside at 7:00. And when I was at the
6  stereo area, I happened to bump into Dr.
7  Sewell. And Dr. Sewell was very
8  apologetic about the incident that I was
9  terminated. And he commented --
10 Q.    Did he know -- did you tell
11 him you had been terminated?
12 A.    He was the one who said that,
13 "I'm very sorry that you were
14 terminated. That is not my intention."
15 That's what he said. "My intention for
16 giving that order to my nurse is that --
17 so that the company can somehow
18 accommodate you to a work environment
19 that, you know, would be less exposure,
20 less traumatic for you."
21 Q.    So Dr. Sewell told you in
22 Circuit City that he wrote -- that he
23 ordered his nurse to write, "No exposure

Page 216

1  to fiberglass"?
2  A.    Correct. He confirmed that.
3  Q.    Okay. And so what happened
4  after that?
5  A.    That's it. We parted ways.
6  Q.    Did you ask him at any point
7  to change what he had said or anything
8  like that?
9  A.    No, no, I never asked him to
10 change or whatnot, no.
11 Q.    And Defendant's Exhibit 14 is
12 dated 11-19-04, the next morning.
13 A.    Okay.
14 Q.    Is that right?
15 A.    From what I can see, it's
16 right, November 19. But like I said,
17 this is the first time for me,
18 Defendant's Exhibit Number 14, pages one
19 and two.
20 Q.    Do you know if this was
21 submitted to Pemco?
22 A.    I don't have any idea. Like
23 I say, I never see this one.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 217

1 Q.    Look at page two, November
2 19, 2004, via fax. And there's a fax
3 number there and then it says, "Pemco."
4 A.    Uh-huh. No, I never saw
5 this.
6 Q.    Any idea if this was sent to
7 Pemco?
8 A.    I have no idea.
9 Q.    When was the next
10 conversation that you had with Pemco?
11 A.    I believe November 4 or 5. I
12 may be wrong.
13 Q.    Well, we're talking about
14 November 19 is the last date we're on.
15 A.    I'm sorry, I'm sorry,
16 November -- December 5, probably. No,
17 no, no, November 20, the next time that
18 I was able to talk with Mr. Battcher,
19 November 20, 2004.
20 Q.    And what happened in that
21 conversation?
22 A.    Mr. Battcher -- I was not at
23 home. He left a message. And he said

Page 218

1 to call him and -- which I did, as soon
2 as I got home. And actually, on that
3 day, I went to the attorney from Dothan.
4 Q.    The city?
5 A.    No, not the city; a
6 private -- attorney Meredith. In fact,
7 I was in the office of attorney Meredith
8 on either November 4th or 5th, and then
9 on November 18, when I was fired -- no,
10 no, 20, 20. Because on November 4 or 5,
11 I -- because like I said, the
12 intonation, you can already read -- you
13 can clearly understand that you are
14 being terminated on November 3, the
15 intonation, the wordings. And so I
16 went --
17 Q.    What happened on November 3,
18 when you made your complaint about --
19 A.    Mr. Battcher said, "No,
20 there's no work for you."
21 Q.    Okay. So November 3, after
22 the first time you went to see Dr.
23 Sewell and Mr. Battcher said, "We don't

Page 219

1 have any work within your restrictions.
2 You've got to be off for two weeks until
3 you go see Dr. Sewell again" --
4 A.    Right.
5 Q.    You went to go see an
6 attorney on November 3rd?
7 A.    Not the 3rd. 4th or 5th,
8 which is attorney Meredith in Dothan.
9 And from what the attorney Meredith --
10 Q.    And I don't want you to tell
11 me about the conversation that you had.
12 A.    Oh, okay.
13 Q.    I may ask you some questions
14 about why did you go, but I don't want
15 you to testify about what you told the
16 attorney and what the attorney told you.
17 A.    Oh, okay.
18 Q.    Okay?
19 A.    Okay.
20 Q.    But it's okay to tell me that
21 you went. I just don't want to hear
22 about your privileged conversation.
23 A.    Okay. I went there either on

Page 220

1 November 4th or 5th, and also on
2 November 20th.
3 Q.    And you said you were at the
4 attorney's office when you got a message
5 from Jim Battcher?
6 A.    When I went home, there was a
7 message.
8 Q.    Okay. Let's talk about that.
9 A.    Okay. And so I went out
10 again and went to his office. I called
11 first, if I can have a meeting with
12 attorney Meredith.
13 Q.    You got the message from Jim
14 Battcher?
15 A.    Yes.
16 Q.    And you listened to the
17 message?
18 A.    Yes.
19 Q.    Did you call Jim Battcher
20 back?
21 A.    I did when --
22 Q.    With your attorney?
23 A.    Yes.

55 (Pages 217 to 220)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 221

1 Q. Okay. What happened in the
2 conversation with Jim Battcher?
3 A. He said that he's trying to
4 look for a specialist, skin specialist
5 to set me up to be seen.
6 Q. Do you remember Mr. Battcher
7 telling you that day that you were no
8 longer terminated, but you were being
9 placed on medical leave?
10 A. No, he didn't say, "You're on
11 medical leave." He didn't say, "You're
12 on administrative leave." He didn't say
13 that.
14 Q. But he wanted to send you to
15 a doctor anyway?
16 A. Correct. He's trying to look
17 for -- he's trying to look for a skin
18 specialist.
19 Q. Why was he sending you to a
20 skin specialist?
21 A. I don't know.
22 Q. Why did you agree to go?
23 A. Well, I'd like a second

Page 222

1 opinion in regards to the situation.
2 Q. Did you not agree with what
3 Dr. Sewell had determined?
4 A. I very agreed.
5 Q. So why did you want a second
6 opinion?
7 A. Just, you know, for peace of
8 mind.
9 Q. Didn't Mr. Battcher tell you
10 that, "You need to go see this
11 specialist because we're trying to
12 determine whether or not you can come
13 back to work"?
14 A. He's not -- he didn't say
15 trying to determine if he can send me
16 back to work. He didn't say things like
17 that, as far as I can -- I may be wrong.
18 Q. And I want what you remember.
19 That's what I want to know.
20 A. Right. That's why I'm
21 saying -- but I cannot remember him
22 saying, but definitely he did not say
23 that I am being placed on medical leave

Page 223

1 or administrative leave.
2 Q. Was your attorney on the
3 phone with you when you were talking to
4 Mr. Battcher?
5 A. Correct.
6 Q. Was he speaking to Mr.
7 Battcher?
8 A. No.
9 Q. So he was just listening to
10 the conversation?
11 A. Yes.
12 Q. And were you on speaker
13 phone?
14 A. No. I can't remember that.
15 I'm not quite sure. But he -- on the
16 urging of the attorney?
17 Q. Right. And again, don't say
18 any more unless I ask about that. So
19 Mr. Battcher said he was trying to find
20 you a specialist during your
21 conversation on November 20th, 2004.
22 And did he fine one?
23 A. Yes. He said that he set up

Page 224

1 an appointment for me to see Dr. Ruddock
2 on --
3 Q. November 23rd?
4 A. November 23rd at the Flowers
5 Hospital. And I even asked for
6 directions for that.
7 Q. And did he give you that?
8 A. Yeah.
9 Q. Mr. Battcher --
10 A. He gave me the time and place
11 and the phone number.
12 Q. And directions?
13 A. Directions.
14 Q. You understood Mr. Battcher
15 to be helping you at this point?
16 A. Yes.
17 Q. And did you go to the doctor?
18 A. No.
19 Q. Why not?
20 A. Because we -- because while I
21 was at the attorney's office, like I
22 said, I was in conversation with Mr.
23 Battcher and I agreed to come to that

