IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| WILFREDO CAMACHO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 1:05cv503-MHT-VPM |
| | ) | |
| | ) | |
| PEMCO WORLD AIR SERVICES, INC. | ) | |
| | ) | |
| Defendant. | ) | |

## RECOMMENDATION OF THE MAGISTRATE JUDGE

Pending before the court is the defendant's ["Pemco"] motion for summary judgment (Doc. # 31). The plaintiff ["Camacho"] failed to respond to the motion, and the court deems the motion to have been submitted on the date his response was due.

The plaintiff brought this action seeking compensatory and declaratory relief pursuant to the Civil Rights Act of 1991, 42 U.S.C. § 1981; Title VII of the Civil Rights Act of 1964 ["Title VII"], as amended, 42 U.S.C. §§ 2000e *et seq.*; and the Americans with Disabilities Act ["ADA"], 42 U.S.C. §§ 12101 *et seq.* (2000). Therefore, the court has jurisdiction pursuant 28 U.S.C. §§ 1331, 1343(a)(4) and 42 U.S.C. §§ 2000e-5(f)(3), 12117(a).

Having reviewed the record and the relevant law, the Magistrate Judge concludes that Pemco's motion is due to be granted.

## I.    SUMMARY JUDGMENT STANDARD

Summary judgment can be entered on a claim only if it is shown "that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Green v. Pittsburgh Plate & Glass Co*., 224 F. Supp. 2d 1348, 1352 (N.D. Ala. 2002) (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)). "A judge's guide is the same standard necessary to direct a verdict: 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Id*. at 259. "Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore, the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor." *Id*. at 255.

Because the court must evaluate the merits without the benefit of a response from Camacho, it is extremely important for the parties to understand the movant's burden on summary judgment. A party's failure to respond to a motion for summary judgment is not fatal for that reason alone, and, notwithstanding the nonmovant's failure, the moving party must nevertheless demonstrate that summary judgment is "appropriate." Fed. R. Civ. P. 56(e).

Thus, the movant must first demonstrate the absence of a genuine issue as to any material fact and entitlement to judgment as a matter of law. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970) ("As the moving party, respondent had the burden of showing the absence of a genuine issue as to any material fact, and for these purposes *the material it*

2

*lodged* must be viewed in the light most favorable to the opposing party." (emphasis added));

*see also*, *e.g.*, **Information Syss. & Networks Corp. v. City of Atlanta**, 281 F.3d 1220, 1224

(11th Cir. 2002) ("The moving party bears the burden of proving that no genuine issue of

material fact exists."); **United States v. One (1) 1944 Steel Hull Freighter Converted**

**Wartime Landing Craft Utility Vessel (LCU) Shamrock**, 697 F.2d 1030, 1031-32 (11th Cir.

1983) ("[W]hether or not the non-moving party has the burden of proof at trial, in a summary

judgment action the moving party has the burden of showing that there is no genuine issue

of material fact.").

The burden shifts to the non-movant "[o]nly after the moving party has satisfied that

burden." **Mullins v. Crowell**, 228 F.3d 1305, 1313 (11th Cir. 2000).

## II.    DISCUSSION

### A.    *Framework for Analysis*

Camacho has failed to present direct or statistical evidence of discrimination;[1]

---

[1]As discussed in more detail *infra*, Camacho vaguely testified at his deposition that two of his supervisors made derogatory comments incorporating a reference to his race and/or national origin. While indicative of potential harassment, these comments, the substance of which Camacho could not recall, nevertheless do not amount to direct evidence of discrimination. *See* **Wilson v. B/E Aerospace, Inc.**, 376 F.3d 1079, 1085 (11th Cir. 2004). Direct evidence is

> "evidence which reflects 'a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee.'" **Damon** [**v. Fleming Supermarkets of Am.**], 196 F.3d [1354,] 1358 [(11th Cir. 1999)] (quoting **Carter v. Three Springs Residential Treatment**, 132 F.3d 635, 641 (11th Cir. 1998)). Direct evidence is "evidence, that, if believed, proves [the] existence of [a] fact without inference or presumption." **Burrell v. Bd. of Trs. of Ga.**

therefore, he must prove his claims through the introduction of circumstantial evidence, which the court evaluates in accordance with the burden-shifting framework set forth by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Durley v. APAC, Inc.*, 236 F.3d 651, 657 (11th Cir. 2000) ("The burden of poof for an ADA claim is also based on the framework set forth *McDonnell Douglas* . . .."); *Standard v. A.B.E.L. Svcs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) ("Both [Title VII and 42 U.S.C. § 1981] . . . have the same requirements and use the same analytical framework . . .."). Consequently, the materials before the court must first establish a *prima facie* case. *McDonnell Douglas Corp.*, 411 U.S. at 802; *see E.E.O.C. v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1272 (11th Cir. 2002).