56 (Pages 221 to 224)

# FREEDOM COURT REPORTING

Page 225

1  appointment that he had set for -- to
2  see Dr. Ruddock, and I said I was going
3  to come, but later that night, I need to
4  go back to Jacksonville, and so --
5  Q.     Did you call Mr. Battcher and
6  tell him that you were going to miss the
7  appointment?
8  A.     No, because he --
9  Q.     Did you call Dr. Ruddock's
10 office and tell him that you weren't
11 going to be there?
12 A.     Yes. In fact, I cannot
13 remember the name of the lady that I
14 left message with, but as far as I can
15 remember, she is -- because the offices
16 are closed and that they are the
17 answering service. But in the course of
18 me putting all paperworks together, I
19 found some of my notes and that I placed
20 the name of the lady that I was talking
21 to, but on my previous letters, I said I
22 forgot the name of the lady, but finally
23 I found it and her name is Christy, and

Page 226

1  I talked to her at about 2:36 in the
2  morning and -- because I was heading
3  back for Jacksonville, and I told her to
4  relay the message to Dr. Ruddock,
5  because I cannot make the appointment at
6  7 o'clock that morning.
7  Q.     And?
8  A.     And the lady said yes, and I
9  asked for her name and I placed the
10 time. You should have a copy from one
11 of the things that I gave you.
12 Q.     Did you talk to Mr. Battcher
13 after that day, when you did not go to
14 the appointment on November 23rd, 2004?
15 A.     No, but he called up
16 sometime, I can't remember when. He
17 called up sometime and he said that he's
18 setting up another appointment to see
19 Dr. Tamburin on December 7.
20 Q.     And he also gave you
21 directions and made sure that you knew
22 how to get there?
23 A.     Yes, yes, correct.

Page 227

1  Q.     Did he tell you that if you
2  wanted your job, you needed to make that
3  appointment?
4  A.     Yes, I believe he said that.
5  Q.     And was it your
6  understanding, based on that statement,
7  that Pemco was trying to figure out a
8  way for you to come back to work?
9  A.     Yes.
10 Q.     Did you go see Dr. Tamburin
11 on December 7?
12 A.     Yes. I drive from
13 Jacksonville back to Dothan and back
14 home.
15 Q.     And what happened at that
16 appointment?
17 A.     She -- well, there was other
18 situation that occurred before I ended
19 up seeing Dr. Tamburin. The clinic
20 doesn't know where to bill the cost of
21 this, the cost of consultation.
22 Q.     With Dr. Tamburin?
23 A.     With Dr. Tamburin.

Page 228

1  Q.     Okay.
2  A.     And I called doctor -- I
3  called Mr. Battcher, letting him know
4  that I am there in the clinic and that
5  there is a question about who would pay,
6  and the clinic is asking me to pay.
7        I said, "I'm not supposed to
8  pay this."
9        But eventually, they ended
10 up -- I don't know what transpired in
11 there. Eventually, Dr. Tamburin did see
12 me.
13 Q.     And you didn't have to pay
14 for it?
15 A.     I didn't have to pay for it.
16        (Whereupon, Defendant's
17        Exhibit Number 16 was
18        marked for identification.)
19 Q.     (By Mr. Holmes) Okay. Let's
20 look at Defendant's Exhibit 16 to your
21 deposition.
22 A.     Okay.
23 Q.     Have you seen Defendant's

57  (Pages 225 to 228)

# FREEDOM COURT REPORTING

Page 229

1  Exhibit 16 before?
2  A.      No, not specifically this
3  one, because this is the first time for
4  me to see this Defendant's Exhibit
5  Number 16. And there's also some errors
6  to this. It says there that he was
7  terminated from -- on the first
8  paragraph, "He was terminated from his
9  job November 3, 2004."
10  Q.      And that's incorrect; right?
11  A.      That's incorrect. It should
12  be November 18. And then another
13  sentence of the same paragraph, the last
14  sentence, it says here, "He is sent for
15  consultation today by Dr. Joseph
16  Sewell." It was not Dr. Joseph Sewell
17  who send me there. It was Mr. Battcher.
18       Also in one of the
19  Defendant's Exhibit, I can't remember
20  which one, it says there -- like it
21  says, "He's Hispanic." I'm not
22  Hispanic. On page two, I believe.
23  Q.      Has anybody ever confused you

Page 230

1  for being Hispanic before?
2  A.      No, no.
3  Q.      And what did Dr. Tamburin
4  decide about your condition?
5  A.      Well, pretty much what she
6  said, to apply the topical cream that
7  she recommended and what Dr. Sewell
8  recommended.
9  Q.      Did she say you could go back
10  to work?
11  A.      Yes.
12  Q.      And did you want to go back
13  to work?
14  A.      Honestly, I wanted to work,
15  but it's keeping me from going back to
16  work, because of all the treatment that
17  I got from there, and I don't know
18  what's going to happen next, when I go
19  back, how the treatment's going to be.
20  So it's like I wanted to work, but I
21  don't want to work.
22  Q.      And had you gotten better,
23  your condition, your skin condition,

Page 231

1  having been away from the fiberglass for
2  over a month at that point?
3  A.      Yes, on and off, on and off.
4  Q.      It wasn't worse, was it?
5  A.      It depends on the day that --
6  that it would be worse. It's on and
7  off.
8  Q.      Were you exposed to
9  fiberglass after --
10  A.      No, no.
11  Q.      -- after the second visit
12  with Dr. Sewell, before --
13  A.      Just on the day that I was
14  terminated, to get my toolbox, and
15  that's it.
16  Q.      Defendant's Exhibit 16, the
17  second -- the third to the last sentence
18  of the first paragraph says, "Since that
19  time, the rash was almost completely
20  resolved. He has some occasional
21  pruritus, but no other problems." Was
22  that the condition you were in on
23  December 7 of 2004 when you saw her?

Page 232

1  A.      Yes, but there were -- it's
2  not totally healed up, and she could see
3  all the rashes that's still open. But
4  practically, you could see that there's
5  a development, a good development going
6  on.
7  Q.      So at this point, she said
8  you could go back to work, assuming you
9  wear protective gear?
10  A.      Correct.
11  Q.      That was your understanding?
12  A.      Yes. She told me that I can
13  go back to work.
14  Q.      And did you talk to Mr.
15  Battcher after you saw Dr. Tamburin?
16  A.      Yes, I told him that it's
17  already finished and I'm heading back to
18  Jacksonville and if there's anything
19  that he wants me to do before I leave
20  the area --
21  Q.      And was that on that day?
22  A.      Yes.
23  Q.      And did you talk to --

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 233

1   A.      Before I leave the hospital.
2   Q.      And did you talk to Mr.
3   Battcher again on December 16th, 2004?
4   A.      I'm not quite sure about the
5   date, but yes.
6   Q.      The conversation you had with
7   Mr. Battcher when he told you that you
8   needed to come back to work?
9   A.      Yes, he said that he wants me
10  to go back to work on December 20 and
11  bring my toolbox, ready for work.
12  Q.      And did you go to work on
13  December 20?
14  A.      No.
15  Q.      Did you go to work on
16  December 21?
17  A.      No.
18  Q.      Did you go to work on
19  December 22?
20  A.      No.
21  Q.      Why not?
22  A.      Like what I said. I wanted
23  to work, but I don't want to be exposed