If they do, the burden shifts to Pemco to produce evidence that its allegedly wrongful actions were "taken for some, legitimate, non-discriminatory reason." *Joe's Stone Crabs, Inc.*, 296 F.3d at 1272. If Pemco succeeds, "the inquiry 'proceeds to a new level of specificity,' in which the plaintiff must show that the proffered reason really is a pretext for

---

*Military Coll.*, 125 F.3d 1390, 1393 (11th Cir. 1997). As . . . precedent illustrates, "only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of" some impermissible factor constitute direct evidence of discrimination. *Rojas v. Florida*, 285 F.3d 1339, 1342 n.2 (11th Cir. 2002) (quoting *Schoenfeld* [*v. Babbitt*], 168 F.3d [1257,] 1266 [(11th Cir. 1999)] (citations and quotations omitted); *see Carter v. City of Miami*, 870 F.2d 578, 582 (11th Cir. 1989). If the alleged statement suggests, but does not prove, a discriminatory motive, then it is circumstantial evidence. *See Burrell*, 125 F.3d at 1393.

*Id.* at 1086.

unlawful discrimination." *Id.* at 1273.

**B.    *Camacho's Claims***

Camacho contends that he has been subjected to disparate treatment in the terms and conditions of his employment with Pemco because of his race, Asian-American, and/or national origin, Filipino (Doc. # 1, pp. 2-3)**.** "This disparate treatment includes . . . job assignments, unfavorable working conditions and not being given the proper safety equipment necessary for the performance of his job" (Doc. # 1, p. 3).[2] As a result of this treatment, Camacho contends that he developed a skin condition that left him disabled, and Pemco refused to provide reasonable accommodations despite its ability to do. *Id.*[3] Finally, Camacho's complaint vaguely suggests that he was wrongfully terminated (Doc. # 1, p. 3).

**C.    *Pemco's Motion***

Relying primarily on testimony Camacho provided at his deposition, Pemco contends that no factual disputes of any consequence exist, and it is entitled to judgment as a matter of law because Camacho has failed to demonstrate that (1) he is disabled as that term is

---

[2]Although his complaint indicates that he was not provided the same equipment as those not in his protected class, Camacho testified at his deposition that he did in fact receive the same equipment as everyone else who wanted it (Pl's Dep. 262). In the absence of any other evidence suggesting that he did not receive the same equipment, the court considers this claim to have been abandoned.

[3]At his deposition, Camacho described himself as disabled due to a back injury he suffered while serving in the U.S. Navy (Pl's Dep. 268-70). His complaint did not mention this condition, and there is no evidence in the record that his back condition is relevant to this lawsuit. Therefore, the court declines to discuss it further.

defined under the ADA; (2) Pemco treated him differently because of his alleged disability;
(3) Pemco failed to accommodate his alleged disability; (4) decisions Pemco made regarding
Camacho's employment were related in any way to his race and/or national origin; and (5)
his allegations fail to establish a claim for hostile work environment.

### D.     ADA Claim

With respect to Camacho's claim that he was discriminated against on the basis of his
alleged disability, the overarching issue before the court is whether, viewing the facts in his
favor, Camacho was disabled, as that term is defined under the ADA.

### 1.     Overview of the Facts

Camacho was initially hired to work for Pemco through a sub-contractor, Airplanes,
Inc., in October 2003 (Pl's Dep. 50).  The position for which he was hired required him to
work with and around fiberglass, which he quickly noticed irritated his skin (Pl's Dep. 55-
56).

At that time, he was not wearing any special, protective clothing (Pl's Dep. 56).
When he complained to a Pemco supervisor, "Mr. Woods" ["Woods"], about his skin
irritation,  Woods informed him where he could obtain protective "coveralls, . . . earplugs,
. . . goggles and mask, nose mask, and . . . latex gloves" and permitted him to do so (Pl's
Dep. 57-61).

Although his job assignment changed shortly after his employment began, Camacho's

exposure to fiberglass continued, and except for the few occasions when some of the safety equipment was out of stock or the safety goggles interfered with his ability to perform a task, he wore his protective clothing without fail (Pl's Dep. 80, 144-47). The coveralls provided only little comfort, however, and, despite utilizing the protective clothing, Camacho continued to experience skin irritation (Pl's Dep. 139-40, 150). Nevertheless, he did not at that time seek medical treatment (Pl's Dep. 62).

Approximately one month after he began working for Airplanes, Inc., Pemco offered Camacho full-time employment, which he accepted, although he knew that he would continue to work with and around fiberglass (Pl's Dep. 62-65). Although Camacho continued to suffer from the skin irritation, after having initially informed Woods of the problem, he did not mention it again to anyone from Pemco's management until 29 October 2004 during a meeting at which Camacho had been verbally reprimanded in a matter unrelated to his ADA claim (Pl's Dep. 91-95, 150; Def's Ex. 6 to Pl's Dep., Doc. # 34-4, p. 11). An incident report dated 29 October 2004 notes that Camacho had "small sores on arms + legs possibly from fiberglass" (Def's Ex. 8 to Pl's Dep., Doc. # 34-4, p. 13).