Page 234

1   to that same situation.
2   Q.      Were you physically --
3   A.      Meaning the harassment,
4   discrimination, the fiberglass, and I
5   don't know what treatment they will be
6   doing to me. I don't want to be in that
7   kind of situation again, so --
8   Q.      You didn't want to work
9   around the fiberglass again?
10  A.      Not just the fiberglass, but
11  the treatment that they are affording to
12  me. And who knows, there might be other
13  ways in which they could probably find a
14  way of terminating me without the
15  company being answerable for; I don't
16  know. But mainly, I don't want to be
17  exposed to the treatment that they are
18  giving to me. Anybody in that situation
19  doesn't want to go back. If you were in
20  my position, it would be foolish.
21           That's why I did not respond
22  by not going to his offer. And then he
23  accused me that I violated the Pemco

Page 235

1   collective bargaining agreement. And
2   then later on, from the letter I
3   received from them, saying I am being
4   fired the second time, and that they
5   paid my vacation leave and sick leave
6   the second time. And then I called them
7   up, I called up accounting and I
8   asked -- and I talked to Ms. Brenda
9   White.
10           I told her, "Why are you
11  paying me the second time? I already
12  received my first vacation and sick
13  leave the first time I was fired on
14  November 18. And now you're paying me
15  the second time, even higher than what I
16  received." I told Ms. Brenda White
17  that, "This is not mine and that I'm
18  returning it." And so on January 6, I
19  returned the check.
20           (Whereupon, Defendant's
21           Exhibit Number 17 was
22           marked for identification.)
23  Q.      (By Mr. Holmes) Let me show

Page 236

1   you what I'm marking as Defendant's
2   Exhibit 17 to your deposition.
3   A.      I'm ready.
4   Q.      Did you receive a copy of
5   Defendant's Exhibit 17 or the original
6   that was sent to your home in
7   Jacksonville?
8   A.      I believe so.
9   Q.      And did you sign and return
10  this?
11  A.      That, I cannot remember, if I
12  did sign. I believe I did not sign
13  this, because we had already a telephone
14  conversation for me to see Dr. Tamburin.
15  Q.      Mr. Camacho, I'm going to
16  take -- I'm going to remark this
17  Defendant's Exhibit 17 to the one you
18  gave me this morning. I just showed you
19  my copy, and I want to put the one you
20  gave me this morning in here. And if
21  you'll just confirm that that's the same
22  letter that you just discussed. The
23  pages attached are the envelopes that

59 (Pages 233 to 236)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 237

1  you provided to me this morning.
2  A.    Yeah.
3  Q.    Okay.
4  A.    See, it says here on the
5  thing, "Second notice," I haven't
6  received the first. That's why I put
7  the question mark, where is the first.
8  It says "Second notice" on the envelope.
9  Q.    But you do remember getting
10  this letter at some point?
11  A.    Yes, yes.
12  Q.    And you just don't remember
13  why you didn't sign it?
14  A.    Yes. I didn't sign it.
15  Q.    And you don't remember why or
16  you didn't --
17  A.    No, I don't remember why.
18  Probably because it came in late or
19  something. Like I said, it says on the
20  envelope, "Second notice," where, in
21  fact, I never receive any first notice.
22  Q.    Did you talk to Mr. Docett at
23  any point in December after you went to

Page 238

1  see Dr. Tamburin?
2  A.    I can't remember, but I did
3  talk to him, but I can't remember the
4  date.
5  Q.    Was it before or after you
6  saw Dr. Tamburin?
7  A.    I cannot correlate that,
8  whether it's before or after.
9  Q.    Was it after you wrote in his
10  notebook?
11  A.    Definitely.
12  Q.    Tell me what you -- what
13  conversations you had with him after you
14  wrote in his notebook.
15  A.    I called the telephone number
16  that he gave me on the day -- on
17  November 18, when I returned the
18  notebook to him, he gave me a phone
19  number where I could call him. But it
20  took some time before I ended up calling
21  him. I was already past being -- I know
22  it takes some -- took some time before I
23  called him up. And I called him at

Page 239

1  home.
2  Q.    Was there any particular
3  reason why you waited so long to call
4  him?
5  A.    No, I was just wondering
6  what's going on with the letter, the
7  notes that I gave to him.
8  Q.    Was it your understanding
9  that the notes that you gave to him
10  constituted some kind of grievance that
11  you wanted to file?
12  A.    Yes.
13  Q.    When you talked to him when
14  he gave you the notebook to write in,
15  did you say, "I want to file a
16  grievance"?
17  A.    I don't know if I uttered
18  that to him. I'm not quite sure,
19  because I'm being rushed to get out of
20  the place.
21  Q.    Well, you certainly weren't
22  rushed when you had your conversation
23  with him, when he said, "Here, write in

Page 240

1  this notebook"?
2  A.    No, no, no.
3  Q.    Well, tell me, then, what you
4  do remember when you did talk to him
5  eventually.
6  A.    You mean when I called him at
7  home?
8  Q.    Yes.
9  A.    That's all. I just said,
10  "Hi, hello, how are you?" And I just
11  asked, "What's going on with the notes
12  that I left you? I'm sorry I was not
13  able to finish. Probably you will not
14  be able to understand it." That's it.
15  Q.    And what did you discuss with
16  him beyond that?
17  A.    Just the note, that's it.
18  Q.    Did you say, "I want to file
19  a grievance. I've been terminated"?
20  A.    I believe that was my
21  implication at the time.
22  Q.    You didn't state that?
23  A.    I can't remember if I did. I

60  (Pages 237 to 240)

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 241

1  don't know if I did even utter it.
2  Q.      Did you ever file a
3  grievance?
4  A.      No.
5  Q.      Did you ever ask Mr. Docett
6  to file a grievance on your behalf?
7  A.      No.
8  Q.      Did you ever ask anyone at
9  the union at Pemco to file a grievance
10  on your behalf?
11  A.      No.
12  Q.      Did you consider filing a
13  grievance?
14  A.      No. Only at the time like
15  when I was about to say to Mr. Battcher
16  and Ms. Gerri Paulk on November 18,
17  that's the time that I would like them
18  to know what's going on. But other than
19  that, no.
20  Q.      The same day you wrote in
21  Danny's notebook?
22  A.      Correct.
23         (Whereupon, Defendant's

Page 242

1         Exhibit Number 18 was
2         marked for identification.)
3  Q.      (By Mr. Holmes) Let me show
4  you what I've marked as Defendant's
5  Exhibit 18 to your deposition. And if
6  you'll take a minute and review that.
7  A.      See, this is another one.
8  They said I'm on administrative leave.
9  I'm not. I was fired. And it says
10  here, "Off work for a week." Not week;
11  two weeks.
12  Q.      Mr. Camacho, if you would, if
13  you would review all of Defendant's
14  Exhibit 18, and then we can talk about
15  it.
16  A.      Okay. I'm ready.
17  Q.      Did you receive Defendant's
18  Exhibit 18?
19  A.      Yes, I received this
20  Defendant's Exhibit Number 18.
21  Q.      Did you talk to anyone at
22  Pemco after you received that?
23  A.      I can't remember, but it's

Page 243

1  more than likely not. There are a lot
2  of errors. This letter is from the mind
3  of Mr. Battcher.
4  Q.      I understand Defendant's
5  Exhibit 18 is a Pemco document that was
6  sent to you.
7  A.      There's a lot of errors on
8  this letter.
9  Q.      Well, why don't you tell me
10  what you disagree with.
11  A.      Okay. One, it says here I'm
12  on administrative leave. I was never
13  put on administrative leave. I was
14  fired. I was terminated on November 18.
15         Second, it says here I was
16  off for a week. I was not off for a
17  week. It was two weeks, from November 3
18  through 18.
19  Q.      What else?
20  A.      And third is as per doctor --
21  "Per Mr. Battcher, that Dr. Sewell
22  determined that you had not been using
23  your prescribed medicine, but that your