Camacho then sought medical treatment for his condition for the first time on 3 November 2004 (Pl's Dep. 162-63). J.H. Sewell, M.D. ["Dr. Sewell"], diagnosed Camacho with "contact dermatitis from fiberglass," prescribed medication and instructed Camacho to limit his exposure to fiberglass "if possible" (Def's Ex. 11 to Pl's Dep., Doc. # 34-4, p. 16).

Camacho returned to Pemco and notified Jim Battcher ["Battcher"], Pemco's director of human resources (Doc. # 34-4, p. 30), of his medical status (Pl's Dep. 165-74). Battcher

sent Camacho home for two weeks until his first scheduled follow-up visit with Dr. Sewell on 17 November 2004 (Pl's Dep. 165-74).  During his time away from work, Camacho was paid through Worker's Compensation.  *Id.*

Although there is some dispute regarding the events following Camacho's return visit to Dr. Sewell, viewing the evidence in Camacho's favor, Camacho returned to Battcher on 18 November 2004 and informed him that he could still work but he needed to limit his exposure to fiberglass (Pl's Dep. 182-91).  Battcher then informed Camacho that he was terminating Camacho's employment because Pemco would not provide any extra, nonstandard protective clothing for him beyond what the company had already made available and there were no positions available that did not involve exposure to fiberglass (Pl's Dep. 168-72; 184-91).[4]

---

[4]Pemco does not expressly deny that Battcher told Camacho that his employment was terminated as of 18 November, but it does not concede the point and portrays the case in such a way as to suggest that, while Pemco "initiated the separation process on November 18, 2004," Camacho was not officially terminated until late December (Doc. # 32, pp. 7-9, 17-18).  Notwithstanding evidence in the record supporting Pemco's position that Camacho was technically on leave until 20 December while Pemco attempted to determine whether he could return to work (Def's Ex. 20 to Pl's Dep., Doc. 34-4, p. 38), Camacho's testimony at his deposition, which this court must accept as true, establishes that Camacho was terminated on 18 November (Pl's Dep. 168-72; 184-91).

Notably, Camacho's position also is supported by evidence in the record beyond his testimony.  Battcher's letter reference to the possibility that Camacho be "reinstat[ed]" (Def's Ex. 17 to Pl's Dep., Doc. # 34-4, p. 32) and a subsequent letter from human resources manager Ramona Segler describing Mr. Battcher as having "terminated [Camacho's] employment" on 18 November (Def's Ex. 18 to Pl's Dep., Doc. # 34-4, p. 35) strongly suggest that Camacho's employment ended 18 November.

The court views Pemco's post-termination actions as an effort to reinstate him, and his apparent failure or refusal to comply with the conditions of reinstatement does not necessarily strip him of his right to relief.  *Claiborne v. Illinois Cent. R.R.*, 583 F.2d 143, 153 (5th Cir. 1978) *cited in* *Stanfield v. Answering Svc., Inc.*, 867 F.2d 1290, 1296 (11th Cir. 1989).  Pemco has not raised

**2.    General Legal Principles**

The ADA prohibits employers from discriminating against "a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). More specifically, employers must make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee, unless such [employer] can demonstrate that the accommodation would impose an undue hardship on the operation" of the employer's business. *Id.* at 12112(b)(5)(A).

In addition, an employer may not deny "employment opportunities to a[n] . . . employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such [employer] to make reasonable accommodation to the physical or mental impairments of the employee or applicant."[5] *Id.* at 12112(b)(5)(B).

In the absence of a response from Camacho, the court must determine whether the evidence before the court establishes a *prima facie* case, which requires evidence that

_____

this issue in its motion.

[5]It is important to note that Camacho does not claim that Pemco treated him differently than anyone else on account of his alleged disability. He merely contends that Pemco failed to provide reasonable accommodations and terminated him rather than provide those accommodations. (Doc. # 1; Pl's Dep. 261-62).

9

Camacho "(1) has a disability, (2) . . . is a 'qualified individual,' which is to say, able to perform the essential functions of the employment position that he holds or seeks with or without reasonable accommodation, and (3) the defendant unlawfully discriminated against him because of the disability." *Reed v. Heil Co.*, 206 F.3d 1055, 1061 (11th Cir. 2000).

"The term 'disability' means, with respect to an individual - - (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. at § 12102(2).

### 3.    Analysis

#### a.    *Camacho's Skin Condition*

As an initial matter, it bears noting that Camacho testified at his deposition that he is not alleging that he is disabled or, for that matter, "impaired in any way" (Pl's Dep. at 256, 257). Nevertheless, the court recognizes that Camacho is not qualified to draw conclusions regarding legal definitions, and it is clear from his complaint that he has alleged discrimination on the basis of a medical condition.