Page 244

1  symptoms had improved after limiting
2  your exposure to fiberglass."
3  Q.      Is that wrong?
4  A.      Yes.
5  Q.      How is that wrong?
6  A.      He voluntarily told him --
7  because it was me who told Dr. Sewell.
8  Q.      Okay. What else?
9  A.      On the same sentence, the
10  following sentence, "Dr. Sewell
11  concluded that you could not be exposed
12  to fiberglass," open close parenthesis
13  quotation, "No exposure to fiberglass."
14  That's not on the consult that -- the
15  original consult that Dr. Sewell gave to
16  me, the one on the close parenthesis
17  open close quotation, "No exposure to
18  fiberglass." It was not there. It was
19  just added on.
20  Q.      What else?
21  A.      On the fourth paragraph, on
22  November --
23  Q.      Let's go up one. Look at the

61  (Pages 241 to 244)

# FREEDOM COURT REPORTING

Page 245

1  third paragraph.
2  A.      Okay.
3  Q.      The last sentence there --
4  well, the whole paragraph, on November
5  18, 2004, and then the last sentence,
6  "Mr. Battcher terminated your employment
7  that day," there's no dispute between
8  you and Pemco about that, is there?
9  A.      No, that's the right date
10 that I was terminated.
11 Q.      All right. You were about to
12 say something about the fourth
13 paragraph?
14 A.      The fourth paragraph, "On
15 November 19th, 2004, Dr. Sewell amended
16 his prior assessment after talking with
17 you." I don't know of any amendment
18 that he -- on November 19. The only
19 amendment that was -- I learned later
20 on, which was -- I mean I learned on the
21 18th, was the added, open close
22 parenthesis there on paragraph two,
23 quotation, "No exposure to fiberglass."

Page 246

1  That's the only amendment that I have
2  learned from the situation.
3  Q.      Mr. Camacho, Pemco got a
4  document from Dr. Sewell that said, "No
5  exposure to fiberglass on it," correct?
6  Or at least Dr. Sewell told you at
7  Circuit City that he instructed his
8  nurse to send -- to write that on there
9  and send it to Pemco?
10 A.      Correct.
11 Q.      Then Defendant's Exhibit 14
12 is dated November 19, '04 and that does
13 not say, "No exposure to fiberglass,"
14 does it?
15 A.      No, but we're referring to
16 the November 17 -- the November 17
17 original consult.
18 Q.      Mr. Camacho, look --
19 A.      That Dr. Sewell gave me.
20 Q.      Okay. I'm looking at
21 paragraph four of Defendant's Exhibit
22 18. And as you've already testified,
23 this letter is from Mr. Battcher's

Page 247

1  perspective.
2  A.      Correct.
3  Q.      "On November 19, 2004, Dr.
4  Sewell amended his prior assessment
5  after talking with you." Is it possible
6  that that is referring to Defendant's
7  Exhibit 14, which was sent to Pemco
8  after your conversation at Circuit City?
9  A.      I have no idea.
10 Q.      It's possible?
11 A.      I cannot say that.
12 Q.      What else is wrong with that?
13 A.      Okay. That's the fifth. I
14 never know any amendment after the --
15 after November 18.
16 Q.      Is Dr. Sewell going to be an
17 important source of information to find
18 out about this?
19 A.      Yes.
20 Q.      Okay.
21 A.      On paragraph five, last
22 sentence, "However, you failed to attend
23 your scheduled appointment." The

Page 248

1  intonation on this is a blame on me.
2  There was a miscommunication there. I
3  talked to -- paged telephone
4  answering -- the telephone answering
5  service, and her name is Christy. I
6  called her up early that morning, at
7  2:36 in the morning, informed her to
8  relay the message to Dr. Ruddock that I
9  cannot attend the 7 o'clock appointment,
10 as I am heading back to Jacksonville.
11 Q.      You've testified about that,
12 and you've also said that you did not
13 call Pemco to tell them you weren't
14 going?
15 A.      No. I --
16 Q.      That's correct, you did not
17 call Pemco?
18 A.      I called the doctor's office.
19 So it so happened at that time --
20 Q.      Did you call Pemco?
21 A.      No, I did not call Pemco.
22 Q.      Any other problems with the
23 first page?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

Page 249

1  A.      No more on the first page.
2  Okay.  On page two, second paragraph --
3  Q.      No problems with the first
4  paragraph?
5  A.      No problem with the first
6  paragraph.
7  Q.      Second paragraph?
8  A.      On the second paragraph, the
9  first sentence, "Pursuant to your
10  medical evaluations, Mr. Battcher
11  informed you on December 16th, 2004,
12  that you can return to work, assuming
13  you rigorously follow your recommended
14  treatment and wear your prescribed
15  protective gear."  Why would he have to
16  say that?  Where, in fact, I am
17  religiously putting on my protective
18  gears and I'm -- I do put on the cream
19  and the medication that was prescribed
20  to me.  He didn't even say that to me.
21  He's blaming me and the tone of this is
22  he's blaming me for not wearing any
23  protective gear.  He's blaming me on

Page 250

1  that.
2  Q.      And you --
3  A.      That is not right.
4  Q.      And you disagree with the --
5  A.      I definitely disagree.
6  Q.      Okay.
7  A.      And that's it.  No more
8  errors on page two.
9          (Whereupon, Defendant's
10         Exhibit Number 19 was
11         marked for identification.)
12  Q.      (By Mr. Holmes)  Let me show
13  you Defendant's Exhibit 19 to your
14  deposition.  And this is a little out of
15  sequence of what we've been talking
16  about, but I think it will clarify the
17  record.
18  A.      Okay.
19  Q.      Is that your handwriting that
20  has filled out the top portion of
21  Defendant's Exhibit 19?
22  A.      Correct.
23  Q.      And this is the new patient

Page 251

1  information sheet you filled out with
2  Dr. Tamburin's office?
3  A.      Correct.
4  Q.      And can you see the, "Who
5  referred you to us?"
6  A.      I wrote there, "Dr. Joseph
7  Sewell."
8  Q.      Do you think it's possible
9  that Dr. Tamburin's statement in
10  Defendant's Exhibit 16 which you
11  previously disagreed with regarding the
12  referral, came from you filling out
13  Defendant's Exhibit 19?
14  A.      I made a mistake in writing
15  this, and it was from the conversation
16  with Mr. Battcher that he set up the
17  appointment for me to see Dr. Tamburin.
18  Q.      An answer to my question is,
19  yes, it's possible that Defendant's
20  Exhibit 16, which gives credit to Dr.
21  Sewell, came from you filling out
22  Defendant's Exhibit 19 and writing down
23  Dr. Sewell?

Page 252

1  A.      Yes.
2  Q.      Okay.
3  A.      But I may have made the
4  mistake in writing Dr. Joseph Sewell
5  there, where in fact, it's Mr. Battcher.
6  Q.      That's your handwriting on
7  Defendant's Exhibit 19?
8  A.      Correct.
9  Q.      Okay.  Thank you.  When you
10  received Defendant's Exhibit 27 -- I'm
11  sorry, Defendant's Exhibit 18, was it
12  your understanding after reading, that
13  letter that you had been terminated
14  again?
15  A.      Yes, the second time.
16  Q.      And --
17  A.      How can I be terminated the
18  second time when I was terminated the
19  first time?  I was never on medical
20  leave, administrative leave or what was
21  the other one that -- what was the other
22  one that was earlier said?  But never on
23  administrative leave or medical leave.