The materials before the court, however, fail to raise an inference that Camacho's skin condition, which the court assumes is an impairment for the purpose of its analysis,[6] satisfies the ADA's definition of disability. Therefore, summary judgment is due to be granted in

---

[6]Pemco does not argue otherwise.

favor of Pemco on this claim.

Camacho worked in the in the aircraft industry for more than a decade as an aviation machinist and jet engine mechanic. He testified that he had never "worked around fiberglass before" coming to work for Pemco as an airframe and power plant mechanic (Pl's Dep. 12, 20-22, 24-25, 33, 77, 81). He also was not aware of his susceptibility to the irritation he experienced upon working with the fiberglass (Pl's Dep. 78). While he noticed his condition almost immediately, he did not suspect that fiberglass was to blame (Pl's Dep. 78).

When Camacho finally sought medical treatment, his treating physician diagnosed his condition as dermatitis triggered by contact with fiberglass. (Def's Ex. 11 to Pl's Dep., Doc. # 34-4, p. 16). Prior to October 2004, when he complained about his condition for a second time nearly a year after having mentioned it the first time, Camacho did not stop working due to the fiberglass exposure (Pl's Dep. 62). He was at all times physically capable of working and did not inform his supervisors otherwise (Pl's Tr. 202-03). He did, however, have difficulty sleeping and was only getting "three, four hours" of sleep per night while working with Pemco (Pl's Tr. 270-71).

Interestingly, despite his complaints about his condition, utilization of protective clothing for approximately a year with the understanding that his skin condition was a result of working with fiberglass, and his quest for medical treatment, Camacho declined to follow Dr. Sewell's instructions to apply a prescription skin cream during the two weeks between his initial and follow-up visits (Pl's Dep. 175, 179). Instead, Camacho self-prescribed a home remedy, utilizing masking tape and cold showers (Pl's Dep. 174-75). He would roll

masking tape all over his body before showering.  *Id.*

Although he ignored Dr. Sewell's instructions, his condition improved  - though not completely -   enough to allow Camacho to conclude, independently, that his condition was in fact related to his exposure to fiberglass (Pl's Dep. 179).  On Camacho's return visit, Dr. Sewell noted his noncompliance and advised Camacho that if he was not able to limit his exposure to fiberglass, he should consider finding another job (Pl's Dep. 180).

After he was terminated, Pemco made efforts to reinstate him.  The company arranged an appointment with a specialist, who concurred with Dr. Sewell's assessment but concluded that Camacho could return to work with the condition that he wear protective clothing (Pl's Dep. 230-32).  His condition had improved noticeably, though he still had some signs of a rash (Pl's Dep. 231-32).  Pemco then offered to let Camacho return to work, but thereafter, Camacho never reported for work (Pl's Dep. 233).

Since his employment with Pemco ended, Camacho has continued to work in the aircraft industry, and he has not since been exposed to fiberglass (R. 258-59).  Notably, although he testified that his skin condition is not completely resolved and he has enjoyed the benefit of health insurance since his termination from Pemco, as of the date of his deposition, 19 May 2006, he had not sought medical treatment since visiting the specialist secured by Pemco in December 2004 (Pl's Dep. 259).  In addition, at his deposition, he had not used his skin medication in at least three months (Pl's Dep. 259).

> b.    *"Disability" Under the ADA*

The ADA's definition of disability encompasses at least two concepts that the statute does not define further: "substantially limits" and "major life activities." For further guidance, the court refers to regulations interpreting the Rehabilitation Act of 1973, 87 Stat. 361, as amended, 29 U.S.C. § 701 *et seq.* (2000). ***Toyota Motor Mfg., Ky., Inc. v. Williams***, 534 U.S. 184, 193-94 (2002) (noting also that "no agency has been given authority to issue regulations interpreting the term 'disability' in the ADA" but declining to address the degree of deference that should be afforded regulations adopted by the Equal Employment Opportunity Commission ["EEOC"]). In addition, courts in the Eleventh Circuit have relied on regulations adopted by the EEOC (interpreting the ADA) to guide decision making. *See*, *e.g.*, ***Rossbach v. City of Miami***, 371 F.3d 1354, 1357 n.4 (11th Cir. 2004) (discussing the Supreme Court's view of the EEOC's interpretation of the ADA as set forth in ***Williams*** and concluding nevertheless that reliance on the EEOC's regulations is appropriate); ***Hall v. Wal-Mart Assocs., Inc.***, 373 F. Supp. 2d 1267, 1271 n.4 (M.D. Ala. 2005); ***Watson v. Hughston Sports Med. Hosp.***, 231 F. Supp. 2d 1344, 1349 (M.D. Ga. 2002).