63  (Pages 249 to 252)

# FREEDOM COURT REPORTING

### Page 253

1  Q.    As far as you knew?
2  A.    Yes, definitely.
3  Q.    Okay.
4  A.    I was not -- never conveyed
5  to me.
6  Q.    Despite what letter the has
7  said, and you've already testified that
8  you agree with or don't have any
9  problems with?
10  A.    Yes. Oh, there are lots of
11  problems on that letter.
12  Q.    Right.
13  A.    On Defendant's Exhibit 18.
14  Q.    And you've already --
15  A.    Like I've noted.
16  Q.    So you've noted all the
17  problems that you have with Defendant's
18  Exhibit 18?
19  A.    Correct.
20  Q.    What evidence do you have
21  that your termination on December 22nd,
22  2004 --
23  A.    The second --

### Page 254

1  Q.    The second termination.
2  A.    The second pink slip, the --
3  Q.    Please, Mr. Camacho, let me
4  finish my question. What evidence do
5  you have that your December 22nd, 2004
6  termination was in any way related to
7  you being Philippino?
8  A.    It goes back to all the
9  things that have transpired.
10  Q.    Do you have any other
11  evidence other than what you've already
12  testified about today?
13  A.    No.
14  Q.    What evidence do you have
15  that your termination on December 22nd,
16  2004 was in any way related to your
17  reaction to fiberglass and your
18  condition?
19  A.    How can I -- I do not
20  consider myself being fired on December
21  22nd. It's November 18. That's it.
22  There's no -- nothing to consider.
23  Q.    What evidence do you have

### Page 255

1  that -- strike that.
2      At what point did you file
3  for unemployment?
4  A.    I can't remember the date.
5  Probably as soon as I got laid off.
6      (Whereupon, Defendant's
7      Exhibit Number 20 was
8      marked for identification.)
9  Q.    (By Mr. Holmes) Let me give
10  you what I've marked Defendant's Exhibit
11  20 to your deposition.
12  A.    Okay.
13  Q.    And can you confirm for me
14  that that was a check you received from
15  the workers' comp insurance company that
16  Pemco used?
17  A.    Yes.
18  Q.    And what was your
19  understanding that check was for?
20  A.    The workers' comp, for the
21  two weeks.
22  Q.    Longer than two weeks; right?
23  A.    Yeah.

### Page 256

1  Q.    But that was the benefits you
2  were owed for being out of work?
3  A.    Yeah, for October 29 to
4  December, that's what I understand about
5  this.
6  Q.    Are you, in this lawsuit,
7  seeking additional workers' compensation
8  benefits?
9  A.    No.
10  Q.    When did you contact the
11  EEOC?
12  A.    December 1st, 2004.
13  Q.    Is the charge that you filed
14  with the EEOC, the same issues that
15  you're complaining about in this
16  lawsuit?
17  A.    Yes.
18  Q.    Are you alleging that you are
19  disabled?
20  A.    No.
21  Q.    Are you able to treat your
22  skin condition with medication?
23  A.    Yes.

64  (Pages 253 to 256)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 257

1  Q.      Have you worked around
2  fiberglass since your employment at
3  Pemco?
4  A.      No.
5  Q.      And you've been able to work
6  since your employment at Pemco
7  physically?
8  A.      Correct.
9  Q.      Has anyone at Pemco ever told
10 you that you're disabled?
11 A.      No.
12 Q.      Has anyone at Pemco ever told
13 you that they think you're disabled?
14 A.      No.
15 Q.      Are you claiming that you're
16 impaired in any way?
17 A.      No.  But I am definitely --
18 have the impairment, but I don't want to
19 claim it, meaning to the -- to the
20 detriment, there we go, to the detriment
21 of my work ability.
22 Q.      In any of the job interviews
23 or job applications or hiring processes

Page 258

1  that you've experienced since Pemco --
2  and you've worked for two companies
3  since Pemco; right?
4  A.      Since Pemco?  No, just one.
5  Q.      Well, Northwest and then the
6  contractor before Northwest?
7  A.      That's just one.  I was
8  just -- just like --
9  Q.      Just like at Pemco?
10 A.      Yeah, they are just a
11 supplier of workers, but in reality,
12 you're working for Northwest.
13 Q.      Did the work for Northwest
14 include working around fiberglass?
15 A.      No.
16 Q.      Did you tell them that you
17 could not work around fiberglass?
18 A.      No.
19 Q.      Do you still have problems
20 with your skin as we sit here today?
21 A.      Yes, in fact, yes.
22 Q.      Even though you haven't been
23 around fiberglass?

Page 259

1  A.      Yes.
2  Q.      When was the last time you
3  received treatment for your condition?
4  A.      Meaning medically?
5  Q.      Any kind of treatment?
6  A.      The last topical solution
7  that I put was probably three months
8  ago, and I'm out of medication.
9  Q.      What's the last doctor that
10 you saw?
11 A.      Dr. Tamburin.
12 Q.      In December of 2004?
13 A.      Yeah.
14 Q.      Have you asked to see another
15 doctor?
16 A.      No.
17 Q.      When you worked for Northwest
18 Airlines, did you have insurance?
19 A.      Yes.
20 Q.      Did you ask to go see a
21 doctor or did you go see a doctor when
22 you had insurance?
23 A.      No.

Page 260

1  Q.      Does your skin condition
2  limit you in your daily activities?
3  A.      No.  It hurts, but --
4  Q.      Other than discomfort or a
5  certain amount of pain, you're able to
6  do everything you could do before
7  recognizing a skin condition?
8  A.      Correct.
9  Q.      On December 20th, 2004, were
10 you physically able to return to work at
11 Pemco?
12 A.      Yes.
13 Q.      Are there any types of jobs
14 that you are unable to perform?
15 A.      Of course, heavy lifting.
16 Q.      Due to your back?
17 A.      Yes.
18 Q.      What about due to your skin
19 condition?
20 A.      No.
21 Q.      Did you ever try to figure
22 out if there were any jobs available at
23 Pemco in the office or anywhere other

65 (Pages 257 to 260)

# FREEDOM COURT REPORTING

Page 261

1    than the hangars?
2    A.    No, I just asked Mr. Battcher
3    on two occasions.
4    Q.    Are there job postings and
5    job bids that are put up around the
6    facility?
7    A.    I'm not aware of those
8    things.
9    Q.    Do you read the newspaper?
10   A.    What newspaper?
11   Q.    Any newspaper for
12   classifieds, for jobs, anything like
13   that?
14   A.    No.
15   Q.    Are you alleging as part of
16   this lawsuit that you were treated
17   differently from other employees because
18   of your skin condition?
19   A.    Yes.
20   Q.    How so?
21   A.    Oh, skin condition, no,
22   not -- skin color. That's what I was.
23   Q.    Just so we're clear, you're

Page 262

1    not alleging that you were treated
2    differently than any other employee
3    because of your skin condition?
4    A.    No.
5    Q.    That's correct? What I said,
6    that's correct?
7    A.    Yes.
8    Q.    Okay. Are you aware of any
9    employees, other employees with skin
10   conditions like yours at Pemco?
11   A.    I am not aware. Oh, wait a
12   minute. At one point, I don't know the
13   name, but some people would say, "Yeah,
14   I'm used to it," you know, meaning they
15   themselves are used to working in
16   fiberglass. That's why it doesn't
17   bother them.
18   Q.    Are you aware of any other
19   employee at Pemco who received
20   additional protective gear?
21   A.    No, I'm not.
22   Q.    Have you seen a copy of the
23   lawsuit that Mr. Gray filed on your