"Major Life Activities means functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 45 C.F.R. § 84.3 (2005); *see also* 29 C.F.R. § 1630.2(i). The Court of Appeals has recognized that an additional major life activity is sleep, which, aside from work, discussed in more detail *infra*, is the only major life activity Camacho's skin condition affects (R. 270-72). *See* ***Rossbach***, 371 F.3d at 1357.

Substantially limits means

(i) Unable to perform a major life activity that the average person in the general population can perform; or

(ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1).

When determining whether someone is substantially limited in a major life activity,

the court should consider

(i) The nature and severity of the impairment;

(ii) The duration or expected duration of the impairment; and

(iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

*Id.* at § 1630.2 (j)(2); *see also **Chanda v. Engelhard/ICC***, 234 F.3d 1219, 1222 (11th Cir.

2000) (quoting § 1630.2(j)(2)).

Moreover,

with respect to the major life activity of working - -

(i) The term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. *The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.*

*Id.* at § 1630.2 (j)(3) (Emphasis supplied).

14

c.    *The Effect of Camacho's Condition on Sleeping and Working*

Camacho's complaint as well as the testimony at his deposition indicate that he is contending that his condition substantially limits his ability to sleep and work.  The court agrees with Pemco, however, that the evidence does not permit an inference that his condition substantially limited or limits either.

With respect to Camacho's restless nights, Pemco's assertion to the contrary notwithstanding, the court does not mean to suggest that a condition that limits a person to three to four hours of sleep per night would not be sufficiently severe under different circumstances to constitute a disability.  *See Rossbach*, 371 F.3d at 1359 (holding that the plaintiffs' vague complaints that their medical conditions caused them to have difficulty sleeping without specifying the amount of sleep lost was not sufficient to establish substantial limitation).  Camacho specifically stated that his sleep was limited to less than half of what is commonly understood to be a full night's sleep.  Thus, this case is distinguishable from *Rossbach*.  Nevertheless, the evidence does not establish that Camacho's condition was severe, and, moreover, the nature of Camacho's condition as well as the duration and permanency of its impact compels the court's conclusion. 29 C.F.R. § 1630.2 (j)(2)[7]

Camacho's contact dermatitis is akin to the allergy recently confronted by the Middle District of Georgia.  *Watson*, 231 F. Supp. 2d at 1349.  The plaintiff in *Watson* was a

---

[7]The court's conclusions in this regard are informed, though not governed, by Camacho's non-compliance with his doctor's treatment plan and his failure to seek medical attention or treatment for almost 18 months following his termination, even though he alleged that his skin condition was not abated.

registered nurse who was allergic to latex. *Id.* at 1346-48. She applied for employment with the defendant, which, upon learning of the extent of her allergy, refused her employment. *Id.*

Focusing on the factors set forth in 29 C.F.R. § 1630.2 (j)(2), the court concluded that Watson's allergy did not substantially limit her major life activity of breathing. As the court explained,

> [f]irst, the evidence reveals that, while the RAST blood test shows that Watson has a latex sensitivity of four on a scale of five, her reactions thus far have not been severe. Furthermore, the only restriction placed upon her as a result of the allergy is to avoid contact with latex at work and at home. Moreover, Plaintiff's allergy, while permanent, is dormant unless activated by exposure to latex. In other words, her "impairment" does not restrict her from engaging in the major life activity of breathing. It simply has the possibility of doing so if she exposes herself to latex. Just as people who are allergic to bees are not in danger of a reaction until they are stung, Watson does not suffer any adverse effect because of her allergy to latex unless and until she comes in contact with it. Similarly, the permanent or long term impact of Watson's allergy to latex appears minimal, as long as she avoids contact with the substance.

*Id.* at 1349-50.

Camacho contends that he experienced only three to four hours of sleep per night, but he never complained about this or sought medical treatment until he was inconvenienced by a disciplinary meeting with his supervisors. Even when he did seek medical treatment, he did not comply with the doctor's orders and consciously declined to use his prescribed medicine. *See **D'Angelo v. ConAgra Foods, Inc.**,* 422 F.3d 1220, 1227 (11th Cir. 2005) (concluding that the plaintiff's noncompliance with her prescribed medicine "indicate[d] that

16

she managed her . . . symptoms adequately"); *see also* **Sutton v. United Air Lines, Inc.**, 527 U.S. 471, 488 (1999) (holding that "disability under the [ADA] is to be determined with reference to corrective measures"). Therefore, Camacho's voluntarily, untreated skin condition cannot be considered severe notwithstanding his loss of sleep.