Page 263

1    behalf?
2    A.    I have a file, but --
3          (Whereupon, Defendant's
4          Exhibit Number 21 was
5          marked for identification.)
6    Q.    (By Mr. Holmes) Let me show
7    you what I'm marking as Defendant's
8    Exhibit 21 to your deposition.
9    A.    Okay.
10   Q.    Have you had an opportunity
11   to review Defendant's Exhibit 21?
12   A.    Yes.
13   Q.    Have you ever seen this
14   before?
15   A.    No, this is the first time
16   for me to see this document, Defendant's
17   Exhibit 21.
18   Q.    I understand you're not an
19   attorney and that Defendant's Exhibit 21
20   was written by your former attorney, but
21   after having a chance to review
22   Defendant's Exhibit 21, is there
23   anything that you're claiming in this

Page 264

1    lawsuit that we haven't talked about
2    today or that's not in Defendant's
3    Exhibit 21?
4    A.    I think it's said in here.
5    Q.    I just want to be clear that
6    on the transcript, that I understand
7    everything you're claiming in this
8    lawsuit. Does that make sense?
9    A.    It's a little bit vague.
10   Q.    And again, I understand
11   you're not an attorney, but every claim
12   that you're making against Pemco, the
13   reason why we're here in this lawsuit,
14   everything that makes up your lawsuit, I
15   want to make sure that we cover it
16   today, and so I'm asking is there
17   anything else other than what you've
18   told me today and other than what's
19   listed in this Complaint, that you're
20   complaining about for --
21   A.    I -- I'm sorry, go ahead.
22   Q.    Go ahead.
23   A.    It just occurred to my mind

66 (Pages 261 to 264)

# FREEDOM COURT REPORTING

### Page 265

1  right now that being exposed to
2  fiberglass, I don't know what the future
3  will hold for me, like especially the
4  respiratory system, so I can't say. I'm
5  not a doctor.
6  Q.      You're worried about the
7  exposure that you've had to fiberglass?
8  A.      Correct.
9  Q.      And breathing in fiberglass
10 particles?
11 A.      Correct.
12 Q.      And is it your hope that this
13 lawsuit will cover that exposure?
14 A.      Yes.
15 Q.      Have you filed a workers'
16 compensation lawsuit?
17 A.      No.
18 Q.      Do you intend to file a
19 workers' compensation lawsuit?
20 A.      No.
21 Q.      Have you told me everything
22 you have to tell me supporting your
23 claim that you've been discriminated

### Page 266

1  against on the basis of your national
2  origin?
3  A.      As far as I can recall, yes,
4  and there may be some that I can't
5  recall at this point of time.
6  Q.      To the best of your
7  knowledge, as we sit here today, you've
8  been able to tell me everything you have
9  to support your claim that Pemco
10 discriminated against you because you're
11 Philippino?
12 A.      Yes.
13 Q.      And is it your understanding
14 that this lawsuit is covering a claim
15 that Pemco violated the Americans With
16 Disabilities Act?
17 A.      Yes.
18 Q.      Even though you would not
19 describe yourself as disabled?
20 A.      I am disabled, but I just
21 don't want to make a big deal out of it,
22 because I can still work. But
23 technically, I am disabled.

### Page 267

1  Q.      And that's -- when I asked
2  you earlier if you were claiming you
3  were disabled, you testified no. You
4  answered no. And I want to -- and
5  you're now saying that you technically
6  are disabled?
7  A.      Technically.
8  Q.      And I need to know how you're
9  disabled. I want you to tell me how
10 you're technically disabled.
11 A.      Disabled because I am -- the
12 broken bones and fracture in my back --
13 Q.      That occurred when you
14 were -- during your Naval service?
15 A.      Correct. Could pose a
16 hindrance to my level of work.
17 Q.      And that did not affect your
18 ability to work at Pemco, did it?
19 A.      It did, because there were
20 pains, but --
21 Q.      You were able to do your job?
22 A.      Correct. I tried to bear the
23 pain and with the medication and all

### Page 268

1  that, but I just am not a person who
2  complains.
3  Q.      Did anybody at Pemco think
4  you were disabled because of your back?
5  A.      No.
6  Q.      Did you tell anyone at Pemco,
7  "I'm disabled because of my back"?
8  A.      Yes, during employment with
9  Mr. Smith.
10 Q.      At the very beginning, when
11 you were hired?
12 A.      Yes.
13 Q.      And you went through a
14 physical?
15 A.      Yes.
16 Q.      And you were released to work
17 with no restrictions?
18 A.      Correct.
19 Q.      So there weren't any
20 restrictions associated with your back,
21 as far as you knew?
22 A.      Well, the restriction is like
23 no heavy lifting or awkward position.

67 (Pages 265 to 268)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

### Page 269

But working on the airplane, you're in
an awkward position, especially in the
kind of assignment they give you.
Q.      Is your back injury a part of
this lawsuit?
A.      No. Well, let me rephrase
that. It can, because, you know, I have
this disability, but I just don't want
really to make a big deal about it. I
just wanted to work.
Q.      And you were, in fact, able
to work?
A.      Yes.
Q.      Other than your back, how
else, if at all, are you technically
disabled?
A.      Well, not at work. When I --
no, at work and at home, those sores and
itchiness, sleepless nights, taking a
cold shower, you know, I have to go
through those rigors every day just to
get rid of these pains, with the
medication and restricting myself to a

### Page 270

job that can expose me again to that
kind of situation.
Q.      In your entire career that
you've worked, from your first job that
you ever had to the time as we sit here
today, the only job you ever had that
exposed you to fiberglass was working at
Pemco?
A.      Yes.
Q.      All the other jobs that
you've had, all the other mechanic jobs,
the machinist jobs, all of those, you
were able to do?
A.      Yes.
Q.      Irrespective of fiberglass?
A.      I am not aware of any
fiberglass.
Q.      As far as the sleepless
nights that you had, how many of those
would you say you had during the time
you worked for Pemco?
A.      Almost every day.
Q.      Tell me what your average

### Page 271

sleep time was.
A.      Three, four, that's it.
Q.      Three or four hours?
A.      Hours.
Q.      And you were sleeping during
the day because you worked the night
shift?
A.      Yes. I'm off at 12:00, and
then by the time I end up sleeping is 8
o'clock, 9 o'clock in the morning.
Q.      And you sleep for how long?
A.      Three, four hours.
Q.      Three, four hours.
A.      You can't get good rest
because you have to scratch all the
time, toss and turn. You've got to do
all the rigors before you could even go
to bed, before you could even eat.
Q.      Apart from sleepless nights,
were there any other effects that your
itchiness had on you, as far as being
able to do a daily activity?
A.      Yes, definitely. You end up

### Page 272

being sleepy at work, sluggish. I mean
just about anything.
Q.      But you were able to work?
A.      Yes.
Q.      And you were able to sleep
three to four hours a night?
A.      Uh-huh.
Q.      Were you able to eat?
A.      Yes.
Q.      Were you able to breathe?
A.      It's a little bit hard, but
yeah, I can breathe.
Q.      Are you able to do household
chores?
A.      Yes.
Q.      Are you able to cook for
yourself?
A.      Yes.
Q.      Are you able to drive a car?
A.      Yes.
Q.      Can you walk?
A.      Yes. But because of that
sleepless night is a safety -- it

# FREEDOM COURT REPORTING

Page 273

1  affects your safety.
2  Q.    Other than your skin
3  condition and your back, are there any
4  other ways that you're claiming you are
5  technically disabled?
6  A.    No.
7  Q.    Have you given me all of the
8  documents that you have to support your
9  claim against Pemco?
10  A.    Not -- like the computation
11  that's being asked, I have only a
12  partial of the computation.
13  Q.    And we're going to get to the
14  computation, but other than that --
15  A.    I'm --
16  Q.    The notebook that you gave me
17  this morning, is that everything that
18  you have to support your claim?
19  A.    Correct.
20  Q.    Are there any witnesses that
21  you have to support your claim, other --
22  A.    Yes.
23  Q.    Well, we can talk about that.