Moreover, similar to Watson's latex allergy, Camacho's condition is contingent upon and triggered by his actual contact with fiberglass. Thus, if any major life activity is affected, it is his ability to work. *See* **Rhoads v. FDIC**, 257 F.3d 373, 390 (4th Cir. 2001) ("[B]ecause Rhoads established that her abilities to breathe and engage in other life activities were limited only by her exposure to tobacco smoke in the workplace, the proper inquiry is whether . . . she was substantially limited in her ability to work) *quoted in* **Tyler v. Dayton Hudson Corp.**, 42 Fed. Appx. 934, 935 (9th Cir. 2002) (finding that the plaintiff's allergy was not a disability when triggered by material he encountered only in the work place); *see also* **Muller v. Costello**, 187 F.3d 298, 314 (2d Cir. 1999) (finding that the plaintiff's ability to perform "substantial physical activity" outside of work despite suffering from a "allergen-induced" respiratory condition that was triggered at the workplace precluded a finding that his condition substantially limited his ability to breathe); **Land v. Baptist Med. Ctr.**, 164 F.3d 423, 425 (8th Cir. 1999) (finding that a peanut allergy did not substantially limit the plaintiff's ability to eat and breathe).[8]

---

[8]Camacho's situation is altogether different from the complainant in **E.E.O.C. v. United Parcel Svc., Inc.**, 249 F.3d 557 (6th Cir. 2001), in which the court concluded that the complainant's allergy was a disability. In that case, the plaintiff's condition was triggered by an allergen that was present in the atmosphere throughout a large geographic region and that "impair[ed] his ability to

The court finds that Camacho's condition does not substantially limit his ability to work.  First, Camacho acknowledged that he worked while the condition manifested itself for approximately a year without medical treatment.   Second, he complained about his condition only once prior to receiving protective clothing, then once more, approximately a year later, after having utilized the clothing.  The circumstances of his complaint strongly suggest he opportunistically complained only to detract attention from an error for which he was being reprimanded.  Third, Camacho admitted that at all times during his employment with Pemco, he was physically capable of carrying out his responsibilities at work (Pl's Tr. 202-03).  *See Durley v. APAC, Inc.*, 236 F.3d 651, 657 (11th Cir. 2000) (agreeing with the district court that the plaintiff was not substantially limited in her ability to work when her own testimony established that she was always able to perform her job "even when her condition was allegedly being aggravated by work-related stress").

At most  - and this preliminary finding is analytically generous -  he is substantially limited in his ability to perform work that involves exposure to fiberglass.  This class of jobs is far too narrow, however, to be considered significant for ADA purposes, especially since Camacho's pre-Pemco employment required him to work in maintenance positions in the

---

breathe and to care for himself."  *Id.* at 562.  Evidence in that case indicated that the plaintiff's "reactions to the allergen were steadily worsening, and that by the time he requested the transfer he rarely left home and spent nearly all of his non-working hours in bed.  His wife assumed responsibility for his correspondence and household duties, while he suffered with severe nasal and bronchial congestion, swollen eyes and nose, rashes and fever blisters over large areas of his body, fatigue, fever, and depression."  *Id.* at 562-63.  Moreover, the complainant's doctor had written a letter stating that "effective allergy medication would threaten [the complainant's] safe operation of his truck," a job requirement.  *Id.* at 563.

aircraft industry for approximately 13 years without encountering fiberglass or developing a skin condition. After leaving Pemco, he continued in this field and had not again, as of the taking of his deposition, been exposed to fiberglass while on the job.

As the United States Supreme Court has explained,

> [t]o be substantially limited in the major life activity of working . . . one must be precluded from more than one type of job, a specialized job, or a particular job of choice. If jobs utilizing an individual's skills (but perhaps not his or her unique talents) are available, one is not precluded from a substantial class of jobs. Similarly, if a host of different types of jobs are available, one is not precluded from a broad range of jobs.

*Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 492 (1999); *see also Cantrell v. Nashville Elec. Svc.*, 173 F.3d 428, 1999 WL 68571, at *4 (6th Cir. 1999) (table) (affirming the district court's finding that the plaintiff's medical restriction precluding contact with hydraulic oil did not amount to a substantial limitation on his ability to work and noting the plaintiff's extensive experience in similar positions without incident); *Lindloff v. Schenectady Int'l.*, 972 F. Supp. 393, 395 (S.D. Tex. 1997) (finding that the plaintiff's skin condition, which restricted him from exposure to "phenolic compounds" did not limit "any of Plaintiff's major life activities").

Therefore, Camacho's skin condition is not a disability under the ADA.

> d.    *The Record of Camacho's Impairment and Pemco's View of Camacho's Skin Condition*

When Battcher decided to terminate Camacho's employment, the only record

regarding Camacho's medical condition established, at worst, that Camacho could not work around fiberglass. Moreover, the evidence establishes that Pemco viewed Camacho as being unable to work around fiberglass, and there is no evidence in the record that Pemco regarded his condition as having broader implications. The undersigned has already concluded that a restriction from exposure to fiberglass does not amount to a disability under the ADA; therefore, Camacho has failed to satisfy the ADA's alternative means of establishing a disability. 42 U.S.C. at § 12102(2); *see also **Murphy v. United Parcel Svc., Inc.***, 527 U.S. 516, 525 (1999) (holding that being "regarded as unable to perform only a particular job . . . is insufficient, as a matter of law, to prove that [the plaintiff] is regarded as substantially limited in the major life activity of working"); ***Hilburn v. Murate Elec. N. Am., Inc.***, 181 F.3d 1220, 1229 (11th Cir. 1999) (noting that "the record-of-impairment standard is satisfied only if she actually suffered a physical impairment that substantially limited one or more of her major life activities).