Page 274

1  A.    I'm sorry.
2  Q.    But other than who you've
3  already told me about today, are there
4  any other people that are witnesses to
5  the claims that you're making against
6  Pemco?
7  A.    Let me think. I talked about
8  Mr. Woods and Mr. Briody, Dr. Ruddock --
9  I mean Dr. Tamburin, Dr. Sewell, Jerry,
10  Mr. --
11  Q.    You don't remember Jerry's
12  last name?
13  A.    No. Mr. Cooper, Mr. Dewayne
14  Music, Mr. Docett, Mr. Gipner.
15  Q.    Mr. Gipner is who?
16  A.    Mr. Gipner is the -- my shift
17  shop steward, the one who was --
18  Q.    He was present the October
19  29, 2004 conversation?
20  A.    Correct.
21  Q.    Okay.
22  A.    Korreen (phonetic spelling),
23  the supply clerk at the Hangar 15, Mr.

Page 275

1  Jim Jones. Yes, there's one too. Mr.
2  David is his first name. I can't
3  remember his last name. He sports a
4  beard.
5  Q.    And who is he? Who is David?
6  A.    Another crew member, another
7  crew member, but he's no longer with
8  Pemco.
9  Q.    And what does he have to --
10  what would he have to say about your
11  lawsuit?
12  A.    He would know how we are
13  being treated.
14  Q.    Is he --
15  A.    He's white.
16  Q.    He's white?
17  A.    He's white.
18  Q.    And what would he say about
19  how you're being treated or how he's
20  being treated?
21  A.    How we were being treated,
22  how --
23  Q.    You and David?

Page 276

1  A.    Me, Mr. Adams and Mr. Malick
2  and him too.
3  Q.    And David as well?
4  A.    I guess, yeah. From what I
5  understand, but I'm not sure, he claims
6  to be a member of the KKK. I don't know
7  if it is a joke or if it is the truth.
8  He even sports a tattoo on his left arm
9  saying that's the sign of the KKK, so I
10  don't know. I'm not sure.
11  Q.    I'm not following you. This
12  David, that's who your describing may be
13  a member of the KKK?
14  A.    That's what he claims.
15  Q.    That's what he told you?
16  A.    Yes.
17  Q.    Okay. And is he -- he was a
18  co-worker?
19  A.    Yes.
20  Q.    Was he also an A&P mechanic?
21  A.    Yes.
22  Q.    And he was on your crew?
23  A.    Yes. He also has a pilot's

69  (Pages 273 to 276)

# FREEDOM COURT REPORTING

Page 277

1  license, has his own airplane. He has
2  his -- he's also an inspector.
3  Q.       And he was your friend?
4  A.       A co-worker. Yeah, I could
5  say he's also my friend.
6  Q.       And he was treated badly by
7  your supervisors as well?
8  A.       I believe so, because he
9  would be given a job too that other
10 people really don't want.
11 Q.       Any reason why he was given
12 those jobs? Did you understand that?
13 A.       No.
14 Q.       But you just talked to him
15 from time to time about not being happy?
16 A.       Right, like -- because you
17 would be working together side by side.
18 You know, you end up talking.
19 Q.       Any other co-workers that
20 would be able to testify about the
21 treatment from Gary Cooper or Mr. Music?
22 A.       Like Mr. Brewster, Mr. --
23 another --

Page 278

1  Q.       Mr. Brewster was --
2  A.       The avionics person.
3  Q.       And he's white?
4  A.       Yes. Mr. -- another Dewayne,
5  I can't remember his first name, and
6  he's a young white guy working under Mr.
7  B.J. Watson. Another --
8  Q.       You didn't have a problem
9  with Mr. Watson?
10 A.       No, no, no.
11 Q.       But what does Dewayne have to
12 say?
13 A.       He knows what's going on, how
14 the kind of -- the work that I've been
15 doing.
16 Q.       Was Dewayne mistreated?
17 A.       I have no idea, because he's
18 not in my crew.
19 Q.       Yeah, and what I'm asking now
20 is you mentioned David was another
21 person who claims or would claim to be
22 mistreated, and I -- are there any
23 others, from your crew or another crew,

Page 279

1  that you're aware of, that may have
2  reported to or was supervised by Mr.
3  Cooper or Mr. Music that would complain
4  about the treatment, other than the
5  people you've talked about?
6  A.       Mr. Jim Jones might complain.
7  Q.       Jim Jones, the white man with
8  the license?
9  A.       Yes.
10 Q.       Would complain about the
11 treatment that he got?
12 A.       Yes, he -- I think he will
13 complain too, given the chance.
14 Q.       And he worked for both
15 gentlemen?
16 A.       Yes.
17 Q.       He was on --
18 A.       Yes, yes.
19 Q.       Okay. And what would his
20 complaint be?
21 A.       Same thing, how work load is
22 being assigned.
23 Q.       Unfair how the work's being

Page 280

1  assigned to Jim and to the others?
2  A.       Well, between him and I or
3  between him and Mr. Adams or Mr. Malick,
4  he's a little bit well off, meaning he
5  gets to work outside. But still, he
6  could -- you could find from him that
7  he's not happy with how things are going
8  on.
9  Q.       Okay. Any others?
10 A.       Not from our crew, but Mr.
11 Willie -- a black guy, a little bit old,
12 I'd say he's in his 50s, middle 50s,
13 Willie something is his -- Willie is his
14 name, first name. I cannot remember the
15 last name. It starts with a G. He
16 works under Mr. Watson and he would know
17 too my condition of the work that I'm
18 doing. And like that --
19 Q.       Have you --
20 A.       I'm sorry.
21 Q.       No, please, go ahead.
22 A.       Like that tall cowboy, skinny
23 cowboy, like relate to -- he knows, the

70 (Pages 277 to 280)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 281

1 inspector guy.
2 Q.    Anyone else?
3 A.    I'm trying to think. Yeah,
4 just like Mr. Riddle, he was not
5 reprimanded. I was reprimanded and
6 fired. He just was transferred to day
7 shift, from what I understood, from his
8 request.
9 Q.    Anyone else?
10 A.    More, but I just don't know
11 their names, and they were contractors
12 to Pemco. They were the airframers, but
13 I don't know their names.
14 Q.    Okay. Anyone else?
15 A.    I can't think of anything
16 else, but I'm sure there's more. Oh,
17 like the guy from the tool crib,
18 Allen --
19 Q.    From the where, I'm sorry?
20 A.    From the tool crib.
21 Q.    Okay.
22 A.    He would even joke me about,
23 "You again?" Because I'm borrowing the