In conclusion, Pemco has established the absence of a genuine, material factual dispute. Moreover, drawing all inferences in Camacho's favor, the undersigned concludes that he has failed to establish that he is disabled, and he cannot therefore demonstrate a *prima facie* case of discrimination under the ADA. Therfore, Pemco has met its burden of establishing entitlement to judgment as a matter of law. Pemco is entitled to summary judgment on Camacho's ADA claim.

**E.**     ***Camacho's Claim of Race/National Origin Discrimination***

Camacho contends that Pemco discriminated against him because he is an Asian-American and, more specifically, a Filipino.  (Doc. # 1; Pl's Dep. 83, 86, 101-04, 106, 111-12, 132-33, 147).  He contends that he was assigned undesirable tasks and that two of his supervisors verbally harassed him.  *Id.*  Furthermore, he contends that he was disciplined differently than a co-worker, and he arguably contends that he was wrongfully terminated.  *Id.*

**1.     Facts Relevant to Camacho's Claims Regarding His Disparate Treatment and Hostile Work Environment claims.**

Camacho relies on the following facts, gleaned from a meticulous review of his deposition testimony, to prove that he was the victim of race or national origin discrimination:

1.     From approximately November 2003 until May 2004, Camacho's supervisor, Gary Cooper ["Cooper"], made two derogatory comments to Camacho, one of which criticized Camacho for being slow (R. 85).  Other than the reference to Camacho's speed, Camacho does not recall the substance of the comments.  *Id.*

2.     On Camacho's third day working under Cooper, Cooper issued Camacho a written warning, though Camacho provided no other details regarding the relevant circumstances or the substance of the warning (Pl's Dep. 89).

21

3.     Cooper closely supervised Camacho and two foreign-born co-workers, who may or may not have been the only foreign-born workers on Camacho's work crew, more closely than he supervised those workers whom Camacho perceived to be Cooper's friends (Pl's Dep. 101-02).

4.     Camacho was given a written reprimand for a mistake he made though the co-worker who was also involved in the incident, Gary Riddle, with whom Camacho frequently worked and whose race, national origin and work record are not in evidence, received only a verbal reprimand (Pl's Dep. 90-96).

5.     Between August 2004 and November 2004, Camacho's subsequent supervisor, Dewayne Music ["Music"], who became Camacho's supervisor in May 2004, also made "one or two" derogatory comments, though Camacho does not recall the substance of these comments (Pl's Dep. 111).

6.     Music criticized Camacho for being slow and described him as capable of performing only menial tasks (Pl's Dep. 115).  A co-worker of Camacho's overheard the comment and teased Camacho for being limited to only menial tasks (Pl's Dep. 116).

7.     During the course of supervising Camacho, when criticizing his pace, Cooper and Music may or may not have correlated Camacho's speed with his status as a Filipino (Pl's Dep. 112).  Specifically, Camacho is "about 70 percent" sure that they made reference to his national origin.  *Id.*

8.     Cooper and Music assigned Camacho and the two previously-mentioned,

22

foreign-born co-workers primarily to jobs Camacho described as the "dirtiest" available, though others on his crew were also assigned to those jobs and Camacho was assigned to other jobs as well (Pl's Dep. 131-35, 139). Camacho never specified which jobs Music assigned him to that were dirty, but he did state that Cooper assigned him primarily "to the cargo and to areas that are, you know, tight and uncomfortable place [sic] to be in." (Pl's Dep. 83).

2.      **Analysis**

It is axiomatic that to succeed in demonstrating a *prima facie* case of race or national origin discrimination, whether it is a claim of harassment or disparate treatment in work assignments, the evidence must permit an inference that the alleged actionable employment practices are somehow related to the protected characteristic. 42 U.S.C. § 2000e-2(a) (prohibiting employment discrimination "*because of*" a person's "race, color, religion, sex, or national origin"); *see also* ***Wilson v. B/E Aerospace, Inc.***, 376 F.3d 1079 (11th Cir. 2004) (noting the requirement that a plaintiff alleging disparate treatment demonstrate that she was treated differently than similarly situated persons not in her protected class); ***Miller v. Kenworth of Dothan, Inc.***, 277 F.3d 1269, 1275 (11th Cir. 2002) (setting forth the requirements for a *prima facie* case of a hostile work environment claim).