Page 282

1 vacuum cleaner. And there are more, but
2 I just can't remember the others.
3 Q.    Did the EEOC ever tell you
4 that Pemco had done anything wrong?
5 A.    No. When I went there, I
6 gave all my -- my deposition and they
7 just summarize it into one piece of
8 paper.
9         (Whereupon, Defendant's
10        Exhibit Number 22 was
11        marked for identification.)
12 Q.    (By Mr. Holmes) Let me go
13 ahead and just mark this as Defendant's
14 Exhibit 22 to your deposition. And will
15 you confirm for me that that was the
16 dismissal and right to sue notice that
17 the EEOC issued after investigating your
18 charge?
19 A.    I'm ready.
20 Q.    Did you hear my question?
21 A.    Could you repeat that for me,
22 please?
23 Q.    Sure. Can you confirm for me

Page 283

1 that that was the notice the EEOC sent
2 after investigating your charge?
3 A.    Yes, Defendant's Exhibit 22.
4        (Whereupon, Defendant's
5        Exhibit Number 23 was
6        marked for identification.)
7 Q.    (By Mr. Holmes) Let's talk
8 about Defendant's Exhibit 23, which I've
9 now marked and am giving to you. This
10 is a collection of pieces of paper that
11 you provided to me this morning. And if
12 you could just tell me what these are.
13 A.    On Defendant's Exhibit Number
14 23, I just started here, I mean on the
15 headings, starting pay, from October
16 2003 to August 22 of 2004. I can break
17 down the basic pay as would regard to
18 the regular, time and a half and double
19 time, how much would each category be,
20 the license fee and the night
21 differential and a total of each
22 category.
23        And then on the second one, I

Page 284

1 put there the heading, "Final pay,"
2 meaning after August 22, which is the
3 effectivity of the CBA agreement until
4 November 3 of 2004. Again, I broke it
5 down by category with regards to the new
6 rate and totaled each one. And on the
7 bottom, I just took a sample of ten
8 weekly pay, their corresponding hours,
9 whether it's single or double time, and
10 divided it, a breakdown computation and
11 summarized them. And lastly, I just --
12 since it has ten weekly pay, I just did
13 an average of the total weekly pay by
14 ten. And that's on the first page.
15 Q.    And what was the purpose of
16 putting together the first page of
17 Defendant's Exhibit 23?
18 A.    Just for me to be able to do
19 a basis for computing my claim. I may
20 be wrong or there may be more.
21 Q.    Is it accurate to say that
22 you have not computed what you're
23 claiming?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 285

1  A.      What do you mean I have not
2  computed? It's partial. It's not the
3  entirety.
4  Q.      Well, you haven't
5  completed --
6  A.      I have not completed.
7  Q.      Do you have a ballpark of
8  what you're claiming you're owed in this
9  lawsuit?
10  A.      I have no idea.
11  Q.      You haven't calculated how
12  much you're owed?
13  A.      Owed? What do you mean
14  "owed"?
15  Q.      What you're claiming that
16  Pemco owes you?
17  A.      I am not -- like I said, I
18  was -- this is just a partial and I have
19  no idea.
20  Q.      And you don't have a figure
21  in mind of what you think Pemco owes
22  you?
23  A.      When Magistrate Judge

Page 286

1  McPherson asked me last March 22nd, I
2  gave her a ballpark of 50,000, and from
3  there, I'm trying to justify my
4  computation, and I am being reasonable
5  in that.
6  Q.      And what is Defendant's
7  Exhibit 23, the first page of that?
8  What's the total at the bottom there?
9  A.      Are you talking about the
10  average weekly pay that I placed there?
11  As far as, like, I said synopsis of ten
12  weeks, the last ten weeks of pay,
13  although they're not 40 hours each,
14  there are less than 40 hours, there are
15  at least four pay that reflected a 40
16  hour workweek. But in any case, it
17  includes overtime, basic pay, license
18  pay, nighttime differential, totaled
19  them up and totaled up column came to
20  9,046.31, and divided it by ten weeks,
21  of this computation to get an average, a
22  weekly average.
23  Q.      Other than wages that you did

Page 287

1  not receive after being terminated,
2  before you started working for
3  Northwest, are there --
4  A.      I didn't get you, I'm sorry.
5  Q.      It looks like that first page
6  to Defendant's Exhibit 23 is an effort
7  to compute the wages that you earned the
8  last ten weeks of your employment at
9  Pemco, to determine an average of what
10  you might make per week, what you made
11  per week while working at Pemco at the
12  end of your employment with Pemco; is
13  that right?
14  A.      Yes. This one is towards the
15  end of my employment with Pemco.
16  Q.      Okay. Apart from any wages
17  and trying to figure out what you would
18  have made, had you continued working at
19  Pemco, are there any other amounts of
20  money that you're going to put in your
21  computation?
22  A.      Expenses that I have incurred
23  right from the onset up to the present.

Page 288

1  Q.      And I'd like to talk about
2  those. What are the expenses that you
3  have incurred from the onset up to the
4  present?
5  A.      Like gasoline, traveling
6  expenses, food, lodging.
7  Q.      As part of this lawsuit?
8  A.      Yes.
9  Q.      Okay. What about as a result
10  of being terminated by Pemco?
11  A.      That's not clear to me what
12  you're trying to ask.
13  Q.      Are there any medical
14  expenses that you're claiming you had to
15  pay out of pocket that Pemco should have
16  paid?
17  A.      No.
18  Q.      Are there any damages you're
19  claiming because your feelings were hurt
20  by Pemco?
21  A.      Yes.
22  Q.      Have you put a dollar amount
23  on that?

72 (Pages 285 to 288)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 289

1　A.　　I have no idea.
2　Q.　　Okay. Do you plan on coming
3　up with a dollar amount for that?
4　A.　　If somebody can help me. I
5　don't know.
6　Q.　　Okay.
7　A.　　That's why up to this point
8　in time, I'm still trying to get legal
9　counsel.
10　Q.　　Other than wages, expenses
11　for litigating this lawsuit and maybe
12　money for having your feelings hurt by
13　Pemco; are there any other amounts of
14　money or calculations that you'll be
15　making to compute what you're claiming
16　Pemco owes you?
17　A.　　I -- like I said, I'm not
18　done with it. I haven't thought about
19　it that far. There may be more.
20　Q.　　As we sit here today, you
21　can't think of any, but there may be
22　more?
23　A.　　Yes.

Page 290

1　Q.　　Is there anything else that
2　you want to tell me about your lawsuit
3　before we finish?
4　A.　　I --
5　Q.　　Other than what you've told
6　me today?
7　A.　　I can't think of any at this
8　point in time.
9　　　　MR. HOLMES: All right. Mr.
10　Camacho, we're finished.
11
12　　　FURTHER THE DEPONENT SAITH NOT
13
14
15
16
17
18
19
20
21
22
23

Page 291

1　　　C E R T I F I C A T E
2
3　STATE OF ALABAMA
4　COUNTY OF JEFFERSON
5　　　I, Scott Wilmeth, hereby
6　certify that the above and foregoing
7　deposition was taken down by me on
8　Computerized Stenotype, and the
9　questions and answers thereto were
10　transcribed by me, and that the
11　foregoing represents a true and correct
12　transcript of the deposition given by
13　said witness upon said hearing.
14　　　I further certify that I am
15　neither of counsel nor of kin to the
16　parties in the action, nor am I in
17　anywise interested in the result of said
18　cause.
19
20　　　_____
21　　　SCOTT WILMETH, RPR
22　　　COMMISSIONER
23

73 (Pages 289 to 291)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**