Without deciding whether the employment practices alleged are actually actionable - a dubious proposition - the evidence before the court would not permit a reasonable fact

finder to conclude that Camacho's race or national origin played any role in the actions about which Camacho now complains. On the contrary, to draw that conclusion based on the materials before the court would require a fact finder to make assumptions and perhaps even speculate about the motives of Camacho's supervisors and his co-workers.[9]

---

[9]That Camacho has allowed himself to become a victim of a distorted rationale is spectacularly illustrated by the following two exchanges between Camacho and Pemco's attorney at Camacho's deposition:

> Q.    Are you contending that Mr. Cooper was giving you these job assignments based on your national origin?
> A.    Yes, because that night, just being on the first day with him, he already warned me. He was intimidating me.
> Q.    What do you mean by "he already warned me"?
> A.    He said I'm slow.
> Q.    Explain to me how him saying that you're slow has anything to do with you being Philippino [sic].
> A.    Well, probably because I am not born and raised in America, the way the American individual is being raised, the tradition, the culture, the discipline is being imparted to each and every one. He kind of expect [sic] that from a person, to a person like me, but since I'm foreign born, he - - to him, I do not meet that classification. And to him, I am not worth.
> Q.    You are not what, I'm sorry?
> A.    Not worth.
> Q.    I don't understand what you just said. Not - -
> A.    Not worth being in the same category as an American, like, you know - -.

(Pl's Dep. 84, 85).

> A.    . . . And all of a sudden [Music] said, "So you're a big man now?" I don't understand. I didn't say anything, but I was just asking for a job. And he said, "Oh, so you're a big man now?" I don't know.
> Q.    And that was offensive to you?
> A.    Yes.
> Q.    And did you think that had anything to do with you being Philippino [sic]?
> A.    Yes.

24

To allow Camacho's claims to proceed to a jury would expose the judiciary to the public perception that anyone in a protected class who believes he is being treated unfairly at work can sue his employer for discrimination with no reliable evidence that the adverse treatment has anything to do with the protected characteristic. Cooper and Music may not have been easy to work for, and Camacho may have been targeted for unfavorable work assignments, but the record does not support the conclusion that Camacho's national origin factored into their decision making. His uncertain recollection that they may have made comments that he was slow because he was Filipino is simply not sufficient. Moreover, Camacho failed to identify a similarly situated worker not in his protected class who was treated differently.[10] In fact, Camacho actually identified two white employees (whose work history is not in evidence) who shared his complaints about the work assignments Cooper and Music doled out (276-79).

---

| | |
|---|---|
| Q. | And connect those for me, because I don't see - - |
| A. | Well, the perception of a foreigner is somebody probably, in his mind or somebody's mind who is discriminatory, that a foreigner could not understand the work being asked, the procedure that needs to be followed, the safety that needs to be implemented. I believe that they could not grasp the - - even a foreigner can outperform their abilities. |
| Q. | And that relates to you being a big man? |
| A. | A foreigner. |
| Q. | A big man? Is that what that means? |
| A. | In all the aspects that we have just discussed. |

(Pl's Dep. 206-07).

[10]As a more basic matter, the record is not sufficient to evaluate how exactly Camacho is situated let alone compare Camacho with his fellow employees.

25

Also, the fact that Camacho and two foreign-born co-workers were assigned to undesirable tasks does not implicate unlawful discrimination without, at the very least, reliable evidence of the ethnic makeup of Camacho's work crew.  Again, Camacho expects the fact finder to rely on his uncertainties in that regard, which this court should not allow.

Furthermore, the suggestion in his complaint and his assertion at his deposition that his race or national origin played a role in his termination are unsupported.  The record does not allow for an inference that Battcher, whom the record identifies as the sole decision maker with respect to Camacho's termination, based his decision to fire Camacho on anything other than his belief the Camacho could not work in an atmosphere that put him at risk of exposure to fiberglass.

In summary, the undersigned has afforded Camacho the benefit of every doubt, has resolved every possible conflict and drawn every reasonable inference in his favor, and can only conclude that summary judgment should be granted in favor of Pemco.  Pemco has met its burden.  No genuine dispute of material fact exists, and Pemco is entitled to judgment as a matter of law.

## IV.  CONCLUSION

Therefore, it is the RECOMMENDATION of the Magistrate Judge that Pemco's motion for summary be GRANTED and that judgment be entered in its favor on all of Camacho's claims.  It is further

ORDERED that the parties are DIRECTED to file any objections to the said

Recommendation on or before 27 September, 2006. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation objected to. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a *de novo* determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. ***Nettles v. Wainwright***, 677 F.2d 404 (5th Cir. 1982). *See **Stein v. Reynolds Securities, Inc.**, 667 F.2d 33 (11th Cir. 1982). *See also **Bonner v. City of Prichard***, 661 F.2d 1206 (11th Cir. 1981) (*en banc*) (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on 30 September 1981).

DONE this 13th day of September, 2006.


/s/ Vanzetta Penn McPherson
VANZETTA PENN MCPHERSON
UNITED STATES MAGISTRATE JUDGE